**David Anthony RUNYON, Petitioner,**

v.

**UNITED STATES of America, Respondent.**

**CIVIL NO. 4:15cv108 [ORIGINAL CRIMINAL NO. 4:08cr16–3]**

United States District Court, E.D. Virginia, **Newport News Division.**

Signed 01/19/2017

---

Michele J. Brace, Esquire, Virginia Capital Representation Resource Center, 2421 Ivy Road, Suite 301, Charlottesville, VA 22903, Dana C.H. Chavis, Esquire, Federal Defender Services of Eastern Tennessee, 800 S. Gay Street, Suite 2400 Knoxville, TN 37929, for Petitioner.

Brian J. Samuels, Lisa R. McKeel, Jeffrey A. Zick, Blair C. Perez, United States Attorney's Office, 721 Lake Front Commons, Suite 300, Newport News, VA 23606, for Respondent.

## OPINION

REBECCA BEACH SMITH, CHIEF JUDGE

This matter comes before the court on the Motion Under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct a Sentence ("Motion"), filed by David Anthony Runyon ("Petitioner") on February 4, 2016. ECF No. 511.[1] Further before the court are the Petitioner's First Motion for Discovery, filed on December 9, 2015, ECF No. 491, and Second Motion for Discovery, filed on April 1, 2016. ECF No. 530. All matters have been fully briefed and are ripe for decision. For the reasons contained herein, the First Motion for Discovery is **DENIED**, and the Second Motion for Discovery is **DENIED**. The Motion to Vacate brought pursuant to 28 U.S.C. § 2255 is **DENIED**.

## I. FACTUAL BACKGROUND [2]

On April 29, 2007, Cory Allen Voss ("Voss"), an officer in the United States Navy, was murdered. At the time, Voss was married to Catherina Voss ("Cat"), and the couple had two children, ages eight and seven. He was stationed out of Norfolk Naval Base, and lived in Newport News, Virginia, with his wife and children. On April 29, 2007, Voss returned home from a twenty-four hour shift aboard the USS Elrod, where he served as the Communications Officer. That night, Cat asked Voss to go to the ATM at Langley Federal Credit Union ("LFCU") in Newport News, Virginia. The next morning, Voss was found dead in his truck, after being shot five times with a .357 revolver as part of a murder-for-hire conspiracy. The facts neither start nor end here.

Testimony presented at trial revealed that in 2006, while Voss was at sea on a six-month deployment, Cat began having an extramarital affair with Michael Draven ("Draven"). After Voss returned home from that deployment, Cat and Cory Voss began experiencing financial difficulties, and the affair between Cat and Draven remained ongoing. Cat had no independent source of income, and Draven had no regular employment, but earned some money from participating in experimental clinical drug studies. Cat and Draven realized that if they were to stay together, and have the money to live the lavish lifestyle they wanted, they needed to get rid of Voss. As a member of the United States Navy, Voss had a life insurance policy through the Office of Servicemember's Group Life Insurance ("SGLI"), which named Cat as the primary beneficiary. Once Voss was dead, Cat would receive the $400,000 SGLI life insurance policy benefit, together with other Navy spousal benefits.

Cat and Draven decided that the best way to accomplish their goal was to hire someone to commit the actual murder. Draven had met David Anthony Runyon ("Runyon") while participating in experimental clinical drug trials, and Draven now reached out to Runyon about joining the conspiracy. Runyon was a former police officer and former member of the United States Army, as well as a firearm enthusiast. Runyon agreed to act as the triggerman, in exchange for payment. Once Runyon agreed to participate, phone records show that the defendants began to communicate and plan how to commit the crime.

---

1. The Petitioner filed his original Motion under 28 U.S.C. § 2255 on October 5, 2015, ECF No. 478, after which he filed an amended Motion on February 4, 2016. ECF No. 511. This amended Motion is the operative pleading. See infra Part II.

2. The following is a summary of the voluminous evidence presented to the jury, both through testimony and exhibits, during the guilt phase of trial. The appellate process is complete, and the case is now on collateral review. See infra Part II.

On April 20, 2007, Cat Voss opened an account with LFCU, into which she deposited only five dollars. On April 29, 2007, the day of the murder, Runyon bought a .357 magnum Taurus revolver from George Koski in Morgantown, West Virginia, where Runyon was then living. Koski testified that he wrote down Runyon's driver's license number and phone number, and he also provided Runyon with some old ammunition. Koski further testified that the type of gun he sold Runyon could shoot both .357 magnum and .38 special cartridges. That same day, Runyon drove from Morgantown to Newport News, Virginia, to complete his part of the crime. He stopped at payphones along the way, including one at a Newport News Waffle House, to communicate with Draven, and Draven provided him with identifying information about Voss's truck. Runyon wrote down this information on a map of the Hampton Roads area, which police later discovered in Runyon's car. Phone records also indicate multiple calls between Draven and Cat Voss during this same time span.

Later on the night of April 29, 2007, around 11:00 p.m., Cat sent Voss to the ATM at LFCU. At approximately 11:31 p.m., Voss attempted a transaction but entered the wrong personal identification number. Surveillance footage and phone records reveal that Voss was talking to Cat on his cell phone at this time. At around 11:33 p.m., while Voss was still at the ATM, video shows that an assailant wearing a black hoodie climbed into Voss's truck. Voss reentered his truck at around 11:36 p.m. and began to drive away from the ATM, before returning at approximately 11:41 p.m. to attempt three withdrawals. All the withdrawals were denied for insufficient funds, because unbeknownst to Voss, Cat had placed only five dollars in the account. Voss then got back in his truck and drove away. He was found dead in his truck the next morning in a nearby parking lot. He had been shot five times, with three of the shots being fatal. Four hollow-point bullets and one jacket were recovered. The bullets were identified as .38 class, which can be used with guns capable of firing .357 magnum and .38 special cartridges.

Just a few days after the murder, Runyon checked back into a clinical drug study, and ordered online a stainless steel bore brush, which is used to clean the inside of the barrel of a gun, to be shipped to his West Virginia address, but under a false name. Expert testimony revealed this type of brush can impact examinations that attempt to link bullets to a specific gun. Testimony also revealed that in the Fall of 2007, Runyon had a friend pawn his .357 Taurus magnum revolver several times. Then, in December 2007, Runyon instructed his friend to retrieve the firearm from the pawn shop one last time, and to give the gun back to him. The police were unable to locate the gun after its return to Runyon.

While the police were beginning the investigation into the crime, the defendants were working together to hide evidence of the murder. Although Cat had received an initial $100,000 death gratuity benefit from the United States Navy, which she and Draven quickly spent, she had yet to receive the $400,000 life insurance benefit on Voss. In order to receive the full payout, Cat had to clear herself from suspicion, and emails and wiretaps showed that the defendants coordinated amongst themselves to align their alibis and hide their relationships with each other from the investigators.

During police interviews, the defendants gave conflicting stories and attempted to obstruct the investigation. Runyon denied owning any firearms, and he was unable to confirm his whereabouts on April 29 and 30, 2007. All of the parties denied the

relationship between Draven and Cat for several months, although Draven did eventually admit the affair to the police.[3] Both Draven and Runyon stated they had met or called each other from a Waffle House in Newport News during the Spring of 2007. Draven further admitted that Runyon used the payphone there to talk with him on the night of the murder, although Draven claimed that Runyon stopped at the Waffle House on his way to an out-of-state fishing trip.

In December 2007, nearly eight months after the murder, police executed search warrants in West Virginia for Runyon's residences, vehicle, and storage unit, and the contents of the search were introduced during the guilt phase of trial. In the console of Runyon's car, agents found a map of Newport News, Virginia, on which Runyon had written the following: "Langley Federal Credit Union, 97 grey Ford Ranger, FL hubcap missing, tailgate down, J. Morris Blvd, Cory." The description of the Ford Ranger matched the description of Voss's truck, and J. [Clyde] Morris Boulevard is a street near the LFCU that Voss went to on the night he was murdered. Also found with the map was a photograph of Cat and Draven, with their names, addresses, and social security numbers written on the back.

In Runyon's residence, the investigators located a shopping list written by Runyon, which included a taser, Spyderco knife, tarp, trash bag, boots, gloves, military-style pants, and a black hoodie. Runyon had also written on that list the location of LFCU, and travel time and mileage from Morgantown, West Virginia, to Newport

News, Virginia. Although Runyon had apparently requested a payment of five hundred dollars ($500) up front for the murder, a Western Union receipt indicated that Runyon received two hundred seventy-five dollars ($275) from Draven's brother, Randy Fitchett, on June 1, 2007. Fitchett testified, and while he denied that he sent the money order, he recalled going with Draven to send the money order to a friend of Draven's. Additionally, the police found boxes of .38 special and .357 magnum bullets in the basement of Runyon's former residence.[4] Five of the Winchester .357 magnum hollow-point bullets were missing from the box, and medical reports revealed that Voss had been shot five times by hollow-point .38 class bullets. Expert witness testimony provided that .38 class bullets include .357 magnum and .38 special bullets. Multiple witnesses also testified that Runyon had bragged about killing Voss, or a military member or other unidentified person, for money.

In February 2008, a five-count Indictment was returned against Runyon, Cat, and Draven. Although Cat pled guilty in exchange for a life sentence, the above facts were established through evidence and testimony during the trial against Runyon and Draven. The jury then found Runyon guilty of Conspiracy to Commit Murder for Hire, Carjacking Resulting in Death, and Murder with a Firearm in Relation to a Crime of Violence.

## II. PROCEDURAL HISTORY

On February 13, 2008, a federal grand jury returned a five-count Indictment

---

3. Cat admitted the relationship when she pled guilty, as set forth in her Statement of Facts accompanying her plea agreement. Case No. 4:08cr16–1, ECF Nos. 69, 70. Both the plea agreement and Statement of Facts were admitted into evidence by defense counsel, during the mitigation phase of trial. Def. Exs. 4, 7.

4. At the time of the search, Runyon had moved to a new address in Morgantown, West Virginia. Agents searched both Runyon's current and former residences, and the residents at his former address indicated that the bullets found in the basement belonged to Runyon.

against the Petitioner and his co-defendants, Michael Draven and Catherina Voss, in the murder of Cat Voss's husband, Cory Voss. ECF No. 3. The Indictment charged the defendants with Conspiracy to Commit Murder for Hire, in violation of 18 U.S.C. § 1958(a) (Count One); Carjacking Resulting in Death, in violation of 18 U.S.C. §§ 2119 and 2 (Count Two); Bank Robbery Resulting in Death, in violation of 18 U.S.C. §§ 2113(a), (e), and 2 (Count Three); Conspiracy to Commit Robbery Affecting Commerce, in violation of 18 U.S.C. § 1951(a) (Count Four); and Murder with a Firearm in Relation to a Crime of Violence, in violation of 18 U.S.C. §§ 924(j) and 2 (Count Five). Id.

The Indictment also included a Notice of Special Findings for the death penalty, pursuant to 18 U.S.C. §§ 3591 and 3592. Id. at 13–14. The Notice set out the statutory requirements for the death penalty: the defendants were more than eighteen years old at the time of the offense; there was the requisite intent to cause death, serious bodily injury, or engage in acts of violence using lethal force or knowingly creating a grave risk of death; and there were statutory aggravating factors. Id. at 13. As to Counts One, Two, Three, and Five, all three defendants were found to meet the statutory aggravating factors of having "committed the offense as consideration for the receipt, or in the expectation of the receipt, of anything of pecuniary value," and having "committed the offense after substantial planning and premeditation to cause the death of a person." Id. at 13–14. Additionally, for those same counts, the grand jury found Cat Voss and Draven satisfied the statutory aggravating factor of having "procured the commission of the offense by payment, or promise of pay-

ment, of anything of pecuniary value." Id. at 14.

On March 4, 2008, Lawrence Woodward and John Babineau were appointed to represent the Petitioner. On July 17, 2008, the government filed its Notice of Intent to Seek a Sentence of Death against the Petitioner. ECF No. 67. The government also filed a Notice stating that it would not seek the death penalty against Draven. Case No. 4:08cr16–2, ECF No. 68. Cat Voss pled guilty to all five counts the following day on July 18, 2008.

On February 13, 2009, Babineau withdrew from the Petitioner's case due to a conflict of interest, and attorney Stephen Hudgins was appointed. ECF No. 161. The Petitioner filed various pre-trial motions and reports,[5] and on June 30, 2009, the jury trial against the Petitioner and Draven commenced. The first two days consisted of voir dire, and the jury was impaneled on July 2, 2009, after which opening statements and the presentation of evidence began. On July 15, 2009, at the conclusion of all evidence, the court dismissed Count Three, pursuant to Federal Rule of Criminal Procedure 29. On July 17, 2009, the jury found the Petitioner and Draven guilty as to Counts One, Two, and Five, and not guilty as to Count Four. Verdict Form, ECF No. 245, attached hereto as Exhibit A. On July 22, 2009, the trial continued with the eligibility phase, in which the government argued that the Petitioner was eligible to receive the death penalty. The jury found that the Petitioner intentionally killed Cory Voss. Special Verdict Form—Eligibility Phase, ECF No. 255, attached hereto as Exhibit B. The jury also found two statutory aggravators: (1) the Petitioner "committed the offense in consideration for the receipt of, or in

---

5. Due to the large volume of filings, the court will not review all the motions and reports at this point. To the extent the filings relate to

this Motion, they will be discussed at such point as they are relevant to the claims for relief.

expectation of the receipt, of anything of pecuniary value"; and (2) the Petitioner "committed the offense after substantial planning and premeditation to cause the death of a person." Id. On August 19, 2009, the penalty phase of the trial commenced. On August 27, 2009, the jury returned a recommendation for death on Counts One and Five, and life imprisonment on Count Two. Special Verdict Form—Selection Phase, at 5, ECF No. 291, attached hereto as Exhibit C. The jury found four non-statutory aggravating factors. Id.[6] The jury also found two statutory mitigating factors and eight non-statutory mitigating circumstances proposed by defense counsel, along with finding three mitigating factors of their own accord. Id.[7] On December 4, 2009, pursuant to the jury's verdict, the Petitioner was sentenced to death for Counts One and Five and to life

imprisonment without the possibility of release for Count Two. ECF No. 313.[8]

The Petitioner timely filed an appeal, and on February 25, 2013, the Fourth Circuit Court of Appeals affirmed his conviction and sentence. United States v. Runyon, 707 F.3d 475 (4th Cir. 2013). On October 6, 2014, the Supreme Court denied his petition for writ of certiorari. Runyon v. United States, —— U.S. ——, 135 S.Ct. 46, 190 L.Ed.2d 28 (2014) (No. 13–254). The Petitioner filed his Motion Under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct a Sentence on October 5, 2015. ECF No. 478. The government filed its Response on January 11, 2016, ECF No. 497, and the Petitioner filed his Reply on March 28, 2016. ECF No. 526.

On December 9, 2015, the Petitioner filed his First Motion for Discovery. ECF No. 491. The government submitted its

---

6. The non-statutory aggravating factors found by the jury were that the Petitioner (1) caused injury, harm, and loss to the victim, and the victim's family and friends; (2) utilized training, education, and experience gained during criminal justice college courses, his time in the Kansas National Guard, his work as a law enforcement officer, and his experience as a member of the United States Army; (3) engaged in acts of physical abuse towards women; and (4) demonstrated a lack of remorse. Special Verdict Form—Selection Phase, at 1–2, ECF No. 291.

7. The statutory mitigating factors found by the jury were that (1) the Petitioner did not have a serious criminal record, and (2) other persons equally culpable in the crime will not be punished by death. Special Verdict Form—Selection Phase, at 1–2, ECF No. 291.

The non-statutory mitigators presented by defense counsel, and found by the jury, were that (1) the Petitioner will serve a sentence of life in prison without the possibility of release, if not sentenced to death; (2) the Petitioner has worked and been legally employed for all of his life; (3) the Petitioner committed acts of kindness and generosity for his neighbors and community; (4) the Petitioner grew up, witnessed, and experienced domestic violence

and parental conflict until his mother and biological father separated; (5) the Petitioner's son will suffer emotional harm, if the Petitioner is executed; (6) the Petitioner's mother will suffer emotional harm, if the Petitioner is executed; (7) the Petitioner served his country as a member of the United States Army and was honorably discharged; and (8) the Petitioner graduated from high school, earned an associate of arts degree, and took further college courses. Id. at 3–4.

The jury also found the following three non-statutory mitigating factors of their own creation: (1) the Petitioner continued to witness and experience domestic violence and parental conflict/abuse from his mother and adoptive father; (2) the Petitioner's brother will suffer emotional harm, if the Petitioner is executed; and (3) the Petitioner was given the impression that Cory Voss was molesting his own daughter. Id. at 4.

8. Cat Voss was sentenced to life in prison on Counts One, Two, Three, and Five, and twenty (20) years imprisonment on Count Four. Case No. 4:08cr16–1, ECF No. 127. Draven was sentenced to life in prison on all counts of conviction. Case No. 4:08cr16–2, ECF No. 304. Both of these cases are closed, and the convictions and sentences are final.

Response on January 15, 2016, ECF No. 500, and the Petitioner filed his Reply on January 29, 2016. ECF No. 506. Both the Response and the Reply to the Discovery Motion incorporated the Response and Reply to the § 2255 Motion. On April 1, 2016, the Petitioner filed his Second Motion for Discovery. ECF No. 530. The government filed a Response on April 8, 2016, ECF No. 532, and the Petitioner submitted a Reply on April 13, 2016. ECF No. 533.

On February 4, 2016, the Petitioner filed an amended Motion Under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct a Sentence. The government filed its Response to the amended Motion on April 22, 2016. The Petitioner submitted his Reply to the amended filings on July 7, 2016. As Fourth Circuit precedent provides that an amended pleading supersedes the original, the court will now consider the amended Motion and corresponding Response and Reply. See Young v. City of Mount Ranier, 238 F.3d 567, 573 (4th Cir. 2001) ("[A]n amended pleading supersedes the original pleading, rendering the original pleading of no effect.").[9] The court will also consider the First and Second Discovery Motions in the same sections as the claims to which each discovery request relates.

## III. STANDARDS OF REVIEW

### A. MOTIONS BROUGHT PURSUANT TO 28 U.S.C. § 2255

A prisoner may challenge a sentence imposed by a federal court, if (1) the sentence violates the Constitution or laws of the United States; (2) the sentencing court lacked jurisdiction to impose the sentence; (3) the sentence exceeds the statutory maximum; or (4) the sentence "is otherwise subject to collateral attack." 28 U.S.C. § 2255(a). A sentence is "otherwise subject to collateral attack" if a petitioner shows

that the proceedings suffered from " 'a fundamental defect which inherently results in a complete miscarriage of justice.' " United States v. Addonizio, 442 U.S. 178, 185, 99 S.Ct. 2235, 60 L.Ed.2d 805 (1979) (quoting Hill v. United States, 368 U.S. 424, 428, 82 S.Ct. 468, 7 L.Ed.2d 417 (1962)).

The petitioner bears the burden of proving one of those grounds by a preponderance of the evidence. See Miller v. United States, 261 F.2d 546, 547 (4th Cir. 1958). If he satisfies that burden, the court may vacate, set aside, or correct the sentence. 28 U.S.C. § 2255(b). However, if the motion, when viewed against the record, shows that the petitioner is entitled to no relief, the court may summarily deny the motion. Raines v. United States, 423 F.2d 526, 529 (4th Cir. 1970).

### 1. Ineffective Assistance of Counsel

In cases where a petitioner claims to have received ineffective assistance of counsel as grounds for relief, a petitioner must show by a preponderance of the evidence that (1) the attorney's performance was deficient; and (2) such deficient performance prejudiced the petitioner by undermining the reliability of the judgment against him. Strickland v. Washington, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

To show deficient performance, counsel's actions or omissions must be measured against what "an objectively reasonable attorney would have done under the circumstances existing at the time of the representation." Savino v. Murray, 82 F.3d 593, 599 (4th Cir. 1996); see Lawrence v. Branker, 517 F.3d 700, 708–09 (4th Cir. 2008) (noting that this is a "difficult" showing for a petitioner to make). The court

---

**9.** All citations in this Opinion will refer to the amended pleadings unless otherwise specified.

must attempt to "eliminate the distorting effects of hindsight," and instead "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Strickland, 466 U.S. at 689, 104 S.Ct. 2052.

To demonstrate prejudice, a petitioner must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694, 104 S.Ct. 2052. In doing so, a petitioner "must demonstrate that the error worked to his 'actual and substantial disadvantage,' not merely that the error created a 'possibility of prejudice.'" Satcher v. Pruett, 126 F.3d 561, 572 (4th Cir. 1997) (quoting Murray v. Carrier, 477 U.S. 478, 494, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986)). Because a petitioner must satisfy both parts of the Strickland test, a failure to carry the burden of proof as to one prong precludes relief and relieves the court of the duty to consider the other. Strickland, 466 U.S. at 700, 104 S.Ct. 2052.

Due process of law also requires that a defendant receive effective assistance of counsel on direct appeal. Evitts v. Lucey, 469 U.S. 387, 396–97, 105 S.Ct. 830, 83 L.Ed.2d 821 (1985). As with trial counsel, effectiveness of appellate counsel is evaluated under the two prongs of Strickland. See Smith v. Murray, 477 U.S. 527, 535–36, 106 S.Ct. 2661, 91 L.Ed.2d 434 (1986). To determine effectiveness of appellate counsel, a court must evaluate whether counsel failed to raise "a particular nonfrivolous issue [that] was clearly stronger than issues that counsel did present" on direct appeal. Smith v. Robbins, 528 U.S. 259, 288, 120 S.Ct. 746, 145 L.Ed.2d 756 (2000). However, appellate counsel need not raise every nonfrivolous claim in their brief. See id.; Jones v. Barnes, 463 U.S. 745, 753, 103 S.Ct. 3308, 77 L.Ed.2d 987 (1983) ("A brief that raises every colorable issue runs the risk of burying good arguments."). As to

prejudice, the Petitioner must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694, 104 S.Ct. 2052.

## 2. Procedural Default

 Claims that could have been "fully and completely addressed on direct review based on the record" are considered procedurally defaulted, if raised for the first time during collateral review. Bousley v. United States, 523 U.S. 614, 622, 118 S.Ct. 1604, 140 L.Ed.2d 828 (1998). In order to obtain collateral relief based on issues that could have been raised on direct appeal, but were not, the movant must ordinarily show "'cause' excusing his ... procedural default," and "'actual prejudice' resulting from the errors of which he complains." United States v. Frady, 456 U.S. 152, 167–68, 102 S.Ct. 1584, 71 L.Ed.2d 816 (1982); see also Massaro v. United States, 538 U.S. 500, 504, 123 S.Ct. 1690, 155 L.Ed.2d 714 (2003) ("[C]laims not raised on direct appeal may not be raised on collateral review unless the petitioner shows cause and prejudice."). "The existence of cause for a procedural default must turn on something external to the defense, such as the novelty of the claim or a denial of effective assistance of counsel." United States v. Mikalajunas, 186 F.3d 490, 493 (4th Cir. 1999). Prejudice is shown when the alleged errors worked to the petitioner's "actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." Frady, 456 U.S. at 170, 102 S.Ct. 1584.

 Even in the absence of cause for the procedural default and resulting prejudice, a defendant may proceed with a collateral attack, if he is able to show that a fundamental miscarriage of justice would result were his claim denied. United States v. Maybeck, 23 F.3d 888, 892 (4th Cir. 1994). To demonstrate a "miscarriage of

justice," the petitioner "must show actual innocence by clear and convincing evidence." United States v. Williams, 396 Fed.Appx. 951, 953 (4th Cir. 2010) (unpublished); Mikalajunas, 186 F.3d at 493.

### 3. Bar on Relitigating Claims Brought on Direct Appeal

A petitioner is generally not permitted to relitigate issues brought on direct appeal in a collateral attack. Boeckenhaupt v. United States, 537 F.2d 1182, 1183 (4th Cir. 1976) (per curiam). Accordingly, courts may "refuse to reach the merits of a constitutional claim previously raised and rejected on direct appeal." Withrow v. Williams, 507 U.S. 680, 720–21, 113 S.Ct. 1745, 123 L.Ed.2d 407 (1993) (Scalia, J., concurring in part and dissenting in part) (collecting cases). Exceptional circumstances, however, such as an intervening change in the law, may warrant a departure from this law-of-the-case doctrine. See Davis v. United States, 417 U.S. 333, 342–47, 94 S.Ct. 2298, 41 L.Ed.2d 109 (1974) (holding that when relevant substantive law changed after the petitioner's trial and unsuccessful appeal, the petitioner could file a § 2255 motion for collateral relief based on the intervening change in the law); Jones v. United States, 178 F.3d 790, 796 (6th Cir. 1999) ("It is equally well settled that a § 2255 motion may not be employed to relitigate an issue that was raised and considered on direct appeal absent highly exceptional circumstances, such as an intervening change in the law.").

### 4. Retroactive Application of New Rules to Cases on Collateral Review

Generally, "new constitutional rules of criminal procedure will not be applicable to those cases which have become final before the new rules are announced." Teague v. Lane, 489 U.S. 288, 310, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989). There are two exceptions to this bar on retroactivity. First, "[n]ew substantive rules generally apply retroactively." Schriro v. Summerlin, 542 U.S. 348, 351, 124 S.Ct. 2519, 159 L.Ed.2d 442 (2004). The other exception is for " 'watershed rules of criminal procedure' implicating the fundamental fairness and accuracy of the criminal proceeding." Saffle v. Parks, 494 U.S. 484, 495, 110 S.Ct. 1257, 108 L.Ed.2d 415 (1990). Only if one of these exceptions is met may a court retroactively apply a new rule of criminal procedure to a case on collateral review.

### 5. Evaluation of New Claims Contained in Amended Pleadings

To be timely, a motion brought pursuant to 28 U.S.C. § 2255 must be filed within one year of the latest of

(1) the date on which the judgment of conviction becomes final;

(2) the date on which the impediment to making a motion created by governmental action in violation of the Constitution or laws of the United States is removed, if the movant was prevented from making a motion by such governmental action;

(3) the date on which the right asserted was initially recognized by the Supreme Court, if that right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

(4) the date on which the facts supporting the claim or claims presented could have been discovered through the exercise of due diligence.

28 U.S.C. § 2255(f).

In the instant case, the Petitioner properly amended his Motion, but the amended Motion was filed more than one year after his conviction became final. For the arguments that were raised for the first time in

the amended Motion, Rule 15 of the Federal Rules of Civil Procedure provides for "relation back of amendments to the original pleading under certain circumstances." United States v. Pittman, 209 F.3d 314, 317 (4th Cir. 2000). Such circumstances occur when "the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out—or attempted to be set out—in the original pleading." Fed. R. Civ. P. 15(c)(1)(B). Thus, in a collateral attack, a claim added by amendment relates back unless "it asserts a new ground for relief supported by facts that differ in both time and type from those the original pleading set forth." Mayle v. Felix, 545 U.S. 644, 650, 125 S.Ct. 2562, 162 L.Ed.2d 582 (2005).

## B. DISCOVERY FOR MOTIONS BROUGHT PURSUANT TO 28 U.S.C. § 2255

■ Discovery for motions brought pursuant to 28 U.S.C. § 2255 can occur only upon leave of the court, and after a showing of good cause by the Petitioner. Rule 6(a), Rules Governing Section 2255 Proceedings for the United States District Courts. According to Rule 6(b), "[a] party requesting discovery must provide reasons for the request. The request must also include any proposed interrogatories and requests for admission, and must specify any requested documents." Good cause for discovery is found " 'where specific allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is ... entitled to relief.' " Bracy v. Gramley, 520 U.S. 899, 908–09, 117 S.Ct. 1793, 138 L.Ed.2d 97 (1997) (quoting Harris v. Nelson, 394 U.S. 286, 300, 89 S.Ct. 1082, 22 L.Ed.2d 281 (1969)); see also

United States v. Roane, 378 F.3d 382, 402–03 (4th Cir. 2004) (clarifying that the good cause standard is met when a petitioner establishes a prima facie case for relief). Importantly, the petitioner must be able to point to specific factual allegations when making his request; he "may not use discovery to go on a 'fishing expedition' through the Government's files in search of evidence to support an imagined and fanciful claim." United States v. Lighty, No. CIV. PJM 12-3065, 2014 WL 5509205, at *3 (D. Md. Oct. 30, 2014) (citing United States v. Wilson, 901 F.2d 378, 381 (4th Cir. 1990)).

■ Once good cause is established, the district court has discretion to determine the scope and extent of discovery. See Bracy, 520 U.S. at 909, 117 S.Ct. 1793; see also Roane, 378 F.3d at 394 (using an abuse of discretion standard to review a district court's denial of discovery in a § 2255 case). A judge may "authorize a party to conduct discovery under the Federal Rules of Criminal Procedure or Civil Procedure, or in accordance with the practices and principles of law." Rule 6(a), Rules Governing Section 2255 Proceedings for the United States District Courts.

## IV. THE PETITIONER'S CLAIMS

The Petitioner has raised eighteen claims in his instant Motion, many with one or more subparts. He has also made requests for six different categories of discovery, including requests for both documents and interrogatories. The court will now address each of the eighteen claims in turn. The court will also address the arguments for discovery within the relevant section for each request.[10]

---

**10.** The court finds that based on the substantial amount of evidence presented and the extensive filings by both parties, there remain no factual disputes, and an evidentiary hearing is not necessary to resolve the Petitioner's claims.

### A. CLAIM ONE—DISHONEST LAW ENFORCEMENT OFFICERS INVOLVED IN CASE

In this claim, the Petitioner asserts that Robert Glenn Ford and Clifford Dean Posey, who assisted in the investigation of the Petitioner's case, were also engaged in criminally dishonest acts before and/or during participation in his case. Mot. at 11. He alleges that their involvement in his case denied him of his right to a fair trial, and that the government should have provided him with information about the charges against both individuals and about Posey's work in the government's investigation. Id. at 11–16. The Petitioner further argues that, if his trial counsel knew about the charges against Ford and Posey, trial counsel was ineffective for not taking appropriate action. Id. at 11, 14, 16. The Petitioner also seeks discovery of documents and records held by various agencies concerning both Ford and Posey, and he requests permission to propound corresponding interrogatories. First Mot. for Discovery at 26–29.

The United States asserts that this claim is procedurally defaulted, and, regardless of the default, lacks merit. Resp. at 20. In his Reply, the Petitioner asserts that the government never told his counsel about the charges against Ford and Posey, even during direct appeal. Reply at 10–11. He claims this prevented him from objecting or raising the issue on appeal, and, as such, the claim is not procedurally defaulted. Id.

#### 1. Robert Glenn Ford

■ The Petitioner alleges that Robert Glenn Ford, a former police officer who was appointed at the request of the Petitioner's trial counsel as an investigator for the defense, ECF Nos. 40, 41, was a "dirty cop," and that his involvement in a bribery scheme may have tainted the investigation in the Petitioner's case. Mot. at 11.

Records show that an informant, Marcus Adams, entered into a plea deal for the charge of Felon in Possession of a Firearm. United States v. Adams, 2:08cr103, ECF No. 37. As part of Adams's cooperation, he disclosed that Ford was involved in a scheme whereby Ford "accepted bribes from criminal defendants in exchange for making false representations to prosecutors and judges that the defendants had assisted him in homicide investigations," thereby leading to reduced sentences for the defendants. Id. at 1. On May 7, 2010, nearly six months after the Petitioner was sentenced and almost a year after his trial, Ford was indicted for these actions. United States v. Robert Glenn Ford, 2:10cr83, ECF No. 1. Ford's seven-day jury trial was held in October 2010, and he was sentenced on February 25, 2011. Id. ECF Nos. 57–60, 63, 66, 69, 87, 90. All of these proceedings were public and of record.

The Petitioner's appellate counsel filed their opening appellate brief on February 29, 2012, almost two years after Ford's indictment, and a year after sentencing. Appellate counsel had full benefit of knowledge of Ford's public indictment, trial, and sentencing. As such, the court is unconvinced that this claim could not have been discovered and raised at the time of appeal, and it finds that the claim is procedurally defaulted. However, the Petitioner argues that if appellate counsel knew about Ford's dishonest acts, then appellate counsel was ineffective for not raising this claim on appeal, and such ineffectiveness would excuse default. Mot. at 11. The court will now examine the merits of this claim. If it lacks merit, then the Petitioner will have failed to show the required prejudice for ineffective assistance of appellate counsel, and he will be unable to excuse the procedural default.

First, the Petitioner only speculates about what dishonest acts Ford may have been involved in with regard to Ford's investigation of the Petitioner's case. Id. at 12. The Petitioner theorizes that Ford may have filed a false report or taken a bribe from a witness, but the Petitioner can provide no evidence or example of these, or any other, dishonest acts by Ford in the investigation of the Petitioner's case. Id. Frankly, this argument is merely speculation, with no support in fact. There was no evidence or argument presented at Ford's seven-day trial, sentencing, or motions hearings, that in any way involved the Petitioner's case. See United States v. Robert Glenn Ford, 2:10cr83, Transcripts, ECF Nos. 61, 64, 73, 74, 77, 79, 96–103, 108–110, 112.

Further, the Petitioner's lead attorney, Lawrence Woodward, indicated that Ford and Sheila Cronin, a mitigation investigator, "worked very hard and did a good job investigating the case and [the Petitioner's] background." Mot. Attach. 6, ¶ 4. Cronin stated that she often provided Ford with a list of questions to ask witnesses. Id. Attach. 4, ¶ 3. The Petitioner's other attorney, Stephen Hudgins, also stated that, although he relied on Ford's and Cronin's witness interviews, he talked to the witnesses himself before and during the penalty phase. Id. Attach. 5, ¶ 8. In sum, defense counsel believed that Ford produced quality work, but counsel also provided questions for Ford to ask witnesses and interviewed witnesses themselves. Ford did not investigate the case alone, and counsel did not rely solely on Ford's reports.

Cronin also stated that she knew that Ford was "under considerable stress from the fall-out of the infamous 'Norfolk Four' case." Id. Attach. 4, ¶ 4. Presumably the Petitioner's defense team was on alert to watch over Ford's work, and yet counsel still found no reason to think that he was manipulating witnesses or performing any of the acts that the Petitioner now speculates occurred. Importantly, Ford's case involved his acceptance of bribes in exchange for lower sentences for defendants, and it was not a case where any judge or prosecutor was found to be corrupt. Ford was a person working for the Petitioner's trial counsel, at their request, under their supervision and direction, and with others of the Petitioner's defense team. The Petitioner offers no basis whatsoever why Ford would manipulate witnesses against him or try to harm his case.

 Additionally, the Petitioner argues that the government should have told defense counsel about Ford's conduct, as it would have caused defense counsel to question the reliability and honesty of Ford's reports to the Petitioner's counsel. Mot. at 12–13. He bases this argument on Fifth Amendment due process principles found in Berger v. United States, 295 U.S. 78, 55 S.Ct. 629, 79 L.Ed. 1314 (1935), and an argument that, by not providing trial counsel with this information, the government deprived the Petitioner of effective assistance of trial counsel. Mot. at 13–14. This argument is a bit far-fetched, but the court addresses it below.

As the Petitioner recognizes, the information the government had about Ford's misconduct at the time of the investigation was highly confidential and part of an ongoing criminal investigation not involving the Petitioner's case. Id. at 13 n.4. Ford was not a witness in the Petitioner's case. If anything, Ford would have been a defense witness, not a government witness, so there was no need for impeachment evidence. Ford had not been indicted at that time, and the government was still conducting its investigation. There was no reason that the government should have provided confidential information about the Ford investigation to the Petitioner's coun-

sel. Moreover, as reflected by the transcripts of Ford's trial, cited above, there was no evidence presented that even touched upon the Petitioner's case.

In sum, the Petitioner's conclusory, speculative statements do not show that he was harmed by Ford's involvement in his case, or that Ford's unrelated extortion scheme, in which he took bribes to reduce other defendants' sentences, affected the Petitioner or affected his Fifth Amendment right to a fair trial or his Sixth Amendment right to effective assistance of counsel. The Petitioner was not denied any constitutional rights here, and, as such, the court finds this claim has no merit. As this claim has no merit, the Petitioner fails to show any prejudice from appellate counsel's decision not to argue this claim on appeal, and he fails to overcome the procedural default.

 The Petitioner's claim for discovery about Ford is further without merit. To receive discovery, the Petitioner must show good cause. Good cause is shown, " 'where specific allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is … entitled to relief.' " Bracy, 520 U.S. at 908–09, 117 S.Ct. 1793 (quoting Harris, 394 U.S. at 300, 89 S.Ct. 1082).

The Petitioner is unable to meet this standard. To learn about the scope of Ford's criminal acts and when the government first knew or should have known about those acts, the Petitioner requests "[a]ll documents in the government's possession that both refer or relate to Robert Glenn Ford and this [the Petitioner's] case." First Mot. for Discovery at 29. The Petitioner has shown no cause, much less good cause, as to why this request would help him overcome procedural default or prove ineffective assistance of trial counsel. As Ford was a defense investigator, it would be the Petitioner's defense counsel

that knew of Ford's involvement in the Petitioner's case, not the government. While Ford participated in a criminally dishonest scheme to aid criminal defendants, as discussed above, there is no evidence or allegation of record that it in any way involved the Petitioner's case. See United States v. Robert Glenn Ford, 2:10cr83. The Petitioner fails to show how gaining access to the government's records about Ford will help in his request for relief, and the court declines to grant this discovery request.

### 2. Clifford Dean Posey

 The Petitioner next alleges that there was a second "dirty cop," Clifford Dean Posey, working on his case, and he argues Posey's involvement led to a due process violation. Mot. at 14. Posey was a special agent with the Bureau of Alcohol, Tobacco, and Firearms, and he was indicted on April 5, 2011, for embezzlement, money laundering, wire fraud, possessing or receiving stolen firearms, and false statements. United States v. Clifford Dean Posey, 3:11cr94, ECF No. 3. The Statement of Facts for Posey's case indicates that this conduct began in or around 2007, but was not known or identified by the government until around October 2010, well beyond the Petitioner's trial. Id. ECF No. 14. Posey was sentenced on September 16, 2011. Id. ECF No. 38.

As discussed above, the government argues that this claim about Posey is procedurally defaulted. Resp. at 20. The Petitioner's appellate counsel filed their opening brief on February 29, 2012, and the indictment against Posey was filed sealed on April 5, 2011, and unsealed on April 6, 2011. Posey was sentenced on September 16, 2011. Again, Posey's case is of public record. The court finds that, based on these dates, appellate counsel could have raised this claim on appeal, and the claim is procedurally defaulted.

The Petitioner, however; argues that appellate counsel was ineffective for not raising this claim on appeal, and that such ineffectiveness constitutes the cause and prejudice required to overcome default. Reply at 11. As such, the court will now examine the Petitioner's argument to determine if it has any merit. If it does, then the Petitioner may be able to show ineffective assistance of appellate counsel and overcome default.

Posey investigated Cory Voss's death, but did not testify at trial, and the Petitioner does not know the full extent of Posey's involvement. Mot. at 15. The Petitioner points to a trial exhibit where Posey is listed as the transcriber of a phone call and to a few unadmitted documents that contain Posey's name to support his belief that Posey "played a substantial role in investigating and preparing the evidence in this matter." Id. Posey's dishonest acts, however, were not discovered by the government, until over a year after the Petitioner's trial. Accordingly, the government did not have a duty to give anything to the defense prior to trial, nor did they even have anything to give.

This claim is also entirely speculative. Discovery during trial showed what work Posey had done on the Petitioner's case, and the records indicated this was minimal. The Petitioner presents unsupported theories as to what harmful acts he thinks Posey may have committed, Mot. at 15, but that is not enough for relief. The Petitioner can point to no specific harm, and is simply guessing that Posey may have converted firearms or falsified records, without indicating any such record or any shred of evidence to support this claim. The Petitioner does not make a claim for relief or show constitutional harm. Because the Petitioner fails to present a meritorious claim, he cannot show that appellate counsel was ineffective for not raising this claim on appeal, and he does not overcome default.

Not only does the court find this claim to be procedurally defaulted, it also finds that the Petitioner fails to show good cause for discovery. The Petitioner requests information from the government about Posey's involvement with his case and Posey's illegal activities. First Mot. for Discovery at 28. However, trial counsel already conducted discovery and received all documents that showed Posey's involvement with the Petitioner's case. The Petitioner fails to show good cause for further discovery, as he does not show how gaining access to the government's records will assist him in overcoming default or proving ineffective assistance of counsel. As with Ford, the court does not dispute that Posey engaged in criminally dishonest acts in other cases. The Petitioner does not articulate how this current global discovery request will yield additional information about Posey's role in his case. This appears to the court to be an overly broad "fishing expedition," and the Petitioner simply is not entitled to further discovery here.

### 3. Ineffective Assistance of Trial Counsel

The Petitioner briefly alleges that, if trial counsel knew of the investigations into the law enforcement officers, then they were ineffective for failing to take appropriate action. Mot. at 11, 14, 16. However, these brief allegations of ineffective assistance of trial counsel do not meet the deficiency and prejudice standard under Strickland. Even assuming counsel knew of the investigations, and nothing suggests they did, the court has already concluded that the claims have no merit. Thus, the Petitioner was not prejudiced by any decision trial counsel may have made not to further explore the issue.

### 4. Conclusion

The Petitioner has failed to overcome the procedural default on his due process claim about the involvement of Ford and Posey in his case. He has also failed to show that trial or appellate counsel were ineffective in their actions regarding Ford and Posey. For these reasons, Claim One is **DENIED.**

### B. CLAIM TWO—PROSECUTION FAILED TO DISCLOSE EXCULPATORY EVIDENCE ABOUT CO–DEFENDANT MICHAEL DRAVEN

In Claim Two, the Petitioner argues that the government failed to disclose evidence of co-defendant Draven's violent criminal past, in violation of the Fifth, Sixth, and Eighth Amendments. Mot. at 16. According to the Petitioner, this evidence would demonstrate that Draven had a particularly violent history, including sexual assaults against children. Id. at 16–17.[11] The Petitioner contends that the government should have turned this information over to defense counsel, as it would have been important to the mitigation strategy. Id. Specifically, the Petitioner alleges that such information "would have added substantial weight to the 'equally-culpable-co-defendant' mitigator found by the jury and . . . would have also reduced the weight of the 'abuse of women' aggravator." Id. at 16. The Petitioner believes that failure by the government to hand over this information violated his constitutional rights and the holdings in Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), Giglio v. United States, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972), and Kyles v. Whitley, 514 U.S. 419, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995). Mot. at 19. The government argues that this claim

is procedurally defaulted, and, regardless of the default, it has no merit. Resp. at 24. For the reasons set forth below, the court agrees.

Claim Two is **DENIED.**

### 1. Procedural Default

As this claim was not brought on direct appeal, the government argues it is procedurally defaulted. Id. at 24. The Petitioner argues in his Reply that this claim could not have been brought on direct appeal because it contains information that was not disclosed by the prosecution. Reply at 19; see Bousley, 523 U.S. at 622, 118 S.Ct. 1604 (petitioner's claim was defaulted because it could have been "fully and completely addressed on direct review based on the record" in the case). The Petitioner further argues that a successful Brady claim satisfies the cause and prejudice standard required to excuse default. Reply at 19–20 (citing Wolfe v. Clarke, 691 F.3d 410, 420 (4th Cir. 2012)).

The court does not agree with the Petitioner that this claim was unavailable on direct review. Information about Draven's past existed during the time of direct appeal, and, as mentioned by the Petitioner later in this claim, such information was cited in Draven's sentencing proceedings, which occurred on November 17, 2009. Case No. 4:08cr16–2, ECF No. 303. The Petitioner's appellate counsel filed their opening brief on February 29, 2012. As such, the court finds that had appellate counsel chosen to pursue this line of investigation, information about Draven's past was available and could have been discovered, and the claim could have been raised on appeal. Nevertheless, the Petitioner may still be able to overcome default, as a successful Brady claim would provide the

---

11. For the purpose of evaluating this claim, the court assumes that these allegations are true.

necessary cause and prejudice. The court will now conduct such an analysis.

## 2. Brady Claim

In Brady, the Supreme Court held that suppression by the prosecution of evidence material to the defendant's guilt or punishment violates due process. 373 U.S. at 87, 83 S.Ct. 1194. To make a successful Brady claim, the Petitioner must prove the following three elements: "[1] [t]he evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; [2] that evidence must have been suppressed by the State, either willfully or inadvertently; and [3] prejudice must have ensued." Banks v. Dretke, 540 U.S. 668, 691, 124 S.Ct. 1256, 157 L.Ed.2d 1166 (2004) (quoting Strickler v. Greene, 527 U.S. 263, 281–82, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999)). Prejudice for the final Brady requirement is met when the evidence is material. Id. "The evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." United States v. Bagley, 473 U.S. 667, 682, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985); see also Kyles, 514 U.S. at 435, 115 S.Ct. 1555 (describing materiality as "showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict"). This level of prejudice is also the prejudice required to overcome procedural default. Walker v. Kelly, 589 F.3d 127, 137 (4th Cir. 2009).

■■■ There is no question that the government did not provide the Petitioner's trial counsel with information about Draven's past. What the parties now debate is whether this information is material under Brady.[12] As to whether the information is material to the Petitioner's guilt, Draven's past crimes do not affect whether the Petitioner was involved with the murder of Cory Voss. In fact, Draven's past crimes have little relation to his own guilt for the murder of Cory Voss. Although the defense did argue the other co-defendants were bad actors who were attempting to blame the Petitioner for their crimes, the information about Draven's previous violent acts is unrelated to the murder of Cory Voss and fails to suggest that the Petitioner was not involved with the Voss murder. The court finds that even had this information been introduced during the guilt phase,[13] the extensive direct and circumstantial evidence about the Petitioner's involvement in the murder-for-hire cannot support any finding of a reasonable probability that the proceeding would have resulted in a different outcome.

When the police searched the Petitioner's house and car in December 2007, some eight months after the murder, they found a list of items, written in the Petitioner's handwriting, including a taser, Spyderco knife, tarp, trash bag, boots, gloves, military-style pants, and a black hoodie.[14] The list also mentioned the location of Langley Federal Credit Union ("LFCU") and a distance of three hundred eighty (380) miles and driving travel time of 6.25 hours from Morgantown, West Virginia, to New-

**12.** Although the parties do not argue the first prong of the test for a Brady violation, the court does not see how this evidence would be exculpatory or impeaching. Nevertheless, it will examine the arguments set forth regarding materiality.

**13.** The court is unsure how information about Draven's past crimes could even have been

introduced at the guilt stage, with Draven as a co-defendant who did not testify. See also supra note 12.

**14.** Video surveillance from the night of the murder shows an intruder wearing a black hoodie enter Cory Voss's truck while Cory Voss is at the ATM.

port News, Virginia. A map was located that contained identifying information about Cory Voss's car, and a Western Union receipt indicated that the Petitioner received $275 from Draven's brother on June 1, 2007. Telephone and email records showed extensive planning and communication by all three defendants, both before, during, and after the murder. The government established that the Petitioner had bought a .357 magnum revolver and ammunition the day of the murder, April 29, 2007, and then he drove from Morgantown, West Virginia, to Newport News, Virginia. A box of .357 bullets with five missing was found at the Petitioner's former residence in Morgantown, West Virginia. A video of the ATM at LFCU showed a man wearing a hoodie entering Cory Voss's car, and Cat Voss had already pled guilty and signed a statement of facts describing the murder of Cory Voss and the Petitioner's involvement.

 The next question is whether the evidence is material as to the Petitioner's sentence. The Petitioner's argument centers on how evidence of Draven's past would have influenced a jury during the penalty phase, particularly the weight given to the abuse of women aggravator and the equally culpable co-defendant mitigator. Mot. at 16. The Petitioner argues that the government introduced testimony and incident reports against him to provide support for the abuse of women aggravating factor, and his counsel could have done the same with the requested materials to show that Draven had an equally, if not more, violent past. Id. at 19. He believes at least one juror would have been influenced by knowing the government thought that the Petitioner, but not Draven with his more violent past, was deserving of death. Id. at 19–20.

This argument is a "red herring." First, the jury did find the equally culpable co-defendant mitigator, even without this extra evidence about Draven's history. Special Verdict Form—Selection Phase, at 2, ECF No. 291. The information about Draven may have added additional support for this mitigator, but it was clearly unnecessary because the jury did find this mitigating factor. Second, it is unclear how evidence of Draven's past would affect the abuse of women aggravator for the Petitioner. The past conduct of Draven and the Petitioner are separate and distinct. Just because Draven had a more violent past does not negate the Petitioner's violent criminal history. The court is unconvinced that a jury would not have considered the abuse of women factor to be serious in relation to the Petitioner, simply because Draven had past, separate violent acts from those of the Petitioner. Additionally, the Petitioner played a substantial role in the crime, and the evidence was overwhelming that the Petitioner was the actual perpetrator of the murder; Draven's criminal history does not lower the Petitioner's culpability as to his role in the crime of conviction as compared to his co-defendants. The reliability of the penalty phase is not undermined simply because information about a co-defendant's past was not included.

The Petitioner's cite to Banks v. Dretke, 540 U.S. 668, 124 S.Ct. 1256, 157 L.Ed.2d 1166 (2004), is not on point here. Mot. at 16–17. In that case, the Court held that information about an informant's role was material, as that information was central to the prosecution's argument about the defendant's own propensity to commit violent acts and the jury was unable to accurately assess the informant's credibility without the withheld information. Banks, 540 U.S. at 700–01, 124 S.Ct. 1256. That evidence went to the heart of the case and dealt directly with how the jury perceived the defendant's culpability and propensity for violence. Id. Such evidence is quite different from introducing a co-defendant's

history in order to weaken already-established violent acts of the Petitioner during the penalty stage, after the Petitioner has been found guilty of the murder in phase one.

Further, in this case, the jury found two statutory aggravating factors in the eligibility phase of trial, and four non-statutory aggravating factors in the penalty selection phase of trial. Special Verdict Form—Eligibility Phase, ECF No. 255; Special Verdict Form—Penalty Selection Phase, ECF No. 291. The jury also found two statutory mitigating factors, and a majority of jurors found eleven other non-statutory mitigating factors, eight presented by defense counsel and three of their own creation. Special Verdict Form—Penalty Selection Phase, ECF No. 291. The jury weighed these factors, and even though it found more mitigating factors, it clearly attached substantial weight to the aggravating factors, such as to outweigh the mitigators. Thus, even had the evidence of Draven's past been introduced, the Petitioner is unable to show prejudice. In light of the jury's decision on the other aggravating and mitigating factors and the apparent weight given to the mitigating and aggravating factors, along with all the evidence introduced against the Petitioner during the guilt and penalty phases, the court is not convinced that there is a reasonable probability that the proceeding would have been different, if evidence of another individual's past had been introduced. As such, the Petitioner is unable to show that the information about Draven's crimes is material, and the court finds that this Brady claim is both procedurally defaulted and without merit.

### 3. Ineffective Assistance of Trial Counsel

■ The Petitioner also raises an ineffective assistance of trial counsel claim. Mot. at 20–21. He argues that "[t]o the extent that counsel failed to investigate

and present the information about Draven, despite the evidence being withheld by the prosecution, they were ineffective because the information supported the defense." Id. at 20. The Petitioner further claims that his attorneys were ineffective for not filing a motion to set aside the death penalty or for a new sentencing hearing after the government filed a position paper for Draven's sentencing, which revealed some of Draven's violent past. Id. at 21. In support for why counsel should have further investigated the matter, the Petitioner cites the testimony of Draven's brother at trial and the brother's allegation that Draven raped him and his sister. Id. at 20 n.8.

Counsel does not have a duty to include co-defendant background information in the penalty phase or to perform an in-depth investigation because of a statement made by a witness during trial. Moreover, counsel's decision on how to proceed after judgment is entitled to deference, and the Petitioner fails to show how declining to request that his sentence be set aside based on information about Draven was deficient conduct on the part of counsel. Even had counsel discovered more evidence on Draven's past conduct, the lack of materiality discussed above shows that the Petitioner cannot prove a reasonable probability of a different outcome had counsel argued this information during sentencing or used it to support a motion for resentencing. For these reasons, the Petitioner fails to prove that trial counsel's conduct was either deficient or prejudicial to the Petitioner. There was no ineffective assistance of trial counsel on this claim.

### 4. Discovery

The Petitioner also requests discovery in the form of documents and corresponding interrogatories about Draven's past actions and the investigation into Draven's background. First Mot. for Discovery at 21–25, 30. The Petitioner suggests no purpose for

the requested documents other than using them to prove Draven's past. For purposes of this claim, the court assumed the truth of the Petitioner's allegations about Draven[15] and still found that the Petitioner failed to make a claim. Accordingly, the court finds that the Petitioner fails to make a showing of good cause, or any cause, for the request for discovery and corresponding interrogatories.

## C. CLAIM THREE—COUNSEL RENDERED INEFFECTIVE ASSISTANCE AT GUILT PHASE OF TRIAL BY FAILING TO INVESTIGATE, PRESENT, HIGHLIGHT, AND/OR ARGUE EVIDENCE OF INNOCENCE

The Petitioner next argues that his trial counsel was ineffective during the guilt phase for failing to investigate and present evidence regarding his innocence. Mot. at 21. He cites multiple pieces of evidence and potential testimony that either were not introduced at trial or that he believes were not fully investigated by counsel, and the court will address each of these witnesses and types of evidence in turn.

To prove ineffective assistance of counsel, the Petitioner must show that (1) counsel's representation was deficient and (2) that he was prejudiced as a result. Strickland, 466 U.S. at 693, 104 S.Ct. 2052. The court must evaluate counsel's conduct at the time such decisions were made, and not with the "distorting effects of hindsight." Id. at 689, 104 S.Ct. 2052. Additionally, counsel's decision to pursue certain lines of defense is owed deference when based on reasonable professional judgment. See id. at 681, 104 S.Ct. 2052. "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." Id. at 691, 104 S.Ct. 2052. This helps to prevent a court from second guessing

counsel's strategy, after such a strategy, although reasonably pursued, was not successful. See id.

### 1. Chad Costa

The Petitioner first argues that counsel should have called Chad Costa to testify during the guilt phase of trial. Mot. at 21–25. He asserts that because defense counsel did not introduce witnesses who knew the Petitioner in the years prior to the murder and arrest, the prosecution was able to argue that there was no evidence to counter the claim that the Petitioner was a cold, calculated killer. Id. at 22. The Petitioner contends that Chad Costa could have testified as someone who knew the Petitioner in the "years that preceded the murder and Runyon's arrest," as Costa met the Petitioner in the second half of 2007, when they would drive together to New Jersey to work in clinical drug studies. Id. This contention again reflects a distortion of the facts, as Costa did not know the Petitioner before the murder. The murder occurred on April 29, 2007, but in Costa's declaration, submitted by the Petitioner, Costa states that he met the Petitioner "in the second half of 2007." Id. Attach. 7, ¶ 2. Costa knew the Petitioner briefly before the Petitioner was arrested on March 4, 2008, which is why Costa was questioned by authorities.

The Petitioner next alleges that Costa could have testified that the Petitioner had a tendency to boast, but the Petitioner never told Costa that he killed anyone. Id. at 22–24. This argument does not relate to the Petitioner's innocence. Just because the Petitioner did not tell Costa that he murdered Cory Voss does not mean he is innocent. It is quite conceivable that one might brag or exaggerate to sound tough, but choose to avoid mentioning an actual crime, such as murder.

---

**15.** See supra note 11 and accompanying text.

The Petitioner also argues that the police told Costa about the crime, and that doing so influenced Costa's grand jury testimony. Id. at 23. For this reason, the Petitioner claims that the police investigation into the murder-for-hire conspiracy, and the Petitioner's participation in the conspiracy, was unreliable, and Costa's testimony could have shown the jury this unreliability. Id. at 23–24. This simply is not true.[16] The police telling someone about the facts of a crime is hardly coercion or improper conduct.[17]

not true. Finally, the Petitioner argues that Costa had seen the Petitioner with a black, six-shot revolver, and counsel should have questioned Costa to bring out inconsistencies in the government's statements about the murder weapon, which could have provided the jury with reasonable doubt about whether the Petitioner's gun was used to shoot Cory Voss. Id. at 22–23. These alleged inconsistencies deal with the type and number of bullets used, the fact that the gun was black or "blued,"[18] and the pattern of the gunshot wounds. This argument does not persuade the court that counsel acted deficiently. Counsel could reasonably have decided not to draw attention to the Petitioner's gun ownership and use,[19] and the court fails to accept the Petitioner's argument that drawing more attention to the gun and his gun ownership would have created a reasonable probability of a different result.

The court declines to second guess counsel's decision not to call Costa to the stand,

other than to comment in hindsight, after a review of the grand jury testimony, that it was a good one. Counsel is afforded much deference in litigation strategy, and this decision does not appear to be unreasonable. The Petitioner simply fails to show that Costa's lack of testimony undermines the confidence in the outcome here, particularly given their after-the-murder relationship. The Petitioner shows neither cause nor prejudice here.

### 2. Cat Voss

The Petitioner next argues that his trial counsel was ineffective for not calling his co-defendant, Cat Voss, to testify at trial. Mot. at 25–26. This argument is based on a declaration by Cat Voss, secured by the Petitioner's current habeas counsel on September 10, 2015, in which Cat Voss asserts that she did not have independent personal knowledge about the Petitioner's involvement in the conspiracy to murder Cory Voss. Id. Attach. 9. The Petitioner argues that reasonable doubt would have been raised had Cat Voss testified based on what is contained in this 2015 declaration. Id. at 25–26. This after-the-fact declaration by Cat Voss in 2015 does not reflect the record at the time of trial.

At the time of trial, defense counsel understood that Cat Voss would testify "that she hired Runyon and that Runyon and Michael Draven were lying in wait for Cory." Id. Attach. 6, ¶ 11 (Woodward declaration). At the time of trial, Cat Voss had pled guilty to all counts, had a written Plea

---

**16.** The court has reviewed the grand jury testimony and finds that nothing untoward occurred.

**17.** Although grand jury testimony is not normally admissible, it would have been admissible to impeach Costa, had he testified, and there is plenty in the testimony that could have been used for such a purpose. Accordingly, were Costa's grand jury testimony to be introduced, it would only have added to the

evidence about the Petitioner's gun ownership, and the pawning of such gun, and would have been quite damaging.

**18.** "Bluing" refers to a procedure that is done to protect a gun against rust, and is so named because the process gives the gun a blue-black appearance.

**19.** See supra note 17 and accompanying text.

Agreement and Statement of Facts, both filed under oath, Case No. 4:08cr16–1, ECF Nos. 69, 70, and she was obligated to testify under the agreement. Plea Agreement ¶ 13. Counsel indicated that when making the decision about whether to call Cat Voss to the stand, they knew all of the foregoing, i.e, that Cat Voss pled guilty to hiring the Petitioner to kill her husband, she had reviewed and signed the Statement of Facts under oath, and further, that Draven's counsel had interviewed Cat Voss and shared the information from that interview with the Petitioner's counsel. Mot. Attach. 6, ¶ 11. Cat Voss's Statement of Facts discusses the involvement of all co-defendants, including the Petitioner, in the plot to kill her husband, and she stated that such information was "true and accurate." Statement of Facts, Case No. 4:08cr16–1, ECF No. 70, attached hereto as Exhibit D.

The Petitioner fails to show deficient action on the part of counsel. It is reasonable that counsel for the Petitioner would not have wanted Cat Voss to testify. Based on the information available at the time, which was that Cat Voss would testify that she and Draven hired the Petitioner to kill her husband, counsel made a sound, strategic decision not to call her as a witness. Cat Voss had just pled guilty to hiring the Petitioner to kill Cory Voss and had signed under oath a Statement of Facts to that effect, and testifying differently would have risked her plea agreement. Had Cat Voss testified according to the current declaration, she would have been impeached with her Statement of Facts, and the Petitioner fails to show how either of these outcomes creates a reasonable probability of a different result. Counsel made a proper decision not to call Cat Voss as a witness.

### 3. Scott Linker

■ The Petitioner next asserts that his counsel was ineffective for failing to elicit certain testimony from Scott Linker, the Petitioner's former brother-in-law. Mot. at 26–27. According to a September 2015 declaration by Linker, he would have testified that the Petitioner was a "gun enthusiast," who collected and traded guns, and was an expert marksman. Id. Attach. 13, ¶¶ 10–12. The Petitioner argues that this testimony would have provided context for his gun purchase the day of the crime, and for his ownership of guns and ammunition that was explored by the government through trial exhibits and testimony. Id. at 26–27. Likewise, it could have provided inferences in the other direction as presented at trial.

Regardless of the government's argument that Linker's testimony is irrelevant, the court finds no reason to believe that the decision not to elicit such testimony was based on unsound trial strategy or lack of investigation by counsel. The testimony could have had the opposite effect of what the Petitioner claims. Instead of showing that the Petitioner did not commit the crime, the jury could have found that because the Petitioner was a "gun enthusiast" and an expert marksman, he was an ideal hit man as alleged by the government. As the jury could easily have viewed this evidence as harmful to the defense, the Petitioner fails to show any prejudice or deficient performance. Accordingly, counsel was not ineffective for not calling Linker as a witness at trial.

### 4. Rose Wiggins

■ The Petitioner next claims that counsel was ineffective in handling Rose Wiggins's testimony. Mot. at 27–28. Wiggins is Cat Voss's mother, and she testified at trial that when Cat called her the night of the murder, Wiggins offered to search for Cory because Cat stated that her children were sleeping. Tr. at 259–61. Wiggins testified that she drove by the credit union

parking lot in the early morning, and then again several hours later, and she did not see Cory Voss's truck or the white BMW, which Cat Voss normally drove, in the parking lot. Id. The Petitioner asserts that counsel failed to properly highlight Wiggins's testimony. Mot. at 27–28. Specifically, he argues that counsel failed to ask why Wiggins did not know if Cory Voss had driven his truck or the white BMW, and why Wiggins did not go to Cat's home until around 8:00 a.m. Id. The Petitioner contends that Wiggins's search timeline, during which she did not see either of the vehicles, would have shown inconsistencies with the government's case and caused reasonable doubt. Id. These assertions are not only flimsy, but overreaching and tiresome.

Wiggins's testimony did answer these questions to the extent possible. She did not go to Cat Voss's home until later, because Cat indicated the children were sleeping, so Wiggins volunteered to search for Cory that night. Tr. at 260. She also testified that she looked for both Cory Voss's truck and the white BMW. Id. at 260–61. It is not relevant if she knew which vehicle Cory Voss drove, as she looked for both, and the jury heard Wiggins's testimony that she did not see either vehicle during the timeline in question. Moreover, the facts showed that Cory Voss's truck was not at the ATM, but rather in a nearby office complex. There was no testimony from Wiggins that she searched this area. See id. at 257–65.

### 5. Whereabouts of the Petitioner on the Day of the Murder

The Petitioner next claims that there was evidence relating to his cell phones that would have shown that he was not in Newport News at the time of the murder. Mot. at 28–29. The Petitioner starts by stating that he owned two cell phones, one that he kept for himself and one that he provided to his son's babysitter, Paula Dalton, so that all three of them could remain in contact. Id. at 28. Records show that none of the calls made from those phones on the day of the murder incurred roaming charges, which the Petitioner argues is proof that he was in West Virginia at 8:37 p.m., when a call was placed from his phone to his son's phone. Id. at 29. Based on that 8:37 p.m. call, the Petitioner claims that he would not have been able to drive from West Virginia to Newport News in time to commit the murder. Id. at 28.

The Petitioner now argues that counsel never asked prosecution witness Paula Dalton whether she received a call on the Petitioner's son's phone from anyone other than the Petitioner, or whether she was given a different contact number for the Petitioner for the date of April 29, 2007, and that failure to ask these questions was prejudicial. Id. at 29. The Petitioner states that Dalton would have testified that the only calls she received on the Petitioner's son's phone were from the Petitioner, and she never was given an alternate phone number for the Petitioner. Id. The Petitioner argues such answers could have rebutted the prosecution's theory that the reason for the lack of roaming charges on April 29, 2007, was that the Petitioner left a phone in West Virginia before driving to Newport News to commit the murder. Id. The Petitioner, however, fails to cite any declaration or other evidence to support this contention. The court cannot assume the witness would have testified to something based solely on a conclusory statement of the Petitioner.[20]

---

20. Although there is a declaration by Dalton, it does not address the issues of whether someone other than the Petitioner ever called her on the cell phone that he provided to her or whether she was given an alternative phone number to reach him on the night of the murder. Mot. Attach. 11. The Petitioner's

Further, there was cell phone testimony by a government expert, Paul Swartz, who was cross-examined by defense counsel. Tr. at 1476–88. It was during this cross examination that counsel brought up the fact that the Petitioner's call at 8:37 p.m. did not incur any roaming charges. Id. at 1485. Counsel could have reasonably decided not to ask additional questions about the Petitioner's cell phone use to another witness, and the court sees no reason to doubt counsel's decision. Moreover, the Petitioner has failed to show a reasonable probability that asking a few additional questions on cross examination would have led to a different outcome, considering all the other evidence introduced against him at trial and the lack of clarity about how Dalton would have responded.

### 6. Cell Tower Testimony

■ The Petitioner's next claim is that the government introduced unreliable cell tower testimony in an effort to show that Draven was moving away from the credit union at the time of the murder and could not have been the person who shot Cory Voss. Mot. at 29–31. At trial, Paul Swartz testified as a government expert about the cell phone tower data and analysis performed on the Petitioner's, and his co-defendants', phones. Tr. of 7/14/09.[21] During this analysis, Swartz relied on cell tower data to locate where the co-defendants were during the times preceding and soon after the crime. Id. The Petitioner argues that this type of testing is unreliable, and that his counsel was ineffective for failing to object. Mot. at 30.

The Petitioner first cites several articles written on the subject, but they were published after his trial. Id. In his Reply, he

includes a declaration by Joseph F. Kennedy, a Senior Manager at Cherry Biometrics Corporation who works with cell tower data analysis. Reply Attach. 3, at 1. However, the court declines to conclude that counsel was deficient based on one declaration by an alleged expert, when a qualified expert testified at trial and was fully questioned by both parties. Tr. of 7/14/09.

The Petitioner also references several cases to support his argument that other courts have held cell phone tower data to be unreliable; however, the holdings are not so broad as suggested. Reply at 28–29; see Elmore v. Ozmint, 661 F.3d 783, 851 (4th Cir. 2011) (finding ineffective assistance due to counsel's blind acceptance of the government's multiple pieces of forensic evidence, "including the medical examiner's time-of-death opinion, the pubic hairs allegedly recovered from [the victim's] bed, the nature of the 'Item T' materials removed from [the victim's] bloody abdomen, and the fingerprint lifted from the blood-smeared toilet in [the victim's] en suite bathroom"); Roberts v. Howton, 13 F.Supp.3d 1077, 1100–03 (D. Or. 2014) (ruling that counsel was ineffective for advising his client to plead guilty, as counsel failed to investigate preliminary cell tower evidence that could pinpoint the location and direction the defendant was traveling); United States v. Evans, 892 F.Supp.2d 949, 956–57 (N.D. Ill. 2012) (holding that the government's use of a specific theory of cell tower analysis was unreliable, but noting that other methods of cell site analysis have been tested by the scientific community).

Additionally, in this case, Swartz did not give the precise location of Draven's

---

counsel continues to overreach and second-guess trial counsel to an extent of frivolity and abuse of process.

**21.** Swartz testified that he had performed over five hundred hours of telephone work, he

began doing telephone investigations in 1987, he attends conferences on the subject, and his knowledge on the subject is current due to his training and contact with the telephone companies. Tr. at 1450–51.

phone. Rather, he testified that if someone used a phone and it registered with a certain tower, it must be within a specific radius. Tr. at 1437. He did not say where in the radius the phone was located. He acknowledged that a phone may be able to connect with more than one tower, if, for example, a tower is busy. Id. at 1438. Swartz, thus, testified to the general location where a caller would have to be to connect to a tower, but not a more specific location based on coverage overlap, as seen in the Evans case.

For the above reasons, counsel was not ineffective in their handling of the cell tower testimony. Counsel did attempt a cross examination, in which they elicited testimony that the cellular records did not indicate that either of the Petitioner's phones was in Newport News, Virginia, on April 29, 2007. Id. at 1478. Counsel then focused on their own theory of the case—that someone else murdered Cory Voss. Based on the evidence and research at the time of trial, counsel did not act deficiently. Further, the Petitioner fails to show prejudice. Swartz did not attempt to precisely determine the Petitioner's location. He simply said that Draven must be located in a certain vicinity based on the surrounding cell towers. The government used this testimony in closing to suggest that Draven spoke with Runyon before heading home, not as definitive proof that Draven was not the shooter. Id. at 1595. As such, the Petitioner fails to show that counsel's decision in 2009 not to further challenge the cell tower data was objectively unreasonable, or that, considering the other evidence and research available at the time of trial, such a challenge would

have led to a reasonable probability of a different outcome.[22]

### 7. The Petitioner's Shopping List

 The Petitioner next challenges another piece of evidence introduced at trial. Mot. at 31–32. This evidence is a "shopping list" that was found among the Petitioner's belongings, months after the murder, together with a map of the Hampton Roads area with identifying information about Cory Voss's car and a photo of Cat Voss and Draven with their names and addresses on the back, and was characterized as a "checklist" for the crime. Gov't Ex. 217. It listed such items as a taser, Spyderco knife, tarp, trash bags, and various pieces of clothing. Id. The Petitioner argues that counsel deficiently failed to highlight that neither a gun nor a mask, both of which were used in the crime, was on the list, and, additionally, that some of the items on the list were not used during the crime. Mot. at 31–32.

Counsel's decision not to highlight the list can be seen as a reasonable strategic decision. Along with the above mentioned items, the list also contained the address of Langley Federal Credit Union, directions to the credit union, and a time of 6.25 hours, which is roughly the time to get from Morgantown, West Virginia, where the Petitioner resided, to Newport News, Virginia. Gov't Ex. 217. It is reasonable that counsel may have thought these writings to be highly prejudicial to the Petitioner, and chose to avoid highlighting the document. This decision was not deficient representation. Further, the Petitioner fails to explain how the lack of two items on the list, or the fact that some items on the list were not related to the crime,

**22.** At the end of this argument, the Petitioner adds that if information about cell tower reliability was not available at the time of trial, it constitutes newly-discovered evidence of innocence. Mot. at 31. The court does not find

that the Petitioner's two-sentence argument for innocence is persuasive, particularly as the Petitioner is still unable to show that the testimony in this case was unreliable or tainted the trial process.

means he did not commit the murder. Thus, he fails to show a reasonable probability of a different outcome had counsel spent more time challenging the list.

### 8. Ballistics Tests

■ The Petitioner next raises several arguments concerning the ballistics testimony. Mot. at 32–34.[23] During the trial, John Willmer, a firearms and toolmark examiner, testified as an expert for the government concerning the bullets and ballistics testing. Tr. at 353–70. The Petitioner now asserts that defense counsel was ineffective for failing to challenge the scientific validity of the ballistics testing and failing to question Willmer during cross examination about the type of bullets found and their relation to the Petitioner's gun. Mot. at 32–33.

The Petitioner first points to the fact that caliber .38 class bullets were found at the crime scene, and the government's evidence was that the murder weapon was the Petitioner's .357 magnum Taurus revolver. Id. During his testimony, however, Willmer specifically stated that caliber .38 class bullets can be used in both .357 magnum revolvers and firearms that can hold .38 special cartridges. Tr. at 362–63. Willmer referenced a certificate of analysis that discussed the types of guns that could fire .38 class bullets and leave rifling characteristics like those on the bullets found at the crime scene. Id. at 369–70. The certificate of analysis stated that these guns "include, but are not limited to, caliber .357 Magnum revolvers with the brand names Astra and Llama." Gov't Ex. 23. The Petitioner now claims that counsel should have corrected "the mis-impression

... that the .38 bullets could have been fired from Runyon's Taurus .357" because the "certificate of analysis excludes the Taurus brand of .357 firearms." Mot. at 33. The certificate did not exclude the Taurus .357. The list is clearly not exhaustive, as proven by the statement "include, but are not limited to." Gov't Ex. 23. There was also clear, additional testimony by George Koski, who sold the gun to the Petitioner, that the gun could fire both .357 magnum and .38 special bullets. Tr. at 849.

The Petitioner also challenges the way counsel handled the ballistics tests, as well as ballistics tests in general. Mot. at 32–33; Reply at 34–37. He further requests discovery of the records from his case to help present this argument. Second Mot. for Discovery at 2–6. Trial counsel in the Petitioner's case did not request the bullets or test results, nor did they perform their own tests or hire their own expert. As such, the Petitioner argues that had counsel requested the ballistics tests or performed a more thorough cross examination about the reliability of ballistics tests, there is a reasonable probability that at least one juror would have found reasonable doubt that the Petitioner's gun was the murder weapon. Second Mot. for Discovery at 5–6.

In support, the Petitioner relies on several studies that discuss the unreliability of forensic testing. Mot. at 33 n. 20; Reply at 35–36. Nothing suggests, however, that counsel did not know of these studies at trial or unreasonably decided to forego a stronger challenge to the ballistics evidence. Decisions about evidence and ex-

---

**23.** The government argues that this claim is untimely because it was not added until the Amended Motion, see Resp. at 34–35, which was filed more than one year after the Petitioner's conviction became final. See 28 U.S.C. § 2255(f). Although the ballistics testing was not challenged earlier, the Petitioner did claim that counsel was ineffective for fail-

ing to argue that the Petitioner's gun was not the murder weapon. Reply at 37. As such, the court finds that this new argument tenuously relates to the underlying conduct set out in the original claim, and will consider it. In this way, the appellate court will have full benefit of the court's analysis here.

pert testimony are vital parts of trial strategy, and the court gives much deference to counsel's decisions on these matters.

Additionally, the court subpoenaed the ballistics records from the Virginia Department of Forensic Science, and these reports are filed under seal. After an in camera review by the court of the reports, the court finds nothing contrary to the evidence presented at trial. The certificate of analysis included with the subpoenaed records is the same as the one introduced at trial. Gov't Ex. 23.

Regardless of the reason that counsel did not further challenge the evidence or request copies of the ballistics records, the court finds there is no prejudice, as the records only support the testimony and evidence introduced at trial. As such, the Petitioner fails to show ineffective assistance of counsel. For the above reasons, the court also denies the Petitioner's related discovery request.

### 9. Conclusion

The court has evaluated all of the witnesses and evidence that the Petitioner now claims should have been introduced by trial counsel, and the court has found no ineffective assistance of counsel here. Even if cumulatively evaluating the suggested evidence and testimony, counsel was not ineffective. It is apparent that counsel had a strategy and focused on the evidence they thought most advantageous to the Petitioner. The Strickland standard is high, and courts do not later judge a strategy to be unreasonable simply because it was ultimately unsuccessful, for with hindsight any number of things could or could not have been done. It is easy to criticize after-the-fact, as the Petitioner's habeas counsel has done here. The question is would the proceeding have reasonably had a different outcome. In light of the voluminous evidence introduced against the Petitioner, see supra Part I and trial record of testimony and exhibits, the court finds no

reasonable probability of a different outcome had counsel done all that the Petitioner now requests.

Accordingly, Claim Three is **DENIED**.

### D. CLAIM FOUR—COUNSEL ABDICATED RESPONSIBILITY TO ADVOCATE AT ELIGIBILITY PHASE OF TRIAL

 In this claim, the Petitioner argues that his counsel was ineffective for not advocating for him at the eligibility phase of trial. Mot. at 35. This claim is bogus. Before trial began, defense counsel filed a Motion to Trifurcate the Jury Deliberations. ECF No. 93. Counsel requested that instead of having bifurcated proceedings with a guilt phase and penalty phase, the court should also have an eligibility phase, wherein the jury would decide if the government had met its burden in proving the statutory requirements for capital punishment. Id. at 4. By keeping this phase separate from sentencing, the jury would not be swayed by evidence relating to non-statutory aggravating factors and the process of weighing the aggravating and mitigating factors. Id. The court granted this motion on December 8, 2008. ECF No. 132.

The Petitioner, through counsel, now argues that trial "counsel failed to guard the presumption of innocence or hold the government to its burden when he abdicated the role of advocate at the eligibility phase." Mot. at 35. To show that counsel was ineffective in the decision on how to proceed at the eligibility phase, the Petitioner must be able to show that counsel's actions were deficient and that such actions demonstrated a "probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 687, 694, 104 S.Ct. 2052.

Part of counsel's strategy during the eligibility phase was to argue that the law never requires the death penalty. Tr. at

1771. Counsel told the jury that, even though they had found the Petitioner guilty, they should look at the evidence and consider the judge's instructions "with new eyes." Id. at 1772. Counsel did not present new evidence during this phase, assuming any was available, and that failure to present evidence to counter the eligibility factors is what the Petitioner now argues was ineffective. Mot. at 36.[24]

While counsel certainly has an "overarching duty to advocate the defendant's cause," Strickland, 466 U.S. at 688, 104 S.Ct. 2052, the court does not find the Petitioner's argument that trial counsel failed in its duty to advocate at the eligibility phase to be persuasive. To prove death eligibility, the government needed to prove beyond a reasonable doubt that: (1) the Petitioner was older than eighteen years of age at the time of the offense; (2) at least one gateway factor regarding intent was present; and (3) at least one statutory aggravating factor was present. Special Verdict Form—Eligibility Phase, ECF No. 255. The statutory aggravating factors argued by the government at this phase were that: (1) the offense was committed after substantial planning and premeditation to cause the death of another; and (2) the offense was committed in consideration for the receipt of, or in expectation of the receipt of, anything of pecuniary gain. Id.

As these aggravating factors were elements of the crime of Conspiracy to Commit Murder for Hire and were argued at the guilt phase, the government had no new evidence to present at the eligibility phase. Resp. at 38. Rather than make the same argument against these factors, which the jury had already heard and rejected during the earlier phase, defense counsel urged the jury to look at the evidence anew and to consider that the death penalty is never required by law. Tr. at 1771–72. This was a strategic decision by trial counsel not to alienate the jury and to set the stage for the penalty phase. Mot. Attach. 6, ¶ 10.

The purpose of the eligibility phase was not to introduce mitigating factors or have the jury weigh aggravators and mitigators. It was simply to determine if the government met the statutory requirements for the death penalty. At the penalty phase, counsel did argue for mitigators to counteract the statutory aggravating factors. In fact, counsel argued that all the co-defendants were equally culpable, and the jury found the equally culpable co-defendant mitigator, during the penalty phase. Special Verdict—Selection Phase, at 2. Considering that the jury had already rejected the claim that the Petitioner was not involved in planning and executing the crime for monetary gain, the court finds that counsel's chosen strategy to handle the eligibility phase was not objectively unreasonable.

The court also finds that the Petitioner did not suffer prejudice from this strategy. The jury had already found the facts required for the two statutory aggravators, so it is unclear how counsel could have fought against those factors at this stage. Even had counsel attempted to introduce

**24.** The Petitioner also argues in a footnote that counsel was ineffective for failing to object to the substantial planning aggravator on due process grounds, as the government argued mutually inconsistent theories of the case against the co-defendants with regards to the planning of the crime. Mot. at 36 n.22. Based on the little information provided in this argument, the court does not find that counsel was ineffective. The government never argued that one of the co-defendants was not involved in the planning; rather, it just switched the way the same argument was presented, depending on the co-defendant at issue. Due to the amount of evidence showing substantial planning by all co-defendants relating to the Charge of Conspiracy to Commit Murder for Hire (Count One), counsel was not deficient in failing to object, and the Petitioner shows no prejudice.

evidence of the co-defendants' involvement, such an argument does not negate the amount of evidence put forth at trial that showed substantial planning by the Petitioner. As to the pecuniary gain factor, confidence in the outcome is not undermined simply because counsel declined to again argue that the Petitioner did not receive full payment for the crime, which the jury already knew from the guilt phase. For these reasons, the court **DENIES** Claim Four.

### E. CLAIM FIVE—TRIAL COUNSEL WAS INEFFECTIVE FOR FAILING TO INVESTIGATE, DISCOVER, AND PRESENT EVIDENCE OF INCOMPETENCY TO STAND TRIAL

In Claim Five, the Petitioner asserts that counsel was ineffective for failing to argue that he was incompetent to stand trial. Mot. at 38. To support his claim, the Petitioner points to various reports by mental health professionals, which stated that the Petitioner likely suffered from delusional beliefs and that there was a family history of psychiatric illnesses and neurological/cognitive/developmental disabilities. Id. at 38–39.

### 1. Standard for Ineffective Assistance of Counsel for Failure to Request Competency Hearing

"[T]the conviction of an accused person while he is legally incompetent violates due process." Pate v. Robinson, 383 U.S. 375, 378, 86 S.Ct. 836, 15 L.Ed.2d 815 (1966). To be competent to stand trial, a defendant must have "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding—and ... a rational as well as factual understanding of the proceedings against him." Dusky v. United States, 362 U.S. 402, 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960) (per curiam). To ensure that such rights are not violated

[t]he court shall grant [a motion for a hearing on competency], or shall order such a hearing on its own motion, if there is reasonable cause to believe that the defendant may presently be suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense.

18 U.S.C. § 4241(a).

As to the standard for an ineffective assistance claim relating to failure to investigate competency, the Petitioner must show that counsel acted deficiently and that there was resulting prejudice. Strickland, 466 U.S. at 687, 104 S.Ct. 2052. Counsel acts deficiently, if he does not act as a reasonably objective attorney would under the circumstances. Savino, 82 F.3d at 599. "An attorney's duty, of course, does not mandate the exploration of the issues of sanity and/or competency in every instance." Wood v. Zahradnick, 430 F.Supp. 107, 111 (E.D. Va. 1977), aff'd, 578 F.2d 980 (4th Cir. 1978). However, when "the facts known and available, or with minimal diligence accessible, to defense counsel raise a reasonable doubt as to a defendant's mental condition, counsel has an affirmative obligation to make further inquiry." Id. (holding that there was ineffective assistance because counsel did not take even the first step of requesting a mental examination when the defendant's rape and robbery of a sixty-seven-year-old woman for no reason was of "such a bizarre nature as to call into question the petitioner's mental condition").

If such reasonable doubt is raised, "a lawyer is not entitled to rely on his own belief about a defendant's mental condition, but instead must make a reasonable investigation" before deciding how to proceed. Becton v. Barnett, 920 F.2d 1190,

1192 (4th Cir. 1990) (involving a "senseless" crime where the defendant raped an elderly woman and told counsel that he had been in and out of mental hospitals prior to his arrest). Importantly, proving ineffective assistance of counsel does not require meeting the standard in Dusky, but requires showing that had counsel investigated the defendant's mental health, a hearing could have been held, at which point Dusky would have applied. Id. at 1193.

As support for what constitutes incompetency, the Petitioner cites two Fourth Circuit cases. Mot. at 40.[25] In United States v. White, the defendant was found incompetent to stand trial during a preliminary psychological evaluation. 620 F.3d 401, 405 (4th Cir. 2010). The defendant believed she had found a cure for AIDS and breast cancer. Id. at 406. She refused to leave her cell, even to take a shower or to have staff clean her cell, and she began writing on the walls in blood after her writing instruments were removed. Id. In United States v. Culp, the defendant robbed a bank because he heard voices telling him to do so, and he was diagnosed with paranoid schizophrenia. 930 F.2d 23 (4th Cir. 1991) (unpublished table decision). He tampered with the pipes in his cell so that it would flood, and an independent psychiatrist reported that he became "very psychotic without medication." Id.

**2. Whether Counsel was Ineffective for Failing to Investigate Competency and Request a Hearing on the Issue**

▮ The Petitioner argues that had trial counsel properly investigated his

mental health, they would have determined that he was incompetent to stand trial and requested a hearing to that effect. Mot. at 38–40. The declarations filed with the Petitioner's Motion, however, show that defense counsel investigated the Petitioner's mental health, interviewed mental health experts, and filed such reports with the court. See id. Attachs. 5, 6. Counsel also tried to track down military medical records and evidence of a car accident, although they were unable to find all the sought-after records. Id. Attach. 6, ¶ 5, Attach. 5, ¶ 5.[26]

The fact that the Portsmouth City Jail records noted the Petitioner was "somewhat grandiose" and "verbalized some delusional material," id. Attach. 16, at 4, is not enough to put counsel on notice that further inquiry, beyond the mental health experts retained and reports already filed, was required. That trial counsel knew the Petitioner compared himself to great historical figures or talked about how many lives he saved, see id. at 39, Attach. 4, ¶ 7, does not rise to the level of incompetency seen in the White and Culp cases cited by the Petitioner. Further, unlike in White, there was no preliminary psychological evaluation that suggested incompetency. Although the Petitioner now argues some of the mental health examinations were preliminary in nature, that does not make counsel's conduct deficient. Reply at 46–47. The records show that the Petitioner underwent multiple tests and counsel gathered numerous medical and other records, and none suggested mental health issues

---

**25.** Although these cases deal with determining incompetency versus ineffective assistance for failing to investigate and request a competency hearing, the court finds the facts in them to be instructive when evaluating the facts in the instant case.

**26.** There is no evidence to show that all of these unavailable records exist or could be

"tracked down." Moreover, the Petitioner's habeas counsel seem to lose sight of the legal standard that the evidence has to present a reasonable probability that the outcome would have turned out differently, if the evidence had been presented. It is not a question just of availability, but one of materiality.

that rose to the level of incompetency to stand trial. See infra Part IV.F.

Additionally, the crime was not so bizarre or senseless as to cause counsel to reasonably question the Petitioner's mental health and consider an incompetency argument. While murder-for-hire may be cold and calculating, it is not so unique as the facts of Becton and Wood. The Petitioner met Draven while they were paid volunteers in clinical drug trials, and the Petitioner was offered money to murder Cat Voss's husband, and followed through on the plan. The evidence shows that the motive was driven by greed for the Petitioner, and by both greed and lust, for Cat and Draven. The crime was carefully planned, and it presented counsel with no signs to question the Petitioner's competency. In fact, the evidence at trial showed a competent, intelligent defendant. Regardless, counsel still did extensive investigation into the Petitioner's mental health.

Based on counsel's investigation and the facts before the court, the Petitioner fails to show that trial counsel acted in a deficient manner by not requesting a competency hearing, as none was warranted. The Petitioner also does not provide evidence that had a hearing been held, he would have been declared incompetent. The court does not find that counsel was ineffective, and Claim Five is **DENIED**.

### 3. Discovery

For the reasons stated herein, the Petitioner also fails to show good cause for additional discovery. All he seeks for this claim are records from the Portsmouth City Jail. First Mot. for Discovery at 33–36. He already has records from the jail, and although those records do reference a follow-up visit, Mot. Attach. 16, at 4, the Petitioner makes no showing that such a visit even happened. Further, he does not state how he hopes these records, which may or may not exist, would prove anything different from the multiple mental health records already filed by counsel in this case. Accordingly, his request for discovery of any Portsmouth City Jail records is **DENIED**.[27]

### F. CLAIM SIX—COUNSEL RENDERED INEFFECTIVE ASSISTANCE BY FAILING TO INVESTIGATE AND PRESENT MITIGATING EVIDENCE REGARDING PSYCHO–SOCIAL HISTORY, BRAIN DAMAGE, AND MENTAL HEALTH

The Petitioner next alleges that his counsel was ineffective for failing to investigate his mental health and psycho-social history, and for not using the results of such an investigation as mitigating evidence to offset the prosecution's presentation of aggravating factors. Mot. at 41. Specifically, the Petitioner breaks Claim Six down into several subparts: (1) counsel Hudgins appeared in the case too late for him to effectively investigate and present mitigation evidence; (2) counsel failed to present mental health experts, and, instead, used ineffective lay person testimo-

---

27. The same reasoning applies to the request for discovery of the Portsmouth City Jail records in relation to all other claims. See First Mot. for Discovery at 33–36 (stating how the records relate to multiple claims in the instant Motion). Counsel talked to multiple mental health experts and had those experts write up reports. Counsel further requested relevant records from the Petitioner's past. Collateral counsel even submitted updated mental health records with the instant Motion. It is unclear and unspecified what the Petitioner hopes to discover in the Portsmouth City Jail records that are not contained in the other reports and the current record before the court. Thus, the court finds that the Petitioner fails to show good cause for global discovery of the Portsmouth City Jail records, to the extent they have not been so discovered, as to all claims mentioned in the First Motion for Discovery.

ny; (3) a complete psycho-social history, which counsel failed to provide, would have countered the aggravating factors, added weight to the mitigating factors, and informed the jury that the Petitioner had a lesser moral culpability; and (4) the combination of all these factors resulted in prejudice to the Petitioner. The court will address these arguments in turn.

### 1. Ineffective Assistance Standard

To make a successful showing of ineffective assistance of counsel, the Petitioner must prove that (1) his attorneys' performance was seriously deficient, and (2) such deficient performance prejudiced him by undermining the reliability of the judgment against him. See Strickland, 466 U.S. at 687, 104 S.Ct. 2052. To show deficient performance, counsel's actions or omissions must be measured against what "an objectively reasonable attorney would have done under the circumstances existing at the time of representation." Savino, 82 F.3d at 599. To demonstrate prejudice, a petitioner must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694, 104 S.Ct. 2052.

In so doing, the court keeps in mind that when deciding an ineffective assistance claim involving counsel's strategy, "[i]t is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable." Strickland, 466 U.S. at 689, 104 S.Ct. 2052. As such, "every effort [should] be made to eliminate the distorting effects of hindsight." Id. This is because "[i]n many cases, counsel's decision not to pursue a particular approach at sentencing reflects not incompetence, but rather a sound strategic choice." Lovitt v. True, 403 F.3d 171, 179 (4th Cir. 2005).

Accordingly, "Strickland does not require defense counsel to 'investigate every conceivable line of mitigating evidence no matter how unlikely the effort would be to assist the defendant at sentencing.'" Gray v. Branker, 529 F.3d 220, 229 (4th Cir. 2008) (quoting Wiggins v. Smith, 539 U.S. 510, 533, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003)). The requirement is that "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." Strickland, 466 U.S. at 691, 104 S.Ct. 2052. "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." Id. at 690–91, 104 S.Ct. 2052. Even a showing that counsel could have conducted a more thorough investigation is not enough to show that counsel was ineffective. See Burger v. Kemp, 483 U.S. 776, 794–95, 107 S.Ct. 3114, 97 L.Ed.2d 638 (1987).

Additionally, there is no per se rule requiring counsel to introduce mental health evidence at the penalty phase of a capital trial. See Meyer v. Branker, 506 F.3d 358, 372 (4th Cir. 2007). "In fact, there are many strategically valid reasons why defense counsel, given the circumstances of an individual case, may decide not to offer mental health mitigation testimony: it may not be persuasive; it may appear to be a 'flight into theory' without proper grounding in the facts of the case." Id. As such, the court must determine whether counsel performed a reasonable investigation of the law and facts regarding the Petitioner's mental health and made an objectively reasonable decision to

forego a mental health strategy. See Strickland, 466 U.S. at 690–91, 104 S.Ct. 2052.

## 2. Hudgins's Involvement with the Case

■ The Petitioner first alleges that counsel Stephen Hudgins appeared too late in the case to perform an effective mitigation investigation. Mot. at 41. On February 18, 2009, Hudgins was appointed to replace attorney Jon Babineau, who had developed a conflict of interest. ECF No. 161; see also Mot. to Continue at 12–13, ECF No. 179. On February 26, 2009, the Petitioner filed a Motion for Continuance and for Hearing to Schedule Trial. ECF No. 164. The court continued the trial to June 30, 2009. ECF No. 171. As such, Hudgins had four months to get ready for trial once he was appointed. Importantly, Hudgins did not start from the beginning when he was appointed to the Petitioner's defense team. Babineau, along with a mitigation expert and an investigator, had already been conducting an investigation for the penalty phase since June of 2008,[28] and Hudgins was able to use that work as the basis for his continuing investigation. Using what had already been discovered, Hudgins was able to expand on that investigation and find new experts, arrange for examinations, and search for additional medical records.

Hudgins may have felt constrained by the amount of time he had on the case and the lack of communication with Babineau,[29] Reply Attach. 1, at 1, but the fact is that Hudgins joined a team that had already done much work on the case. After reviewing the extensive record in this case, which is set out below, the court finds that counsel took reasonable and proper steps to

investigate the Petitioner's mental health and psycho-social history, both before and after Hudgins was appointed to the case, and that the Petitioner suffered no prejudice by the later addition of Hudgins to the defense team.

## 3. Counsel's Mental Health Investigation

■ Investigation into the Petitioner's mental health began soon after he was indicted, when the government filed a motion regarding discovery of mental health evidence on April 25, 2008. ECF No. 46. The court held a hearing on the matter, and on June 16, 2008, issued orders setting forth a comprehensive scheme for mental health testing and notice to each party. ECF Nos. 65, 66. The first order provided that any defendant intending to introduce mental health experts at the penalty phase must file written notice of such experts no later than ninety (90) days prior to the commencement of jury selection. Order at 1, ECF No 65. It also stated that failure to provide the proper notice could result in forfeiture of the right to present mental health testimony at trial. Id. at 3.

On December 12, 2008, the Petitioner provided notice that he intended to introduce expert mental health evidence and may call two expert witnesses to testify at the penalty phase: Dr. Evan S. Nelson and Dr. Mark D. Cunningham, both licensed clinical psychologists. Notice at 1–2, ECF No. 135. The Notice also mentioned that the Petitioner was seeking court budget approval for a neuropsychologist. Id. at 3. While Dr. Nelson did examine the Petitioner, no reports were filed, and in a declaration filed with the Petitioner's instant motion, Hudgins asserts that the results of Dr. Nelson's testing were not fa-

---

**28.** See infra Part IV.F.3.

**29.** Once Babineau had withdrawn due to a conflict, he could then only ethically commu-

nicate and pass on his efforts before the withdrawal.

vorable to the defense. Mot. Attach. 5, ¶ 4. On February 25, 2009, the court approved funding for the Petitioner to hire a neuropsychologist. ECF No. 163.

On April 8, 2009, the Petitioner filed notice that he intended to hire Dr. Scott D. Bender, a neuropsychologist, to perform psychological testing, once the medical records of the Petitioner and his family were received. Notice at 1, ECF No. 177. The Petitioner also indicated that Dr. Seymour Halleck, a psychiatrist, would "be testifying to factors discovered in defendant's medical records and those of his family" and "may interview defendant on issues discovered in the medical records." Id. at 2.

The Petitioner requested another continuance on April 13, 2009. ECF No. 179. In that motion, counsel argued for a six-month extension, due to such challenges as trying to get copies of medical records of the Petitioner's family from the military and dealing with the remoteness of mitigation witnesses. Id. at 13. Although the government did not object, it pointed out that it had provided counsel for the Petitioner with "voluminous background materials, including school, employment and military records." ECF No. 181, at 1 n.1. It further stated that the "pre-indictment investigation conducted by the United States did not reveal a background of abuse or hospitalization of the defendant, which appears to serve as the justification for obtaining certain types of records." Id. The court declined to continue the trial, noting that "[w]hen Babineau withdrew, he had been paid for considerable legal services, in addition to significant payments having been made for various investigative and expert services on behalf of Runyon, relating to the penalty phases of the proceedings." ECF No. 194., at 3 n.4. The court indicated that if the Petitioner were found guilty, it would consider a motion to continue the penalty phase at that later time. Id. at 8–9.

On June 9, 2009, the Petitioner filed a motion to appoint additional mental health experts. ECF No. 206. In this filing, counsel again discussed the difficulty in obtaining medical records from the military, and noted its intention to add Dr. James Merikangas, a psychiatrist, as a new expert, and to replace Dr. Bender with Dr. Allan Mirsky, for the neuropsychological services. Id. at 1–3. On June 29, 2009, counsel filed a notice that the Petitioner intended to rely on Dr. Merikangas and Dr. Mirsky as experts, although he stated that the "notice is dependent on defendant's receipt of his and his family's medical records from the United States Government for periods of time when defendant was in the Army and when he and his mother were Army dependents." ECF No. 230, at 1. On June 29 and 30, 2009, the government filed the reports of its mental health experts, Dr. Raymond Patterson and Dr. Paul Montalbano. ECF Nos. 276, 277.

The jury convicted the Petitioner on July 17, 2009. On that same day, the Petitioner filed a Supplemental Motion to Continue Capital Sentencing Hearing, in which he requested a ninety-day continuance to gather records and engage in more mental health testing. ECF No. 240, at 1–4. The Petitioner also filed a statement indicating that "Dr. Mirsky's testing revealed deficits which will require neurological testing and the evaluation by a neurologist" and suggesting that Dr. Merikangas, whom he wished to engage as an expert, be appointed to perform those tests. ECF No. 242, at 1–2. On July 20, 2009, the reports of Dr. Mirsky and Dr. Cunningham were filed with the court, ECF No. 246, and the Petitioner filed a Notice of Intent to Introduce Mental Health Testimony at the penalty phase. ECF No. 248. The Notice stated that the Petitioner intended for Dr.

Cunningham and Dr. Mirsky, and potentially Dr. Merikangas, to testify at the penalty phase. Id. On July 22, 2009, after the jury found the Petitioner eligible for the death penalty, the court granted the Petitioner's request for Dr. Merikangas to be appointed to serve as a psychiatrist and neurologist. ECF No. 257. The court also ordered that the penalty phase of the trial be continued for four weeks. ECF No. 254.

On August 6, 2009, a preliminary report by Dr. Merikangas was filed with the court. ECF No. 263. In the report, Dr. Merikangas indicated that he had ordered an MRI scan of the brain, a PET scan of the brain, and an electroencephalogram (EEG), none of which had been performed at the time of the report. Id. at 1. He opined that the Petitioner is "either in a fantasy world of grandiose wishful thinking, or suffering from delusions." Id. at 2. He ended with a conclusory statement that the Petitioner "clearly has impaired executive functioning suggestive of frontal lobe brain impairment." Id. However, Dr. Merikangas did not indicate what tests and information he relied upon in making these determinations. Counsel for the government made several requests for such underlying data, but did not receive the information. ECF No. 273, at 1–2.

During this period between the eligibility and penalty phases, the Petitioner filed several motions, including motions to supplement his mental health reports after Dr. Merikangas and Dr. Mirsky noted a potential brain injury, and to release the results of the MRI and PET scans directly to defense counsel. ECF Nos. 269, 274. It appears the brain scans were read as normal at this time, although Dr. Mirsky wrote after trial that such a reading is not conclusive as to whether the Petitioner ever suffered brain injuries. Mot. Attach. 22, at 1. Dr. Merikangas now reads the MRI scans as showing white matter hyperintensities, which is consistent with the Petitioner's history of head injuries and migraines, and the PET scan as being "non-diagnostic." Id. Attach. 2, at 4.

Around this time, the parties also argued over the extent of Dr. Cunningham's testimony. According to the Notice filed on December 12, 2008, defense counsel intended to have Dr. Cunningham testify as to developmental factors in the Petitioner's background and factors that would indicate a positive adjustment to a term of life imprisonment. ECF No. 135, at 2. On August 10, 2009, the government filed a motion to limit Dr. Cunningham's testimony. ECF No. 267. The court later ruled that Dr. Cunningham could testify as to positive prisoner evidence, if it related to the Petitioner specifically, but not to generalized data from other Bureau of Prisons inmates. Tr. at 2077–83. The court further ruled that Dr. Cunningham could not testify about developmental factors in the Petitioner's background, as Dr. Cunningham did not include this information in his report. Id. at 2079.[30]

A review of the above filings and the court record shows that defense counsel did not neglect their duty to investigate and prepare mitigating mental health evidence, despite the fact that Hudgins joined the case later in the proceedings. Babineau before him, then Hudgins, and the rest of the defense team, effectively searched for experts and various forms of testing, and the Petitioner fails to show that Hudgins

---

**30.** The Petitioner states that counsel was ineffective for not properly directing Dr. Cunningham or preserving this issue for appeal. Mot. at 46. However, the Petitioner's one conclusory statement is not enough to show that counsel was deficient or that there was resulting prejudice, particularly as counsel did introduce background factors about the Petitioner through other witnesses.

was unable to effectively represent him during trial.

As to whether counsel collectively did a proper investigation into the Petitioner's mental health, counsel was not required to follow every conceivable trail of potential mental health information. They were required to conduct a reasonable investigation, which the court must evaluate by taking into account circumstances as they were at the time of counsel's decision. In this case, counsel engaged multiple defense experts and had the Petitioner undergo different tests, including brain scans. When one of the defense experts did not create a favorable report, counsel searched for new experts. Mot. Attach. 5, ¶ 4. As to the brain scans, it appears that counsel was informed they were read as normal at the time of trial. While Dr. Mirsky and Dr. Merikangas later stated that the scans were not conclusive as to brain damage, based on the knowledge available at the time, counsel was not deficient for declining to introduce them, as the jury could have easily concluded either normality or unreliability, neither of which was necessarily favorable to the Petitioner. Further, while counsel did not introduce the brain scans, nothing suggests that their results were what caused counsel to forego use of mental health evidence or stop investigating. Reply Attach. 1, at 2. Second-guessing counsel at this stage is fruitless.

Counsel tried to continue the trial on several occasions and argued to the court that more testing and reports were needed. Counsel recognized the perceived problems with the current mental health information and tried to fix them. But re-gardless of the fact that the court denied some of their motions for the reasons stated on the record,[31] counsel performed a reasonable investigation and followed potential leads to find mitigating mental health evidence. As such, counsel's performance was not deficient, and the investigation was not harmed by the addition of Hudgins to the defense team on February 18, 2009, over four months before the trial.

### 4. Counsel's Decision Not to Introduce Mental Health as a Mitigating Factor

The Petitioner also argues that counsel was ineffective for failing to introduce mitigating mental health evidence at the penalty phase, and for instead relying on "repetitive lay person testimony." Mot. at 46. The court will now evaluate this decision using the two-pronged Strickland standard.

The Petitioner's trial counsel chose to argue that the Petitioner was not the "worst of the worst" because (1) two equally culpable co-defendants were not receiving the death penalty, so it was unfair for the Petitioner to receive such a sentence; (2) family sympathy weighed in favor of life imprisonment; and (3) the Petitioner would not be a threat of violence in prison. Id. Attach. 6, ¶ 13; Tr. 1818–21. While at one point counsel may have thought that including mental health information would be beneficial, based on the results of their investigations, tests, and subsequent reports, they chose to forego a mental health mitigator. This decision was a reasonable strategy.[32] As the court detailed earlier in this claim, see supra Part IV.F.3, counsel performed a thorough and in-depth investi-

---

**31.** None of the court's rulings are at issue here on collateral review.

**32.** The Petitioner argues that counsel promised the jury that they would introduce mental health information. Mot. at 46. However, what counsel actually said was that if the jury found the Petitioner eligible for the death penalty, counsel would put on evidence including "things like his history as far as his schooling, his family, perhaps mental health information." Tr. at 1770 (emphasis added).

gation into the Petitioner's mental health history. Counsel had multiple reports and records to evaluate when making their decisions about trial, and the results were such that counsel had to make a tactical choice about whether to introduce mental health information during sentencing.

When making this decision, counsel would have looked at the potentially helpful mitigating evidence, but would have also had to look at the evidence that may not help, or could even be harmful, and balance all of these considerations. For example, Hudgins searched for injuries that may have affected the Petitioner's reasoning ability, but was unable to locate records for a grenade blast in the Army and a car accident, both of which the Petitioner reported caused injury. Mot. Attach. 5, ¶ 5, Attach. 6, ¶ 5. Woodward recalls that the government's witnesses, Dr. Patterson and Dr. Montalbano, expressed a strong opinion that the Petitioner did not have any mitigating mental or emotional issues. Id. Attach. 6, ¶ 12. Further, although the defense filed reports from Dr. Mirsky and Dr. Merikangas, and requested a brain scan of the Petitioner, some of the reports remained preliminary at the time of sentencing, and contrasted with the findings in the government's experts' reports. Id. Attach. 5, ¶ 6.

Dr. Cunningham, one of the Petitioner's witnesses, was permitted to testify at the penalty phase only as to specific positive prisoner evidence, and not developmental factors in the Petitioner's background, which the Petitioner's counsel also wanted him to discuss.[33] Additionally, if the Petitioner's mental health was introduced at the penalty phase, the government's expert mental health witnesses would have testified and offered contradicting evidence.[34] While such different opinions are to be expected in the adversarial system, how to counteract those differences in opinion is certainly a consideration that counsel must have when deciding whether to introduce mental health evidence. Although counsel had reports that the Petitioner had grandiose thoughts and delusions and head injuries from past accidents, there was a lack of evidence showing how this would act as mitigating evidence for a contract kill. After considering the many records and tests, counsel decided to focus their mitigation strategy on three prongs: equally culpable co-defendants, family sympathy, and lack of a threat in prison.

When evaluating counsel's decision, the court recognizes that there is no per se rule requiring counsel to introduce mental health evidence at the penalty phase of a capital trial. Meyer, 506 F.3d at 372. Although such evidence may be helpful, it is not right in all situations, and the court must not look back on this decision and judge it with the distorting effect of hindsight. See Strickland, 466 U.S. at 689, 104 S.Ct. 2052. Rather, the court must consider all the options available to counsel at the time of trial and determine if counsel acted as an objectively reasonable attorney would have.

Based on the above information and records, the court finds that counsel thoroughly investigated the Petitioner's mental health and found that there was not enough support to present a viable mitiga-

---

33. The court ruled on the record that this latter testimony was outside the scope of Dr. Cunningham's expert reports, and this ruling is not at issue in the collateral proceedings.

34. For example, the arguments that the Petitioner compared himself to great figures in history and talked about how many lives he saved could also have been shown to fit the government's experts' theory that the Petitioner had narcissistic personality features. Mot. Attach. 4, ¶ 7; Dr. Patterson Report, ECF No. 276, at 23; Dr. Montalbano Report, ECF No. 277, at 27.

tion argument. It was reasonable for counsel to decide that the strongest argument was that "it just wasn't fair for Runyon to be sentenced to death when two equally culpable co-defendants were receiving life sentences," followed by the argument of family sympathy. Mot. Attach. 6, ¶ 13. Counsel put forth many witnesses who testified that the Petitioner was a good father and did kind acts and helped many people. Other witnesses testified about his time in the military and his work history. The idea was to present evidence that the Petitioner was not the "worst of the worst." Although the Petitioner argues that this was repetitive lay testimony and should have been replaced or supplemented with mental health testimony, it had a vital place in the defense's mitigation strategy.[35]

Just because this strategy did not succeed in the end does not mean it was wrong.[36] Counsel performed a most reasonable investigation and carefully considered the available records and evidence when determining their strategy, and the court cannot discount such a strategy based only on the end result. Accordingly, counsel was not deficient for deciding to forego certain mental health evidence and instead present a mitigating strategy that focused on co-defendant culpability, positive prisoner evidence, and family sympathy.

**5. Decision Not to Present a Complete Psycho–Social History**

The Petitioner next argues that counsel was ineffective with respect to the mitigating factors because a complete psychosocial history would have added weight to the mitigating factors and detracted from the weight of the aggravating factors, given context to the Petitioner's life trajectory, and established additional mitigating

factors. Mot. at 50. The Petitioner points to readily available evidence and testimony that could have supported his mental health claims and aided in his sentencing. This evidence includes medical records, jail records, letters by the Petitioner, brain scans, government expert reports, and medical records of the Petitioner's biological parents. The testimony includes witnesses who could have testified about various aggravating and mitigating factors, the car accident, the time before the Petitioner was arrested, and how the Petitioner was led to believe that Cory Voss was molesting his daughter. He also discusses several expert analyses and opinions that counsel could have introduced. As discussed above, counsel is given much discretion in deciding on trial strategy. See Strickland, 466 U.S. at 689, 104 S.Ct. 2052. Courts must not go into the analysis with an assumption of incompetence, but rather an understanding that counsel's decisions are often based on strategic choices. See id. With this in mind, the court will now address the different pieces of evidence that the Petitioner asserts would have been mitigating.

**a. Various Records, Letters, and Medical Reports**

■ The Petitioner argues that counsel possessed multiple records that would have aided in mitigation, and counsel chose not to introduce these records, or all of the facts in the records, at trial. Mot. at 50. As such, the jury did not hear all of the information that the Petitioner now considers to be important to his mitigation case. Id.

The Petitioner first argues that counsel failed to find and introduce records that dealt with his involvement in two car acci-

---

**35.** Had it not been presented, the Petitioner would likely now argue that it should have been. The attorneys simply "can't win for trying," as hindsight involves this type of

"Monday morning quarterbacking," i.e., second-guessing after-the-fact.

**36.** See supra note 35.

dents. Id. at 51–52. The Petitioner argues that he sought treatment from Army medical providers in 1995 for cysts on his forehead that he believed were caused by pieces of glass embedded under his skin from an earlier car accident. Id. Attach. 23, at 1. In 1996, he claims involvement in a head-on collision, and military medical records show that the Petitioner followed up with an Army doctor for injuries from that car accident to his legs, knee, calf, shoulder, and neck, and was directed to undergo physical therapy. Id. Attach. 23, at 2–3. He later complained of insomnia, vertigo, and short-term memory loss, and was informed that PTSD and life stressors were possible etiologies. Id. Attach. 23, at 12.

Hudgins has stated that he tried to find records relating to the Petitioner's head injuries, including records of the 1996 car accident, but he could not locate initial treatment records. Id. Attach. 5, ¶ 5. There is nothing to suggest that counsel acted unreasonably in searching for these records. Further, the 1996 car accident was known at the time of trial, and Dr. Montalbano and Dr. Patterson, the government's experts, found no permanent health effects from it. ECF Nos. 276, 277. The Petitioner does not show how the records he now cites would have supported a mitigation defense, as many of the factors mentioned in the report, such as possible PTSD, were in other expert reports, and counsel still found a mental health strategy unhelpful.[37] As such, the Petitioner fails to show prejudice from counsel's inability to locate all the records related to the car accidents, or that counsel was deficient in not finding and introducing the records.

The Petitioner further mentions that he wrote letters about the 1996 car accident and how he had saved the lives of multiple people. Mot. at 52. It is unclear how such letters would have aided his mitigation case. Counsel was already aware of the 1996 accident. Expert reports from both parties indicated that the Petitioner experienced grandiose thinking, including that he had saved multiple lives, but no other evidence of these life-saving events seems to exist, outside of the Petitioner's letters. As such, counsel already had the opportunity to consider what to do with the information that was contained in the letters, and based on their chosen strategy, they were not deficient for declining to introduce the letters at trial.

The Petitioner next references records from the Portsmouth City Jail. Id. at 52–53. The report that he mentions includes a discussion of the Petitioner's concern about HIV exposure after his cellmate fell and lacerated his head. Id. Attach. 16, at 2. The Petitioner also experienced a runny nose, watery eyes, and a feeling of sickness, which he attributed to mustard gas exposure in the military. Id. Attach. 16, at 3–4. The jail records state that the Petitioner was "somewhat grandiose," "his thoughts were flighty and rambled on," and that he "verbalized some delusional material." Id. Attach. 16, at 4. This is all similar to the many mental health records and expert opinions that counsel reviewed and decided against introducing. Accordingly, counsel's decision not to introduce these jail records is objectively reasonable, as the records did not aid in the defense's chosen mitigation strategy.

The Petitioner next references brain scans from August 2009. Id. at 53. Dr. Merikangas, a defense expert, now states after-the-fact that the scans show white matter hyperintensities, consistent with the Petitioner's history of head injuries and migraines. Id. Attach. 2, at 4. At the

---

**37.** Hudgins now states that these records were "the type of information I was looking for at the penalty phase," but he fails to explain whether, and how, they would have changed his strategy. Mot. Attach. 1, at 3.

time of trial, however, it appears the scans were read as normal, so counsel was not deficient for declining to introduce them. See id. Attach. 22, at 1. Although Hudgins now claims that the results of the scans could have been used during the penalty phase, that does not change the reasonableness of his decision at the time it was made, based on the information then available. Reply Attach. 1, at 2.

The Petitioner argues that counsel could have introduced medical records of his parents, which would have shown a family history of depression and other mental illness, and a possible history of domestic abuse. Mot. at 53–54. However, evidence of the Petitioner's family history and abuse was presented at trial. The jury even found two mitigating factors for the Petitioner because he witnessed domestic violence and family conflict when he was younger. Special Verdict Form—Selection Phase, at 3–4, ECF No. 291. The Petitioner fails to show how additional evidence about his parent's mental health or domestic situation would have supported counsel's chosen strategy, and the court finds that counsel was not ineffective for not introducing this information.

The Petitioner argues that the government's experts' reports indicated that the Petitioner suffered from migraines, attention deficit disorder, and post-traumatic stress disorder. Mot. at 53. Presumably, this assertion is meant as an argument that counsel should have tried to have the government records introduced. Had counsel chosen a mental health mitigation strategy, the reports would likely have been presented to the jury; however, the facts in them are not helpful to the defense. Thus, it is unclear why the Petitioner now argues counsel was ineffective for not having the prosecution expert reports introduced, other than to just add more unnecessary confusion at this juncture.

### b. Government Experts—Dr. Patterson and Dr. Montalbano

■ Dr. Patterson created a twenty-four page report dated June 24, 2009. ECF No. 276. The report by Dr. Patterson states that "it is my opinion that Mr. Runyon does not suffer from any serious mental illness, mental disorder, or brain pathology and that there are no mental health factors that are mitigating or aggravating to whatever sentence, if any, is determined by the court." Id. at 23. He then goes on to say that the Petitioner "meets the criteria for a diagnosis of Personality Disorder, Not Otherwise Specified with Narcissistic Features." Id. Dr. Patterson wrote that such narcissistic traits, including the Petitioner's history of externalizing responsibility and entitlement, may have affected jobs or relationships, but that they are not a serious mental illness that would be either an aggravating or mitigating factor in sentencing. Id. He also believed that the Petitioner's self-reported history of concussions and memory problems did not indicate serious or severe impairments suggestive of significant brain damage. Id. at 24.

Dr. Montalbano wrote a thirty-one page report in February 2009 based on extensive testing and discussions with the Petitioner. ECF No. 277. Testing showed the Petitioner's intellectual functioning to be in the high average range, with "no evidence of delusions, hallucinations or disorganized speech or behavior." Id. at 29. He did note that the Petitioner displayed personality driven factors "such as irresponsibility, conflict with peers [and] supervisors, unrealistic expectations for success, irritability and lack of insight," as well as lack of attention to detail. Id. While attention to detail may have been related to the car accident in November 1996, Dr. Montalbano believed the other issues predated the accident. Id.

Dr. Montalbano wrote that "the records reviewed and the testing performed during this evaluation support the conclusion that Mr. Runyon does not suffer from any major mental illness. There is however evidence of personality dysfunction." Id. at 30. He stated that only a more detailed investigation could definitively rule out brain dysfunction, but the results of his evaluation "find no significant impairment in overall intellectual functioning." Id. Ultimately, Dr. Montalbano found that "[w]ith regard to the mitigating factors of impaired capacity and severe mental or emotional disturbance, the results of this evaluation do not suggest that Mr. Runyon was under any unusual or substantial emotional or psychological duress during the time frame of the alleged offense." Id. at 31.

Based on the opinions contained in the government's experts' reports, counsel was not deficient for choosing to exclude them from consideration by the jury. While some information may have been helpful, or at least neutral, the majority of the reports would have undermined testimony about the Petitioner's positive family and work history, and would have hindered a mental health mitigation strategy. Defense counsel obviously could not "cherry pick" from these reports—it was all or nothing. Accordingly, the court finds that it was reasonable, and counsel certainly was not ineffective, for avoiding introduction of the government's experts' reports on the Petitioner's mental health.

### c. Lay Witnesses

██ The Petitioner next lists multiple lay witnesses who could have testified to provide more background into his psychosocial history. Mot. at 54. These witnesses relate to the different aggravating and mitigating factors, the car accident, his family background, and his belief that Cory Voss was molesting his own children. The court will address each group of witnesses in turn.

The Petitioner first argues that Dr. Cunningham could have testified about transgenerational family dysfunction and its effect on the Petitioner's mental state, as it relates to the abuse of women aggravator. Id. at 56. The court, however, had limited the scope of Dr. Cunningham's testimony because Dr. Cunningham had not included this information in his mental health reports filed with the court, see Tr. at 2079,[38] so counsel was not ineffective for failing to elicit this testimony.

The Petitioner also contends that David Dombrowski, his father; Mark Runyon, his brother; Maria Runyon, his ex-wife; and Scott Linker, his former brother-in-law, could have testified and provided context related to this aggravating factor. Mot. at 56–59. Counsel's strategy was to focus on positive traits, so drawing attention to instances of domestic violence, failed relationships, and restraining orders may have counteracted that strategy. As such, the Petitioner fails to show that counsel was deficient for not introducing this testimony. Further, he fails to show prejudice, as there was already testimony about his family history of domestic violence, and the jury found two mitigators in his favor based on that evidence. Special Verdict Form—Selection Phase, at 3–4, ECF No. 291. It is unclear what more testimony about such violence would have done to lessen the abuse of women aggravator.

The Petitioner next argues that counsel should have introduced lay testimony relevant to the family violence mitigator. Mot. at 59–61. This would include testimony by Suk Cha Runyon, his mother; David Dombroski; and Mark Runyon. Id. As men-

---

**38.** Again, the court's ruling is not at issue here on collateral review.

tioned above, counsel did introduce testimony about the Petitioner's background and abuse at trial. The jury even found mitigating factors related to such evidence, when it determined that the Petitioner witnessed domestic violence and family conflict when he was younger. Special Verdict Form—Selection Phase, at 3–4, ECF No. 291. Additional evidence would have been unnecessary, and counsel reasonably could have concluded that a better plan was to spend that time focusing on a different mitigating factor. Furthermore, defense counsel did try to have the Petitioner's mother testify as to her background. Tr. at 2411–13. The court sustained the government's objection, as this testimony was not relevant to the mitigating factors counsel chose to introduce. Id.[39] For these reasons, counsel was not deficient for choosing not to introduce additional evidence about this mitigator, nor can the Petitioner show prejudice as the jury found this factor in favor of the Petitioner.[40]

The Petitioner further contends that counsel should have called Thomas Preston, a parachute rigger who served at Fort Benning with the Petitioner; Robert and Deborah Seeger, friends of the Petitioner at Fort Benning; Maria Runyon; Mark Runyon; and Captain Jeffrey Harris, of the Fayetteville Police Department, to testify about how the car accident affected the Petitioner's personality. Mot. at 61–65. However, the medical records and doctor opinions in the record do not definitively show that the car accident caused long-term effects to the Petitioner's behavior and personality, and none of these witnesses were experts. Even if there was such a personality change, the Petitioner is unable to show prejudice. According to declarations the Petitioner filed, testimony on this subject would have shown that he became unpredictable, easily frustrated, and paranoid. Id. It is unclear how failure to introduce such information undermines confidence in the outcome, which is that he received the death penalty for a carefully planned contract kill. A personality change is not a defense to murder.

The Petitioner also argues that there were available witnesses who knew him in the time prior to the crime and arrest, and defense counsel should have had those individuals testify. Id. at 65. The Petitioner argues that this could have been used to rebut the government's argument that the defense witnesses had no recent contact with the Petitioner, and that the Petitioner had changed and was not the same caring and kind person described by his witnesses. Tr. at 2610, 2613, 2618–19.

One of these witnesses, Chad Costa, was mentioned in Claim Three, and the court has already discussed why counsel was not ineffective for declining to have him testify. The Petitioner adds nothing in this claim that changes the court's earlier analysis. The other potential witnesses are Matt Long, Paula Dalton, and David Dalton. Mot. at 65–67. Although it is unclear why defense counsel did not call these individuals, the court finds no reason to doubt defense counsel's decision. The Petitioner has failed to show that counsel acted in an objectively unreasonable way, and choosing what witnesses to call is certainly an important part of counsel's trial strategy, which is given much deference by the court. The Petitioner also fails to

---

**39.** The Petitioner argues that counsel was ineffective for not explaining the relevance of his mother's testimony or preserving the issue for appeal, but counsel did argue to the court that the testimony would help explain why the Petitioner turned out the way he did. Tr. at 2412. In the court's opinion, this issue was preserved for appeal and not raised. Importantly, though, the court finds that counsel did not act deficiently in this regard.

**40.** Again, this is an example of a "red herring" argument.

show a reasonable probability of a different outcome had witnesses who knew the Petitioner close to the time of the crime testified, considering all the evidence introduced against him at trial.

The Petitioner next argues that Maria Runyon could have testified that after the Petitioner left her and her children, the children's biological father re-entered their lives, and that within a year of the murder of Cory Voss, the father molested one of the children and was convicted. Id. Attach. 28, ¶ 31. Presumably, the Petitioner cites this information to show additional motivation for his undocumented belief that Cory Voss was molesting his own child and why that would upset him. The jury found in favor of the Petitioner on this mitigator; so he can show no prejudice from counsel's decision not to introduce this evidence. Special Verdict Form—Selection Phase, at 4, ECF No. 291.

### d. Defense Experts—Dr. Mirsky, Dr. Merikangas, Dr. Cunningham, and Dr. Dudley

██ In the final part of this claim, the Petitioner argues that had counsel included expert mental health testimony, counsel could have established mitigators of disturbance and impaired capacity. Mot. at 67. He argues that such testimony would have shown he had an impaired mental state and decision-making ability, as well as a potential brain abnormality and cognitive defects. Id. at 67–68. This section is similar to Parts IV.F.3 and IV.F.4, and the court incorporates its earlier analysis of the Petitioner's mental health history and counsel's strategy into this section.[41]

The Petitioner alleges that the testimony of Dr. Mirsky would have aided in his mitigation defense. Id. at 68. In August 2015, Dr. Mirsky prepared a declaration

after performing a series of tests with the Petitioner. Id. Attach. 35. In his report, Dr. Mirsky wrote that the Petitioner's test results for non-verbal tasks were in the impaired range, and the Petitioner showed evidence of high response time variability, both of which are consistent with damage to the right side of the brain. Id. Attach. 35, at 6. The Petitioner's verbal and memory skills were very strong, and Dr. Mirsky reported that the Petitioner improved or remained consistent on many of the tests that were administered before trial. Id. His final conclusion was that the results "indicate the presence of significant damage to the right side of the brain, as well as a psychotic disorder," both of which could stem from past head injuries. Id.

However, these findings were made in 2015 and were not available to counsel at the time of sentencing. As discussed in more detail in the earlier sections, based on the evidence available from multiple tests and medical records at the time of trial, counsel made an informed and reasonable decision not to pursue a mental health-based mitigation strategy. This new declaration does not change counsel's earlier decision.

Moreover, Dr. Merikangas conducted a neurological examination in 2009, after the Petitioner was found eligible for the death penalty, and he conducted another exam on August 24, 2015, in preparation for the filing of the instant Motion. Id. Attach. 2. In 2009, Dr. Merikangas suggested that the Petitioner may suffer from "Migraine-like Headaches, Attention Deficit Disorder and Post–Traumatic Stress Disorder," and suggested that an MRI and PET scan be performed. Id. Attach. 2, at 5. In the 2015 declaration, Dr. Merikangas reported that he had reviewed the MRI and PET scans

---

41. Here, the Petitioner has filed updated mental health information. The murder occurred on April 29, 2007. The trial was in the Summer of 2009. The four new declarations, which the court will now discuss, were prepared in the Summer of 2015.

that were done in August 2009. Id. Attach. 2, at 4. He found that the MRI revealed multiple white matter hyperintensities consistent with the Petitioner's history of head injuries and migraines, and the PET scan was non-diagnostic. Id. Dr. Merikangas also stated that if he had testified at trial, he would have said that the Petitioner was "a brain damaged individual with migrainous headaches and a disorder of executive functioning with symptoms suggestive of a psychotic thought process." Id. Attach. 2, at 1. He does not provide much detail for this diagnosis, and the court notes that his reading of the MRI and PET scan was not made until after trial.

Accordingly, the declaration does not indicate that counsel ignored important, potentially mitigating, mental health evidence at the time of trial. Counsel either already had the information and reasonably chose not to use it, or the information was gathered in preparation for filing the instant Motion and would not have been available at trial. Thus, counsel's decision that the best strategy involved focusing on equally culpable co-defendants and other more positive traits was not unreasonable, and this new declaration does not change that decision.

The Petitioner next discusses the report that Dr. Cunningham wrote prior to trial, as well as the recent report he prepared on September 25, 2015. Id. at 72, Attach. 8. Dr. Cunningham testified at trial about his prison violence risk assessment of the Petitioner, but the Petitioner now claims that counsel was ineffective for not having Dr. Cunningham also testify as to adverse factors in the Petitioner's upbringing and background and the possible implications of such developmental factors. Id. at 72. However, counsel had tried to expand the scope of Dr. Cunningham's testimony, but the court limited the topics to which Dr. Cunningham could testify. Tr. at 2079.

The Petitioner is also unable to show a reasonable probability of a different result had Dr. Cunningham testified about his background. Several of the factors now mentioned involve the Petitioner's family and history of domestic violence, which were introduced at trial through other witnesses, and can be seen in the jury's finding of two family violence mitigators. See Special Verdict Form—Selection Phase, at 3–4, ECF No. 291. Further, Dr. Cunningham partially based his 2015 declaration on information not available to counsel at the time of trial, or on the trial testimony itself, in which case the jury heard the information. Mot. Attach. 8., ¶ 8. Accordingly, based on the record at the time of trial, the Petitioner fails to show that counsel acted deficiently in relation to Dr. Cunningham's testimony, or, that by not having Dr. Cunningham testify as the Petitioner now suggests, he suffered actual prejudice.

The Petitioner finally points to a psychiatric evaluation by Dr. Richard Dudley from September 2015. Id. at 76, Attach. 29. In that report, Dr. Dudley opines that the Petitioner suffers from Post–Traumatic Stress Disorder; Borderline Personality Disorder; Schizoaffective Disorder, Bipolar Type; and Neurocognitive Disorder. Id. Attach. 29, at 14. He also argues that alteration of facial expression and affect are symptoms of these disorders. Id. Attach. 29, at 15. Dr. Dudley attributes these alleged problems to issues in the Petitioner's childhood and history of mental disorders in his family, rather than the brain injuries and car accidents as other experts did, and the Petitioner argues that the jury should have been presented with this information. Id. Attach. 29, at 14–15.

Counsel, however, had a chosen mitigation strategy that was reasonable in light of their investigation. Much of the information in Dr. Dudley's report, such as the

Petitioner's family background, was introduced at trial. The other evidence could reasonably have been considered by counsel to be adverse to their chosen strategy. For example, the Petitioner consistently denied involvement in the crime. Counsel may have thought that introducing evidence attempting to explain why the Petitioner committed the crime would go against both what the Petitioner claimed and counsel's strategy based on those assertions. While testimony about the Petitioner's affect may have provided some context for the claim that the Petitioner showed no remorse in the interrogation video, the government argued that lack of remorse was shown not only through the video but through numerous phone calls and conversations about collecting the insurance money and plans to thwart the investigation. Tr. at 2615–17. Accordingly, the Petitioner is unable to show how such testimony would have created a reasonable probability of a different outcome. The court is also convinced that counsel's decision was more than reasonable in light of the facts known at the time and the chosen trial strategy that they thought had the best chance of success.

### 6. Evaluation of Counsel's Strategy Based on All of the Above Factors

The court has individually examined many pieces of evidence that the Petitioner argues counsel was ineffective for not introducing, and it has discussed how counsel was not deficient and/or how there was no prejudice from the decision to forego these pieces of evidence or testimony. The court will now collectively evaluate this evidence and whether counsel was deficient for not introducing it, and, if so, whether prejudice resulted.

To show deficient performance, counsel's actions or omissions must be measured against what "an objectively reasonable attorney would have done under the circum-stances existing at the time of the representation." Savino, 82 F.3d at 599. Courts must be aware that "[i]t is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable." Strickland, 466 U.S. at 689, 104 S.Ct. 2052. Counsel's decisions are often based on a sound strategy, and not incompetence. Lovitt, 403 F.3d at 179. As such, courts should work to eliminate viewing counsel's decision with the "distorting effects of hindsight." Id.

In this case, counsel made a strategic decision to focus on equally culpable co-defendants, family sympathy, and positive prisoner evidence, instead of the Petitioner's mental health, at the penalty phase. This strategy was not ultimately successful, but that does not mean it was deficient. The court has already concluded that counsel performed an objectively reasonable investigation into the Petitioner's mental health, and it will not view counsel's decisions as incompetent based on the fact that some reports were preliminary. Much of the evidence that the Petitioner now suggests would have been cumulative, contrary to counsel's strategy, or simply not of help to the Petitioner's case.

Strickland sets a high bar, and just because a strategy appears better or worse in hindsight does not mean that counsel acted deficiently, given the knowledge at the time of trial. The court will not assume incompetence as the reason for counsel's decision, and the Petitioner has failed to show that trial counsel unreasonably ignored a mitigating strategy that appeared stronger than the strategy counsel decided to use. For the above reasons, and after considering all the evidence and testimony now suggested by the Petitioner, the court

does not find counsel was deficient in their investigation into his mental health, and decision not to use a mental health mitigation strategy.

The Petitioner's final argument in Claim Six is essentially that counsel's decisions in the penalty phase were not only deficient, but also prejudicial; thus, counsel was ineffective. Mot. at 81.[42] The Petitioner contends that counsel should have offered the evidence and testimony discussed throughout this claim to counter both statutory and non-statutory aggravating factors and to strengthen the mitigating factors. Id. at 81–82. Although the court has already found that counsel was not deficient in their chosen strategy, it will nevertheless evaluate this argument.

In assessing this claim, the court will look at the totality of all the potential evidence now offered by the Petitioner. Even when looking at the combined potential strength of this testimony and evidence, however, the Petitioner's argument fails to establish a reasonable probability of a different outcome had counsel done all that he now requests.

Counsel performed a reasonable investigation into mitigating factors and developed a thought-out trial strategy, and the Petitioner's claim of how the jury might have decided differently does not undermine confidence in the outcome. As the government mentions, the mental health evidence is a two-edged sword. Resp. at 76–77. Presenting certain mental health evidence could just as easily have hurt the mitigating factors actually presented, such as the Petitioner's prior acts of kindness, past work and military experience, and the allegation that Cory Voss was molesting his own daughter. Further, the Petitioner cites mental health reports that tend to show he lacked impulse control or had

PTSD, but he fails to show how such evidence would lower his culpability when compared to the government's evidence of a calculated and methodically-planned contract kill.

The court is also unconvinced by the Petitioner's argument that his mental health lessens the substantial planning aggravator. Mot. at 81. Based on the mental health reports available, the Petitioner is unable to prove that his mental health left him as a tool for use in Cat Voss's scheme. His monetary motive is quite clear from the evidence, which included his volunteering for clinical drug trials for compensation, and he fails to show that he could be easily manipulated or lacked understanding of what he was doing.

The Petitioner next references the lack of a complete psycho-social history to argue that counsel was unable to counter the aggravating factors and provide support for the mitigating factors, which caused him to suffer prejudice. Id. at 81–83. The Petitioner claims that the lack of remorse aggravating factor was based on his affect, as seen in the interrogation video, and Dr. Dudley's testimony would have helped provide context for his appearance. Id. at 82. The government argued that this aggravator was also shown through phone calls where the Petitioner and Draven planned their responses to the police, and the Petitioner's boasts that he killed Cory Voss for money. Tr. at 2615–17. Based on all this other relevant evidence, Dr. Dudley's lack of testimony does not undermine confidence in the jury's finding of this aggravator.

The Petitioner also contends that the pecuniary gain statutory aggravator could not have been given much weight because he did not receive the full payment for the

---

**42.** The court has already discussed prejudice as to some of the arguments in Claim Six, and now incorporates that reasoning into this discussion.

murder of Cory Voss. Mot. at 81. The Petitioner, however, did receive some payment, and his purpose for participating in the murder was monetary gain. The Petitioner does not show how his mental health or psycho-social history would have changed the way the jury viewed this factor. As to the abuse of women aggravator, the jury heard about his family history of domestic violence and found two mitigators in his favor. The Petitioner fails to show how additional evidence would have reduced his culpability for his past acts against women and affected the weight the jury gave to that factor.

### 7. Conclusion

For the above reasons, the Petitioner fails to show a reasonable probability of a different outcome had the evidence he now argues for been introduced at trial. The government introduced compelling evidence against the Petitioner, and the jury found both aggravating and mitigating factors, and was clearly able to weigh the evidence. The court now concludes that the Petitioner is unable to show how introduction of mental health evidence or a different focus during the penalty phase would meet the Strickland prejudice standard and undermine confidence in the outcome. The number of exhaustive words, pages, and arguments does not make for a successful outcome in a habeas corpus proceeding, particularly in a case of this comprehensive attention to detail in the presentation of the trial evidence, and the fair consideration by a jury in three phases of trial.

As the court discussed in the earlier parts of this claim, counsel was not deficient in their investigation or decision as to the penalty phase strategy. The court now finds that there was no prejudice resulting from such decisions, and counsel was not ineffective regarding their decisions about the Petitioner's mental health, their investigation into the Petitioner's background, and their final trial strategy.

Claim Six is **DENIED**.

### G. CLAIM SEVEN—CONFRONTATION CLAUSE VIOLATED, AND COUNSEL UNREASONABLY FAILED TO OBJECT AND ASK FOR A LIMITING INSTRUCTION

In this claim, the Petitioner alleges a violation of his Sixth Amendment rights because pre-arrest statements of his co-defendant, Draven, were introduced at trial. Mot. at 84. The statements were made by Draven to a Newport News police officer and to his cellmate, and as the Petitioner did not have an opportunity to cross-examine Draven about the statements, he argues that their introduction violated his Confrontation Clause rights. Id.

### 1. Procedural Default

The government argues that this claim is procedurally defaulted, as counsel failed to raise the issue on appeal, and that nevertheless, it has no merit. Resp. at 78–79. The Petitioner asserts that appellate counsel was ineffective for not bringing the claim on direct appeal, and he suffered prejudice as a result; such a finding would excuse the default. Reply at 64. Because the Petitioner alleges ineffective assistance of trial counsel as its own distinct claim, and of appellate counsel as a means to excuse default, the court must examine the arguments in Claim Seven to determine if the Petitioner can prove that counsel acted deficiently and with resulting prejudice.

### 2. Confrontation Clause Claim

During trial, Detective Larry Rilee of the Newport News Police Department testified about several conversations that he had with Draven. Tr. at 1300–09, 1314–22. These conversations included multiple lies,

interspersed with bits of truth, such as confirmation that Draven and Cat Voss were having an affair. Id. at 1320. Draven also told Detective Rilee that he had called the phone at the Waffle House in Newport News and spoken to the Petitioner the night of the murder. Id. at 1320–21. This fact was then highlighted in the government's closing statement to show that the Petitioner and Draven had contact on the day of the murder. Id. at 1593. The government also introduced testimony from Edward Fodrey, a cellmate of Draven's at Western Tidewater Jail. Id. at 1231–38. During his testimony, Fodrey stated that Draven told him that he hired some "other guy" to get rid of his girlfriend's husband. Id. at 1236. However, as Draven did not testify, the Petitioner had no way to cross-examine him about the statements. Mot. at 84–85.

The Petitioner now argues that introduction of the above statements violated his right to confrontation under the Sixth Amendment, and as set out in Crawford v. Washington, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004). Mot. at 84. Crawford held that out-of-court testimonial statements by a witness are not admissible at trial under the Confrontation Clause, unless the witness is unavailable and there was a prior opportunity for cross examination. 541 U.S. at 68, 124 S.Ct. 1354. Certain hearsay exceptions, such as statements in furtherance of conspiracy, are not considered testimonial. Id. at 56, 124 S.Ct. 1354 ("Most of the hearsay exceptions covered statements that by their nature were not testimonial—for example, business records or statements in furtherance of a conspiracy.").

The Petitioner further argues that because the statements were made by the Petitioner's non-testifying co-defendant, counsel should have objected, or at least asked for a limiting instruction. Mot. at 84–86. In Bruton v. United States, 391

U.S. 123, 137–38, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), the Court found that a non-testifying co-defendant's confession implicates the defendant's Confrontation Clause right, and a limiting instruction does not necessarily protect that right. However, the Bruton rule does not apply, if the statements are proper co-conspirator statements under the hearsay rules. See United States v. Shores, 33 F.3d 438, 442 (4th Cir. 1994) ("We have held, however, that the Bruton rule does not apply if the nontestifying co-defendant's statement is admissible against the defendant under the co-conspirator exception to the hearsay rule set forth in Federal Rule of Evidence 801(d)(2)(E)." (citing Folston v. Allsbrook, 691 F.2d 184, 187 (4th Cir. 1982))).

The court will now evaluate the various statements to which the Petitioner objects. The Petitioner starts by challenging Draven's statement that Draven was having an affair with Cat Voss and Draven's assertion that he spoke with the Petitioner on a pay phone at a Waffle House near the crime scene. Mot. at 85. At trial, the government argued and presented evidence that before the arrest of the Petitioner and his co-defendants, a conspiracy existed and continued among the co-defendants. Tr. at 1596–1608. This continuing conspiracy included lying to law enforcement in an attempt to thwart the investigation and to obtain Cory Voss's life insurance proceeds, and receiving that money was a central purpose of the conspiracy to commit murder for hire. Id.

The particular statements to which the Petitioner now objects were not shown to be lies, pursuant to the trial evidence. However, they were made by Draven after he had told multiple lies to the police about the crime, and were made in the course of an interview during which he was still attempting to cover up the facts of the crime. Id. at 1314–22. During that inter-

view, Draven did not confess to the crime, and soon after that incident, the police interviewed the Petitioner, who continued to lie and attempt to frustrate the investigation. Id. at 1322–26. A conspiracy to cover up the facts of the crime in order to receive the life insurance proceeds was ongoing at the time Draven made the statements, and the court finds these pre-arrest statements were made in furtherance of the conspiracy. As statements of co-conspirators in furtherance of a conspiracy are admissible under Federal Rule of Evidence 801(d)(2)(E) and are not considered testimonial, their admission is not a Sixth Amendment violation under Crawford, and admission of these statements did not violate the Petitioner's rights.

Additionally, any references to the Petitioner by Draven cannot be said to violate Bruton and incriminate the Petitioner. See United States v. Locklear, 24 F.3d 641, 645–46 (4th Cir. 1994) (finding that a co-defendant's post-arrest statement that "he was familiar with the Locklear brothers and that he had known them all his life" could not "fairly be understood to incriminate [defendant] M. Locklear"). The Petitioner argues that the statement by Draven that he and Cat Voss were having an extramarital affair speaks to the Petitioner's guilt. While the affair may be a motive for Draven and Cat Voss to engage in murder and hire someone to commit it, their affair itself does not directly implicate the Petitioner. The fact that the Petitioner and Draven spoke on the phone is also not incriminating due to the evidence put forth by defense counsel to show a prior relationship between Draven and the Petitioner that arose from their time doing clinical drug studies. Draven was attempting to clear himself from suspicion, and although the phone call placed the Petitioner in Newport News, the fact of the prior relationship provided a non-suspicious reason for the call that does not implicate the Petitioner in the crime. The

court also notes that it clearly instructed the jurors that they must evaluate the evidence of each defendant's involvement in the crime separately, and return a separate verdict for each defendant. Tr. at 1682.

■ As to the statements by Edward Fodrey, a jailhouse informant, there is no Confrontation Clause problem. Fodrey made a statement about Draven hiring some "other guy," who "was a friend of his," to kill Cory Voss. Tr. at 1236. The Petitioner's name was never mentioned, and Fodrey testified that Draven tried to contact a number of people online about participating in the conspiracy. Id. Fodrey's statement cannot fairly be said to refer to the Petitioner without additional linking evidence. See United States v. Lighty, 616 F.3d 321, 376–77 (4th Cir. 2010) (noting a difference "between statements that incriminate by inference or only when linked with later evidence and those that obviously refer to a particular person or involve inferences a jury could make even without additional evidence," and only the latter category rises to the level of a constitutional violation (citing Gray v. Maryland, 523 U.S. 185, 196, 118 S.Ct. 1151, 140 L.Ed.2d 294 (1998))).

The Petitioner argues, however, that because the jury heard evidence and argument that connected him with Cat Voss and Draven, it was clear that the Petitioner was Draven's "friend" hired to kill Cory Voss. Reply at 63. This argument is again somewhat nonsensical. Just because people are "friends" does not lead to the conclusion that one would hire the other to commit murder. Moreover, in point of fact, the Petitioner and Draven were friends, and evidence of this connection was certainly relevant and admissible, and just because the statements link to the Petitioner after the introduction of many other pieces of evidence and testimony does not mean the

statements violated Bruton. See Lighty, 616 F.3d at 376–77. The important point is that the statements did not directly implicate the Petitioner without additional evidence linking him to the crime.

For the reasons stated above, the introduction of the statements did not violate the Petitioner's rights under the Confrontation Clause or impermissibly refer to the Petitioner in violation of Crawford and Bruton. As this claim has no merit, appellate counsel was not ineffective for declining to include the issue on appeal. Because the Petitioner fails to show cause and prejudice for not having raised the issue on appeal, this portion of Claim Seven is both procedurally defaulted and lacking in merit.

### 3. Ineffective Assistance of Trial Counsel

██ Along with the underlying Confrontation Clause claim, the Petitioner raises as a separate argument that trial counsel was ineffective for not objecting to the testimony and not asking for a limiting instruction. Mot. at 86. However, trial counsel filed a pre-trial Motion to Sever, in which counsel argued that introduction of Draven's statements at a joint trial would be a Confrontation Clause violation under Bruton. Mem. Supp. at 3–6, ECF No. 89. At an oral hearing on December 8, 2008, the court heard argument on this Motion.

During that hearing, defense counsel argued that the questioning occurred during police interrogation and should be considered testimonial, thus triggering the rules in Bruton and Crawford. Dec. 8, 2008, Tr. at 9–10. The government agreed that the statements were made during police interrogation, but argued that the statements were made in furtherance of the conspiracy and were non-hearsay statements, as they would not be admitted to prove the truth of the matter asserted. Id. at 11. Defense counsel conceded that if the statements were made in furtherance of the

conspiracy, and thus properly admissible under Federal Rule of Evidence 801(d)(2)(E) as co-conspirator statements, then Crawford and Bruton would not be implicated. Id. at 8–9. As the court found that the pre-arrest statements were made in furtherance of the conspiracy, it denied the Motion to Sever. Id. at 14–15. The court also noted that although there was a post-arrest statement, the government agreed not to use it in its case-in-chief, thus eliminating any need to address Crawford or Bruton in relation to that statement. Id. at 15.

The court indicated during the hearing that it would be willing to give limiting instructions regarding the statements, if requested by counsel. Id. at 16. While it is unclear why counsel did not later request such an instruction, the Petitioner is unable to show that the choice not to do so was deficient or prejudicial. After the court already decided that the statements were made in furtherance of a conspiracy, counsel could reasonably not have wanted to challenge the statements again, particularly as they did not directly implicate the Petitioner without more evidence linking him to the crime. Counsel also knew that the court would, and did, instruct the jury that they must consider the acts of the Petitioner and Draven separately, and must reach a separate verdict for each defendant. See Tr. at 1682. Further, the Petitioner is unable to prove prejudice as the Fodrey statements did not name the Petitioner, and Draven's statements could have multiple connotations. With all the other evidence against the Petitioner, the Petitioner fails to prove that a limiting instruction related to a couple of statements would have created a reasonable probability of a different outcome, and the court finds that trial counsel was not ineffective.

The Crawford/Bruton challenge to Draven's statements is procedurally defaulted, and without merit. The Petitioner also fails to show ineffective assistance of trial counsel for not objecting to the inclusion of the statements or requesting a limiting instruction. As such, Claim Seven is **DENIED**.

## H. CLAIM EIGHT—THE PETITIONER ARGUES THAT HIS APPELLATE COUNSEL RENDERED INEFFECTIVE ASSISTANCE.

■ In Claim Eight, the Petitioner alleges ineffective assistance of his appellate counsel because they did not raise certain claims on direct appeal, including but not limited to Claims Seven, Eleven, Twelve, Thirteen, Fourteen, and Sixteen. Mot. at 86–88.[43] The Petitioner also argues that ineffective assistance by appellate counsel should provide an excuse for any procedurally defaulted claim. Id. at 88.

Defendants are entitled to effective assistance of counsel on direct appeal. Evitts, 469 U.S. at 396–97, 105 S.Ct. 830. As with trial counsel, courts evaluate appellate counsel using the two prongs of the Strickland test. See Murray, 477 U.S. at 535–36, 106 S.Ct. 2661 (applying Strickland to a claim of ineffective assistance of counsel on appeal). To determine whether appellate counsel acted deficiently, a court must evaluate whether counsel failed to raise "a particular nonfrivolous issue [that] was clearly stronger than issues that counsel did present" on direct appeal. Robbins, 528 U.S. at 288, 120 S.Ct. 746; see also Jones, 463 U.S. at 753, 103 S.Ct. 3308 ("A brief that raises every colorable issue runs the risk of burying good arguments."). To prove prejudice, the Petitioner must show a reasonable probability that, but for counsel's actions, the result of the proceeding would have been different. Strickland, 466 U.S. at 694, 104 S.Ct. 2052.

The Petitioner argues that many of the claims brought in the instant Motion are stronger than those raised on direct appeal, but he places particular emphasis on two claims, the Batson claim (Claim Sixteen) and the Crawford/Bruton claim (Claim Seven). Mot. at 86–87. He argues that the Fourth Circuit denied some of his appellate challenges as "fail[ing] by a wide margin" and contrary to long-standing precedent, and at least one claim in the instant Motion must be stronger than an issue brought on appeal. Mot. at 87 (quoting Runyon, 707 F.3d at 489). As to the Batson claim, he also argues that counsel did not request strike lists or juror questionnaires, making them unable to even investigate whether a Batson claim existed. Id. at 86.

The Petitioner, however, provides no proof that counsel did not carefully consider what claims to bring on appeal. While the court acknowledges that the Fourth Circuit did not accept all of appellate counsel's arguments, this court does not find in favor of the Petitioner on any of the claims raised in the instant Motion, including Claims Seven and Sixteen. As the court does not find that any omitted argument was stronger than any included argument on appeal, the court finds that counsel did not act in an objectively unreasonable manner in deciding what claims to file. The Petitioner is also unable to show a reasonable probability of a different outcome, had

---

43. The government argues that this claim is partially time-barred, as the original Motion did not mention ineffective assistance of appellate counsel in relation to claims Eleven, Twelve, Thirteen, and Fourteen. Resp. at 85–87. As failing to raise these additional four claims on direct appeal arises out of the same conduct that was in the original Motion—the failure to raise other claims on direct appeal—the court considers these claims to be timely.

counsel raised these new meritless arguments in their appellate brief. Moreover, as the court finds the Batson claim to have no merit now that counsel has had the opportunity to evaluate the strike list and questionnaires, the Petitioner fails to show resulting prejudice from appellate counsel's decision not to request those documents.

The Petitioner finally argues that appellate counsel should have used a different font type so that more arguments could have been included in the appellate brief. Mot. at 87–88. However, appellate counsel used a court-approved font, and, even more important, this court finds that the arguments the Petitioner now suggests should have been included have no merit. Accordingly, Claim Eight is **DENIED.**

Because the court finds appellate counsel was not ineffective for failing to raise the additional claims—Claims Seven, Eleven, Twelve, Thirteen, Fourteen, and Sixteen—contained in this Motion, the court also rejects the Petitioner's argument that ineffective assistance of appellate counsel excuses any procedural default. The Petitioner has made no other argument to overcome default for those claims not raised on direct appeal, and these claims are thereby defaulted. See United States v. Frady, 456 U.S. 152, 167–68, 102 S.Ct. 1584, 71 L.Ed.2d 816 (1982).[44]

### I. CLAIM NINE—THE PETITIONER ARGUES THAT THE HOLDING IN JOHNSON V. UNITED STATES, 135 S.CT. 2551 (2015), INVALIDATES HIS CONVICTION.

The Petitioner next argues that the recent Supreme Court case, Johnson v. United States, —— U.S. ——, 135 S.Ct. 2551, 192 L.Ed.2d 569 (2015), which invalidated the residual clause of the Armed Career

Criminal Act ("ACCA"), applies to his case and causes his conviction to be in violation of the Fifth, Sixth, and Eighth Amendments, the Equal Protection Clause, and the Due Process Clause. Mot. at 88. The Petitioner was convicted of Conspiracy to Commit Murder for Hire, in violation of 18 U.S.C. § 1958 (a) (Count One); Carjacking Resulting in Death, in violation of 18 U.S.C. §§ 2119 and 2 (Count Two); and Murder with a Firearm in Relation to a Crime of Violence, in violation of 18 U.S.C. §§ 924 (j) and 2 (Count Five). Jury Verdict Form, ECF No. 245; see Indictment, ECF No. 3. The ACCA did not apply to his conviction and sentencing, but he argues that the holding in Johnson nevertheless applies to his case. Id. at 88–89. To evaluate this claim, the court must first address the holding and retroactivity of Johnson.

#### 1. Holding and Retroactivity of Johnson v. United States

The ACCA provides enhanced penalties for defendants with three prior convictions for a violent felony or serious drug offense. 18 U.S.C. § 924(e)(1). The ACCA defines violent felony as a felony that

(i) has as an element the use, attempted use, or threatened use of physical force against the person of another; or

(ii) is burglary, arson, or extortion, involves use of explosives, or otherwise involves conduct that presents a serious potential risk of physical injury to another.

Id. § 924(e)(2)(B). The first subsection is known as the force clause, and the "or otherwise involves conduct that presents a serious potential risk of physical injury to another" language in the second subsection is known as the residual clause.

In Johnson, the Supreme Court held that the ACCA residual clause is unconsti-

---

[44] See supra Part IV.G (Claim Seven); infra Part IV.K (Claim Eleven); Part IV.L (Claim Twelve); Part IV.M (Claim Thirteen); Part IV.N (Claim Fourteen); Part IV.P (Claim Sixteen) for discussion of the specific claims raised in Claim Eight.

tutionally vague. 135 S.Ct. at 2557. The Court stated that "[t]wo features of the residual clause conspire to make it unconstitutionally vague." Id. First, "the residual clause leaves grave uncertainty about how to estimate the risk posed by a crime" Id. Second, "the residual clause leaves uncertainty about how much risk it takes for a crime to qualify as a violent felony." Id. at 2558. The analysis under the residual clause of the ACCA "forces courts to interpret 'serious potential risk' in light of the four enumerated crimes," which can lead to problems as evaluating the degree of risk posed by the enumerated crimes is "far from clear." Id. The Court also discussed the problems that arise when trying to evaluate the "serious potential risk" in an "ordinary case" violent felony analysis, and how these concerns were causing the lower federal courts to split on their interpretations of the residual clause. Id. at 2557–60. The Court thus concluded that the residual clause in the ACCA is unconstitutionally vague. Id. at 2557.

The Court decided Johnson on June 26, 2015. Generally, "new constitutional rules of criminal procedure will not be applicable to those cases which have become final before the new rules are announced." Teague, 489 U.S. at 310, 109 S.Ct. 1060. However, there are two exceptions to the Teague bar on retroactivity. Teague generally does not prohibit retroactive application of new substantive rules. Schriro, 542 U.S. at 351, 124 S.Ct. 2519. Additionally, " 'watershed rules of criminal procedure' implicating the fundamental fairness and accuracy of the criminal proceeding," are an exception to the retroactivity doctrine. Saffle, 494 U.S. at 495, 110 S.Ct. 1257.

On April 18, 2016, the Supreme Court held that Johnson created a new substantive rule, which applied retroactively on collateral review. Welch v. United States, —— U.S. ——, 136 S.Ct. 1257, 1265, 194 L.Ed.2d 387 (2016). Thus, if the holding in Johnson applies to the statute under which the Petitioner was convicted, the court may consider the claim, even though Johnson was decided after his conviction became final, on October 6, 2014, when the Supreme Court declined to grant his petition for a writ of certiorari.

### 2. Extension of Johnson to the Petitioner's Case

In the instant case, one of the Petitioner's convictions is for Murder with a Firearm in Relation to a Crime of Violence, in violation of 18 U.S.C. §§ 924(j) and 2. The jury was instructed that the possible predicate crimes of violence were Conspiracy to Commit Murder for Hire, in violation of 18 U.S.C. § 1958(a), and Carjacking Resulting in Death, in violation of 18 U.S.C. §§ 2119 and 2. Tr. at 1705.

The relevant crime of violence definition is a felony that:

(A) has as an element the use, attempted use, or threatened use of physical force against the person or property of another, or

(B) that by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense.

18 U.S.C. § 924(c)(3).

As with the ACCA, the first subsection is known as the force clause, and the second subsection is known as the residual clause. The Petitioner argues that the residual clause in the ACCA is analogous to the one in Section 924(c)(3); thus, the residual clause in Section 924(c)(3) is unconstitutionally vague. Mot. at 88–93. The government contends that the two residual clauses should not be given the same treatment. Resp. at 93–100.

Although the language in the ACCA residual clause and the Section 924(c)(3) residual clause are similar, they are not identical. The ACCA residual clause refers to

"a serious potential risk of physical injury to another" and is preceded by four enumerated crimes, while the 924(c)(3) clause requires "a substantial risk that physical force against the person or property of another may be used in the course of committing the offense." The court's ruling in Johnson analyzed only the ACCA residual clause, and did not address whether the similar language in Section 924(c)(3) was also unconstitutionally vague.

The Second, Sixth, and Eighth Circuits have held that Johnson did not invalidate the residual clause in Section 924(c)(3). United States v. Prickett, 839 F.3d 697, 700 (8th Cir. 2016); United States v. Hill, 832 F.3d 135, 146 (2d Cir. 2016); United States v. Taylor, 814 F.3d 340, 378–79 (6th Cir. 2016). The Fifth Circuit has held that the residual clause in 18 U.S.C. § 16(b), which is nearly identical to the Section 924(c)(3) residual clause, was not invalidated by Johnson. United States v. Gonzalez–Longoria, 831 F.3d 670, 677 (5th Cir. 2016) (en banc). However, the Third, Sixth, Seventh, Ninth, and Tenth Circuits have held that the residual clause in § 16(b) was invalidated by Johnson. Baptiste v. Attorney Gen., 841 F.3d 601, 621 (3d Cir. 2016); Golicov v. Lynch, 837 F.3d 1065, 1072 (10th Cir. 2016); Shuti v. Lynch, 828 F.3d 440, 446 (6th Cir. 2016); United States v. Vivas–Ceja, 808 F.3d 719, 723 (7th Cir. 2015); Dimaya v. Lynch, 803 F.3d 1110, 1120 (9th Cir. 2015), cert. granted, —— U.S. ——, 137 S.Ct. 31, 195 L.Ed.2d 902 (2016). The Fourth Circuit has not decided whether the language in the Section 924(c)(3) residual clause is void for vagueness after Johnson. The Fourth Circuit has had opportunities to rule on this issue, but has chosen not to address the question under the principle of constitutional avoidance. See United States v. McNeal, 818 F.3d 141, 152 n.8 (4th Cir. 2016); United States v. Naughton, 621 Fed.Appx. 170, 178 n.4 (4th Cir. 2015); United States v. Fuertes, 805 F.3d 485, 499 n.5 (4th Cir. 2015).

District courts in this circuit have declined to extend the ruling in Johnson to the residual clause in Section 924(c)(3). See, e.g., Frenzel v. United States, No. 1:03CR364, 2016 WL 6804358, at *3 (E.D. Va. Nov. 17, 2016); United States v. Jimenez–Segura, No. 1:07-CR-146, 206 F.Supp.3d 1115, 1127–29, 2016 WL 4718949, at *9 (E.D. Va. Sept. 8, 2016); United States v. Green, No. CR RDB-15-0526, 2016 WL 277982, at *5 (D. Md. Jan. 21, 2016) ("In light of the many differences between the residual clause in Section 924(c)(3)(B) and the Armed Career Criminal Act's residual clause, and in accordance with the Fourth Circuit's decision in Fuertes, this Court's decision in Hayes, and the other United States District Court decisions ... declining to invalidate Section 924(c)(3)(B) under Johnson, the residual clause in Section 924(c)(3)(B) is not unconstitutionally vague."); United States v. Walker, No. 3:15cr49, 2016 WL 153088, at *8–9 (E.D. Va. Jan. 12, 2016); United States v. Hunter, No. 2:12cr124, 2015 WL 6443084, at *2 (E.D. Va. Oct. 23, 2015) (noting that "[t]he residual clause of the ACCA had faced significantly more confusion in the lower courts, was a much broader clause than § 924(c), and required courts to analyze conduct outside of that conduct required for the charged offense").

In accordance with the other courts in this district, this court declines to extend the holding in Johnson to the residual clause in Section 924(c)(3). Even if the court were to extend Johnson's holding to the residual clause in Section 924(c)(3), the question would remain over its retroactive applicability on collateral review, which only the Supreme Court can determine. See 28 U.S.C. § 2244(b)(2)(A); Tyler v. Cain, 533 U.S. 656, 662, 121 S.Ct. 2478, 150 L.Ed.2d 632 (2001). As such, the Petitioner's conviction under Section 924(c)(3) is not unconstitutional. Claim Nine is **DENIED**.

**J. CLAIM TEN—THE PETITION-ER ARGUES THAT THE JURY INSTRUCTIONS LOWERED THE GOVERNMENT'S BURDEN OF PROOF.**

In this claim, the Petitioner argues that the jury instructions at the penalty phase "unconstitutionally lowered the government's burden of proof in violation of the Fifth, Sixth, and Eighth Amendments." Mot. at 99. The instructions with which the Petitioner disagrees are the charges that the jury must agree that the aggravating factors "sufficiently outweigh" any mitigating factors. Tr. at 2672–73, 2675, 2682–84, 2694.[45] For support, the Petitioner relies on Ring v. Arizona, 536 U.S. 584, 609, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), which held that juries, not judges, must find aggravating factors, and they must do so using a beyond a reasonable doubt standard. Mot. at 99. However, the Petitioner already raised this claim on direct appeal. Runyon, 707 F.3d at 515–16. The Fourth Circuit denied the claim, finding that the court's instructions followed the language of the Federal Death Penalty Act ("FDPA") "virtually verbatim." Id. at 516. The Fourth Circuit also stated that although juries must find aggravating factors beyond a reasonable doubt, that standard of proof has not been extended to the weighing of aggravating and mitigating factors by a jury. Id.

**1. Bar to Relitigating Claims Raised on Appeal**

■■■ A petitioner generally is not permitted to relitigate issues brought on direct appeal in a collateral attack. See Boeckenhaupt, 537 F.2d at 1183. As such, courts may "refuse to reach the merits of a constitutional claim previously raised and rejected on direct appeal." Withrow, 507 U.S. at 720–21, 113 S.Ct. 1745 (Scalia, J., concurring in part and dissenting in part). Exceptional circumstances, however, such as an intervening change in the law, may warrant a departure from this law-of-the-case doctrine. See Davis, 417 U.S. at 342–47, 94 S.Ct. 2298 (holding that when relevant substantive law changed after the petitioner's trial and unsuccessful appeal, the petitioner could file a § 2255 motion for collateral relief based on the intervening change in the law); Jones, 178 F.3d at 796 ("It is equally well settled that a § 2255 motion may not be employed to relitigate an issue that was raised and considered on direct appeal absent highly exceptional circumstances, such as an intervening change in the law.").

■■■ Here, the Petitioner argues that the case Hurst v. Florida, —— U.S. ——, 136 S.Ct. 616, 193 L.Ed.2d 504 (2016), created an intervening change in the controlling law that would allow him to relitigate his claim. Mot. at 100. The government argues that this claim should be denied because Hurst does not represent a change in the law with respect to the issue that the Petitioner raised on direct appeal. Resp. at 113. To determine if the Petitioner may relitigate this claim, the court must first examine the ruling in Hurst.

45. One such set of instructions is below:

In this phase, at the end of your deliberations all 12 jurors must unanimously agree that the aggravating factors sufficiently outweigh any mitigating factors, or in the absence of mitigating factors, that the aggravating factors are themselves sufficient to justify a sentence of death. But if any of you, even a single juror, is not persuaded that the aggravating factors sufficiently outweigh any mitigating factors such that a sentence of death is justified, then the jury may not recommend the death penalty on the verdict form.

Tr. at 2675.

In Hurst, the Supreme Court found that Florida's capital sentencing procedures violated the Sixth Amendment. 136 S.Ct. at 619. The sentencing scheme at issue permitted a jury to render an advisory opinion as to whether a defendant should be subject to the death penalty, but the judge made the ultimate determination after holding a separate hearing and independently weighing the mitigating and aggravating factors. Id. at 620. When deciding if this scheme impermissibly took the decision out of the hands of the jury, the Court relied on the holding in Ring. Id. at 621–22. Similar to the sentencing procedure in Ring, the Florida courts did "not require the jury to make the critical findings necessary to impose the death penalty." Id. at 622. The Court reasoned that "[t]he Sixth Amendment requires a jury, not a judge, to find each fact necessary to impose a sentence of death. A jury's mere recommendation is not enough." Id. at 619. Accordingly, the Court found that a jury's advisory opinion on the death penalty does not protect a defendant's constitutional rights, and it struck down Florida's capital sentencing scheme. Id.

### 2. Extension of Hurst v. Florida to the Petitioner's Case

The court will now determine whether the rule in Hurst applies to the Petitioner's claim about the standard to be used when juries weigh the aggravating and mitigating factors during the penalty phase. Hurst held that the Sixth Amendment requires a death sentence be based "on a jury's verdict, not a judge's factfinding," and a jury's mere advisory opinion is not enough to safeguard this right. 136 S.Ct. at 624. The Petitioner does not argue that the judge was involved in determining or weighing the aggravating and mitigating factors in his case, or was in any other way improperly usurping the role of the jury in deciding whether to impose the death penalty. Rather, the Petitioner argues that the jury should have been required to make its final comparison of the weight of the aggravating and mitigating factors using a beyond a reasonable doubt standard, not a sufficiently outweighs standard. Mot. at 99–101.

That both Hurst and Ring deal with juries in death penalty trials does not automatically mean that Hurst represents an intervening change in the law set forth in Ring, and argued by the Petitioner on his direct appeal. Hurst does not mention the weight a jury should give to the aggravating and mitigating factors, as it is concerned with whether a judge may take over the jury's role in determining these factors. The Petitioner's claim does not deal with that specific issue, and his attempt to link Hurst to his case stretches the holding too far.

As such, the court finds that Hurst does not represent an intervening change in the law, with respect to the issue the Petitioner raised on appeal, and it does not affect the Fourth Circuit's earlier finding that the FDPA requires only that the jury decide "whether all the aggravating ... factors found to exist sufficiently outweigh all the mitigating ... factors found to exist," and that this court's instructions during the penalty phase were proper. Runyon, 707 F.3d at 516 (quoting 18 U.S.C. § 3593(e)). The Fourth Circuit found no error here. Id. at 516.

For the above reasons, the Petitioner is barred from relitigating this claim, and Claim Ten is **DENIED**.

### K. CLAIM ELEVEN—THE PETITIONER ARGUES THAT HIS SENTENCE IS UNCONSTITUTIONAL BECAUSE IT IS BASED ON AGGRAVATING CIRCUMSTANCES THAT ARE ARBITRARY AND OVERBROAD.

In this claim, the Petitioner challenges the aggravating factors presented during

the penalty and eligibility phases. Mot. at 102–05. The jury found two statutory aggravating factors in the Petitioner's case: (1) the Petitioner "committed the offense in consideration for the receipt of, or in expectation of the receipt, of anything of pecuniary value"; and (2) the Petitioner "committed the offense after substantial planning and premeditation to cause the death of a person." Special Verdict Form—Eligibility Phase, at 5–6, ECF No. 255. The non-statutory aggravating factors that the jury found were that the Petitioner (1) "caused injury, harm, and loss to the victim … and the victim's family and friends"; (2) "utilized training, education, and experience" gained during criminal justice college courses, his time in the Kansas National Guard, his work as a law enforcement officer, and his experience as a member of the United States Army; (3) "engaged in acts of physical abuse towards women"; and (4) "demonstrated a lack of remorse." Special Verdict Form—Selection Phase, at 1–2, ECF No. 291. He now contends that the statutory factors unconstitutionally mirrored the elements of the conduct required for conviction, and the non-statutory factors were arbitrary and overbroad. Mot. at 102–05.

### 1. Procedural Default and Bar on Relitigation

The government argues that the claim about the statutory factors is procedurally defaulted because it was not raised on appeal, and that the claim regarding the non-statutory factors cannot be relitigated because it was raised on appeal. Resp. at 115, 117.[46] The Petitioner argues that he can show cause and prejudice to overcome the procedural default because his appellate counsel was ineffective for not raising the statutory aggravating factor claim on direct appeal. Reply at 86. He further ar-

gues that although he challenged the non-statutory factors on appeal, that challenge was based on a different premise than the current claim. Id. at 87.

To determine if the Petitioner can overcome the procedural default, the court will examine the statutory aggravating factor portion of the instant claim to determine if it is stronger than the claims presented on appeal, and if the Petitioner suffered prejudice as a result of counsel's failure to raise it on appeal. If the Petitioner cannot make such a showing, the default may not be excused. The court will also examine the non-statutory factor challenge to see if it is different from the claim presented on appeal, in which case the bar on relitigation would not apply.

### 2. Standard for Evaluating Aggravating Factors

 "[A]n aggravating circumstance must genuinely narrow the class of persons eligible for the death penalty and must reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder." Zant v. Stephens, 462 U.S. 862, 877, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983). This "narrowing function required for a regime of capital punishment may be provided in either of these two ways: The legislature may itself narrow the definition of capital offenses … so that the jury finding of guilt responds to this concern, or the legislature may more broadly define capital offenses and provide for narrowing by jury findings of aggravating circumstances at the penalty phase." Lowenfield v. Phelps, 484 U.S. 231, 246, 108 S.Ct. 546, 98 L.Ed.2d 568 (1988).

 Because of the importance in narrowing the application of the death

46. The government also asserts that this claim is barred by the Teague non-retroactivity doctrine. Resp. at 115. However, there have been

no changes to the relevant law since the Petitioner's case became final, so this claim is not barred by Teague.

penalty, aggravating factors may not be unconstitutionally vague or overbroad. See Tuilaepa v. California, 512 U.S. 967, 972, 114 S.Ct. 2630, 129 L.Ed.2d 750 (1994). "[T]he [aggravating] circumstance may not apply to every defendant convicted of a murder; it must apply only to a subclass of defendants convicted of murder." Id. During the penalty selection phase, it is vital that juries make an "individualized determination on the basis of the character of the individual and the circumstances of the crime," and aggravating factors assist with this determination and narrow down "those defendants who will actually be sentenced to death." Zant, 462 U.S. at 878–79, 103 S.Ct. 2733.

### 3. The Petitioner's Statutory Aggravating Factor Claim

■ The Petitioner argues that because the pecuniary gain and substantial planning statutory factors mirrored elements of the crime of Conspiracy to Commit Murder for Hire, an unconstitutional application of the death penalty resulted. Mot. at 102. However, the Supreme Court has held that a statutory aggravating factor may be the same as an element of the crime of conviction. See Tuilaepa, 512 U.S. at 972, 114 S.Ct. 2630 ("The aggravating circumstance may be contained in the definition of the crime or in a separate sentencing factor (or in both)." (citing Lowenfield, 484 U.S. at 244–46, 108 S.Ct. 546)); Lowenfield, 484 U.S. at 246, 108 S.Ct. 546 ("[T]he fact that the aggravating circumstance duplicated one of the elements of the crime does not make this sentence constitutionally infirm.").[47]

The Petitioner argues that because Lowenfield and Tuilaepa involve sentencing schemes with different narrowing procedures than the FDPA, the legal principles contained in them do not apply to his case. Reply at 85. While the court recognizes that the sentencing schemes in those cases differ from the instant case, the court finds that their reasoning extends to the Petitioner's case.[48] The purpose of statutory aggravating factors is not to require the government to prove facts separate from the crime of conviction for death penalty eligibility; their purpose is to narrow down from all those defendants convicted of murder the specific subclass who may receive the death penalty. See Tuilaepa, 512 U.S. at 972, 114 S.Ct. 2630. Whether this is done in the guilt phase, penalty selection phase, or, as in the instant case, eligibility phase, is not the important question, so long as the factors perform the proper narrowing function. See Lowenfield, 484 U.S. at 246, 108 S.Ct. 546. Further, there is no bar on aggravating factors overlapping with facts of conviction, and such an overlap has been specifically upheld in certain instances. See Tuilaepa, 512 U.S. at 972, 114 S.Ct. 2630; Lowenfield, 484 U.S. at 246, 108 S.Ct. 546.

■ If an aggravating factor was such that it applied to every defendant convicted of murder, or perhaps even a large percentage of those convicted, then that may be a constitutional concern. But that is not the case before the court. Here, the jury found the Petitioner eligible for death after finding the age requirement, a gateway factor, and two statutory aggravators during the eligibility phase. Special Verdict

---

47. Both of these cases involved narrowing the class of defendants eligible for the death penalty at the guilt phase of trial, whereas the FDPA narrowing function occurs during the penalty selection phase.

48. The court also notes that the Petitioner fails to provide any case where a court found that an overlap between the statutory aggravating factors and the underlying facts of conviction was unconstitutional, because the narrowing function occurred during the penalty phase instead of the guilt phase.

Form—Eligibility Phase, ECF No. 255. The aggravating factors of committing the crime in expectation of pecuniary gain and after substantial planning do serve to narrow the class of defendants. Not all murders are committed with substantial planning, and many murders are done without any promise or intent of payment.[49] These factors are not vague, and they apply to only a subclass of those convicted of murder. See Tuilaepa, 512 U.S. at 972, 114 S.Ct. 2630 (stating that an aggravating circumstance must "not apply to every defendant convicted of a murder," but instead must "apply only to a subclass of defendants convicted of murder").

For the above reasons, the court finds that these statutory factors performed the required narrowing function to prevent arbitrary application of the death penalty. That they overlap with facts of the Petitioner's specific crime of conviction does not mean he suffered a violation of his constitutional rights. As this claim has no merit and it is not clearly stronger than any claim raised on appeal, the Petitioner's appellate counsel was not ineffective for failing to argue it on appeal. Thus, the claim is not only without merit, but it is also procedurally defaulted.

### 4. The Petitioner's Non–Statutory Aggravating Factor Claim

In addition to the two statutory aggravating factors found during the eligibility phase, the jury also found four non-statutory aggravating factors during the penalty selection phase.[50] The Petitioner now argues that these factors were "arbitrarily determined by the prosecutors, limited only by their imaginations," and were not based on any clear, objective standard. Mot. at 104.[51]

### a. Bar on Relitigation

The government argues that this claim is barred because it was raised on direct appeal, and regardless, it has no merit. Resp. at 117. The Petitioner did challenge the non-statutory aggravating factors on appeal. Runyon, 707 F.3d at 492–507. Although the factor involving the use of his education and law enforcement training during commission of the crime was challenged for being vague or overbroad,[52] which is part of his current argument, the other factors were challenged for different

---

49. The Fourth Circuit has recognized that a "murder for hire" aggravator performs a proper narrowing function, even if the underlying conviction for first-degree murder required a finding of that same murder contract. Grandison v. Corcoran, 225 F.3d 654, 2000 WL 1012953, at *11 (4th Cir. 2000) (unpublished table decision) ("[T]here is no question that Maryland's 'murder for hire' aggravating circumstance narrows the death-eligible pool of murderers, as not every person convicted of first-degree murder will have taken out a murder contract on his victims."). This factor is similar to the pecuniary gain aggravator in the Petitioner's case.

50. These factors are that the Petitioner (1) "caused injury, harm, and loss to the victim ... and the victim's family and friends"; (2) "utilized training, education, and experience" gained during criminal justice college courses and his time in the Kansas National Guard, as a law enforcement officer, and as a member

of the United States Army; (3) "engaged in acts of physical abuse towards women"; and (4) "demonstrated a lack of remorse." Special Verdict Form—Selection Phase, at 1–2, ECF No. 291.

51. The court notes that the Petitioner brought this same challenge before trial. At that time, the Petitioner argued that the non-statutory aggravators were not based on clear and objective criteria, but were "restricted only by the imagination of the prosecutor," thus presenting a risk that the "death penalty [would] be imposed arbitrarily and capriciously." ECF No. 91, at 52–54. The Petitioner later filed an objection arguing that the factors were vague and overbroad. ECF No. 195. The court denied the motions and overruled the objections. ECF NOS. 143, 217.

52. The Fourth Circuit found that this factor was neither vague nor overbroad. Runyon, 707 F.3d at 502–03.

evidentiary or constitutional reasons. Therefore, there is no relitigation bar to the aggravating factors of harm to the victim and his family, lack of remorse, and abuse of women.

### b. The Prosecution's Use of Non–Statutory Aggravating Factors in the Petitioner's Case

To begin, it is established that the FDPA permits the inclusion of non-statutory aggravating factors during the penalty selection phase. See 18 U.S.C. § 3592(c) ("The jury, or if there is no jury, the court, may consider whether any other aggravating factor for which notice has been given exists."). The purpose for an aggravating factor, either statutory or non-statutory, is to "genuinely narrow the class of persons eligible for the death penalty" and "reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder." Zant, 462 U.S. at 877, 103 S.Ct. 2733. "Once a defendant has been rendered eligible for the death penalty by the jury's finding of a statutory aggravating factor, the use of nonstatutory aggravating factors serves only to individualize the sentencing determination." United States v. Higgs, 353 F.3d 281, 320 (4th Cir. 2003).

To prevent an arbitrary and capricious application of the death penalty, aggravating circumstances may not be vague or overbroad. See Tuilaepa, 512 U.S. at 973, 114 S.Ct. 2630. A factor is unconstitutionally overbroad "[i]f the sentencer fairly could conclude that an aggravating circumstance applies to every defendant eligible for the death penalty." Arave v. Creech, 507 U.S. 463, 474, 113 S.Ct. 1534, 123 L.Ed.2d 188 (1993); see also Tuilaepa, 512 U.S. at 972, 114 S.Ct. 2630 (explaining that a factor "must apply only to a subclass of defendants convicted of murder"). A factor is vague if it lacks "some 'common-sense core of meaning . . . that criminal juries should be capable of understanding'". Id. at 973, 114 S.Ct. 2630 (quoting Jurek v. Texas, 428 U.S. 262, 279, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976) (White, J., concurring)). As vagueness review "often 'is not susceptible of mathematical precision,'" it is "quite deferential." Id. (quoting Walton v. Arizona, 497 U.S. 639, 655, 110 S.Ct. 3047, 111 L.Ed.2d 511 (1990)).

The court now finds that the nonstatutory factors in the Petitioner's case are not vague or overbroad, and did not lead to an arbitrary and capricious application of the death penalty. There is a common-sense meaning to the factors, which is easily understood by a jury, and the factors could not fairly apply to every defendant eligible for the death penalty. Many defendants do feel remorse for their crimes, and do not attempt to constantly hinder the investigation in an attempt to receive monetary gain for their illegal acts. While many defendants may have a criminal history, their criminal history does not necessarily involve abuse of women. That is a specific category of violence used to narrow those individuals subject to the death penalty, and the Petitioner fails to show how this factor is overreaching. Although the impact on the victim's family may apply to most crimes, the Supreme Court has held that such evidence is not barred by the Eighth Amendment, as it may aid the jury in its individualized determination about whether to apply the death penalty. See Payne v. Tennessee, 501 U.S. 808, 827, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991). Further, these factors do not require technical knowledge to be understood, and could not be considered vague. Although the Petitioner may not relitigate this issue, the court also notes the Fourth Circuit's holding on direct appeal that the aggravating factor of using military and law enforcement training in commission of a crime is not vague or overbroad. Runyon, 707 F.3d at 502–03.[53] As such, the Petitioner has failed to con-

---

53. The Petitioner acknowledges that he chal-

lenged this factor on direct appeal for being

vince the court that these factors led to an arbitrary or capricious application of the death penalty, or failed to perform a proper narrowing function.

Moreover, although the government has discretion in choosing the non-statutory factors, such a decision is not determined by the mere whim of the prosecutor. The factors have to be narrow and contain a common-sense meaning, and be designed to aid the jury in making its decision. The non-statutory factors at issue here follow these rules. The Petitioner can point to no convincing reason why such narrow and specific factors caused the death penalty to be imposed in an unconstitutional manner; nor does he present any evidence that the prosecution acted arbitrarily or capriciously in using its discretion to choose these factors. Accordingly, the court finds this claim has no merit.

### c. Ineffective Assistance of Counsel

The Petitioner also briefly alleges ineffective assistance of appellate counsel for not raising this specific challenge to the non-statutory factors on appeal. Reply at 87. Considering that the court now finds this claim lacks merit, the Petitioner is unable to show that the arguments raised on appeal are weaker than this claim, or that there is a reasonable probability of a different outcome had appellate counsel

included this argument in their brief. As such, the Petitioner fails to prove ineffective assistance of appellate counsel with regard to the non-statutory aggravating factor claim.

### 5. Conclusion

The challenge to the statutory aggravating factors is procedurally defaulted, as well as without merit, and the challenge to the non-statutory aggravating factors is without merit. The Petitioner also fails to show ineffective assistance of appellate counsel for not raising this specific challenge to the non-statutory factors on appeal. Thus, Claim Eleven is **DENIED**.

### L. CLAIM TWELVE—THE PETITIONER ARGUES THAT THE GOVERNMENT ENGAGED IN SELECTIVE PROSECUTION BASED ON RACE, AND COUNSEL WAS INEFFECTIVE FOR FAILING TO RAISE THIS CLAIM DURING DIRECT PROCEEDINGS.

In this claim, the Petitioner argues that his rights were violated when the prosecution unconstitutionally sought the death penalty against him based on his race, and his trial and appellate counsel were ineffective for not challenging this decision or raising this claim on appeal. Mot. at 105.[54]

---

vague or overbroad, but he claims his new argument is that the factors are arbitrary and capricious. Reply at 87 n.34. The court notes, however, that he includes an overbreadth argument in this challenge, Mot. at 102–03, and evaluating whether the factors are arbitrary and capricious involves looking at whether they are vague or overbroad. For that reason, the court finds that he cannot relitigate this claim. Regardless, the court finds it has no merit. As seen in the Fourth Circuit's ruling, this factor is not vague or overbroad, and the Petitioner fails to show that the prosecutor improperly chose this factor or that a factor related to using the skills acquired in law enforcement training to murder someone is in any way arbitrary or capricious.

**54.** The government treats this claim as a single claim for ineffective assistance of counsel. Resp. at 118. In his Reply, the Petitioner clarifies that Claim Twelve involves "intertwined claims of selective prosecution ... and trial counsel's ineffectiveness for failing to pursue that claim." Reply at 88. Likely due to this misunderstanding, the government has failed to raise the affirmative defense of procedural default for the underlying selective prosecution claim. See Yeatts v. Angelone, 166 F.3d 255, 261 (4th Cir. 1999) (treating procedural default as an affirmative defense that must be pled by the government). As such, the court will examine the merits to determine if the Petitioner has shown either

He also seeks extensive discovery for this claim. First Mot. for Discovery at 12–21.

### 1. Standard for Selective Prosecution Claims

■ Selective prosecution claims require a "court to exercise judicial power over a 'special province' of the Executive." United States v. Armstrong, 517 U.S. 456, 464, 116 S.Ct. 1480, 134 L.Ed.2d 687 (1996). The Attorney General and United States Attorneys are designated by statute as the President's delegates to ensure the faithful execution of the nation's laws, and they have broad discretion in how to discharge this duty. Id. To prevent a chilling effect on law enforcement and the impairment of an executive function, courts require clear evidence of an equal protection violation to overcome the deference given to these executive officers. See id. at 465, 116 S.Ct. 1480.

■ When arguing selective prosecution, "[t]he claimant must demonstrate that the federal prosecutorial policy 'had a discriminatory effect and that it was motivated by a discriminatory purpose.'" Id. at 465, 116 S.Ct. 1480 (quoting Wayte v. United States, 470 U.S. 598, 608, 105 S.Ct. 1524, 84 L.Ed.2d 547 (1985)). To establish a discriminatory effect in a race case, the petitioner "must show that similarly situated individuals of a different race were not prosecuted." Id.; see also United States v. James, 257 F.3d 1173, 1179 (10th Cir. 2001) ("[A] defendant cannot satisfy the discriminatory effect prong by providing statistical evidence which simply shows that the challenged government action tends to affect one particular group. Rather, the proffered statistics must address the critical issue of whether that particular group was treated differently than a similarly-situated group."). Discriminatory intent is shown through evidence that "the decision to prosecute was 'invidious or in

bad faith.'" United States v. Olvis, 97 F.3d 739, 743 (4th Cir. 1996) (quoting United States v. Greenwood, 796 F.2d 49, 52 (4th Cir. 1986)).

■ When attempting to prove discriminatory effect, a petitioner must do more than provide vague conclusory statements or generalities. See United States v. Roane, 378 F.3d 382, 400–01 (4th Cir. 2004) (holding that such statements were not even enough for an evidentiary hearing). Further, it is not enough for a petitioner to rely on raw statistics to prove selective prosecution. In United States v. Bass, 536 U.S. 862, 863–64, 122 S.Ct. 2389, 153 L.Ed.2d 769 (2002) (per curiam), the Supreme Court held that discovery for a selective prosecution claim was not warranted based on nationwide statistics showing differences in the percentage of death-eligible charging decisions, based on race. The Court stated that the petitioner must make a showing of discriminatory effect by comparing himself to similarly situated defendants, not merely by showing a nationwide pattern of charging decisions. Id. at 864, 122 S.Ct. 2389.

### 2. The Petitioner's Argument for Selective Prosecution

■ To support his claim, the Petitioner cites several studies regarding imposition of the death penalty. Mot. at 106–07. These reports include a declaration by Lauren Cohen Bell, Ph.D.; a report by a subcommittee to the Judiciary Committee from 1994; and a Department of Justice survey of death penalty cases from 1988 to 2000. Id. All of these studies deal with nationwide statistics, and the focus is quite broad. There is no way to narrow down the statistics to find cases with defendants who are similarly situated to the Petitioner. See Bass, 536 U.S. at 863–64, 122 S.Ct. 2389 ("Even assuming that the Armstrong requirement can be satisfied by a nationwide

---

selective prosecution or ineffective assistance

for failing to raise such a challenge.

641 (as opposed to a showing regarding

showing (as opposed to a showing regarding the record of the decisionmakers in respondent's case), raw statistics regarding overall charges say nothing about charges brought against similarly situated defendants."). Simply relying on raw data about the race and gender of the defendants, sometimes with a brief mention of the charge, is not enough to show selective prosecution. The court further recognizes that many of the studies deal with statistics from the 1980s and 1990s, while the crime at issue occurred in 2007, and was prosecuted in 2008–09.

Even the broad statistics in these studies do not necessarily involve the same issues as the Petitioner's case. The Lauren Cohen Bell ("Bell") study cited by the Petitioner evaluates sentencing outcomes when the victim is a white female. Mot. Attach. 38. In this case, the victim is a white male. Also, the Bell study evaluated sentencing outcomes, see id. at 3, but the Petitioner challenges the actual charging decision made by the prosecutor. Further, the Bell study, as with the other reports cited by the Petitioner, relies simply on raw statistics and fails to explore cases in enough depth to determine how similarly situated defendants are treated. See id. at 3–6. The Petitioner does mention statistics from the Eastern District of Virginia, see Mot. at 107, but the statistics fail to show anything other than the race and gender of the defendant and victim. They do not explain how the Petitioner was allegedly treated differently from defendants who were similarly situated to him, as an individual whose "mother is Korean" and whose "father is a white American." See id. at 2.

The Petitioner also references his own co-defendants as proof that similarly situated defendants were not given the death penalty. Id. at 108–10. He argues that his two white co-defendants were not authorized for the death penalty, even though they both had three statutory aggravating factors, and he only had two. Id. at 108. He also argues that the aggravating factors were stronger in the cases of his co-defendants than in his case. Id. at 109.[55]

It is not enough for the Petitioner to simply point to his co-defendants to show unequal treatment, when there are many differences between their cases and the Petitioner's. Cat Voss pled guilty, and thereby avoided any chance of the death penalty. While Draven exercised his right to go to trial, that is not enough to show discriminatory effect. The prosecution had any number of distinctions to take into account when considering all the facts of the crime, including the fact that the Petitioner was the individual who waited for the victim at the ATM machine, actually pulled the trigger and shot the victim, multiple times, and agreed to receive payment to kill a man he did not know; these factors are important considerations when making the decision about whether to seek the death penalty.[56] Accordingly, the Peti-

---

**55.** The court has already addressed parts of this argument in Claim Two, Part IV. B, which alleges that Draven had a more violent past than the Petitioner, and in Claim Four, Part IV.D, which alleges that the Petitioner's co-defendants were more involved in the planning of the crime than the Petitioner. The court denies both claims, and incorporates its reasoning into the relevant parts of this claim.

**56.** The Fourth Circuit noted that

the prosecution exercised its discretion on the basis of a number of distinctions between Runyon and the other defendants—including that Runyon was the actual triggerman in the murder-for-hire scheme; that he accepted payment for killing someone who was essentially a complete stranger; and that he not only never cooperated with the investigation but sought to thwart it at virtually every turn.

Runyon, 707 F.3d at 520 n.6. The court then stated that based on this evidence, overturning the Petitioner's sentence would exceed its

tioner fails to show that he was treated differently from similarly situated defendants, because his co-defendants were not similarly situated to him.

Further, the Petitioner is unable to provide proof that there was discriminatory intent, as he does not present evidence that the decision to seek death authorization was invidious or in bad faith. See Olvis, 97 F.3d at 743. The Petitioner points to the prosecution's introduction of an interrogation video in which law enforcement commented on the Petitioner being "an honorable Asian man," when trying to get a confession. Mot. at 110. While the Fourth Circuit held that admitting the video was error, it held that it was harmless error. Runyon, 707 F.3d at 498. The trial lasted several weeks, and the video was just over forty-two minutes long, with the reference to the Petitioner's race just a small part of that length. Id. at 492. The introduction of this video, which provided partial support to one non-statutory aggravator, is not enough to show that the government had an invidious or bad faith motive in seeking the death penalty against the Petitioner. As the Petitioner fails to show both discriminatory effect and discriminatory intent, he does not make out a claim for selective prosecution.

### 3. Ineffective Assistance of Counsel

The Petitioner also argues that his trial and appellate counsel were ineffective for not objecting during direct proceedings to this allegedly discriminatory application of the death penalty. Mot. at 105. To prove a claim of ineffective assistance of counsel, the Petitioner must show deficient action by counsel and resulting prejudice. See Strickland, 466 U.S. at 687, 104 S.Ct. 2052. Counsel was not deficient in failing to raise this meritless challenge at the trial or appellate level. As to the trial level, counsel's

choice not to raise a claim, with a high burden of proof and little, if any, supporting evidence, does not fall below objectively reasonable norms. At the appellate stage, this claim is not any stronger than the claims counsel did raise, and the circuit court noted its assessment of the exercise of prosecutorial discretion in the case. Runyon, 707 F.3d at 520 n.6.[57] Additionally, the Petitioner cannot show any prejudice from failure to raise this argument earlier, as the claim is without merit, and there is no reasonable probability of a different outcome had this claim been raised by trial or appellate counsel. Claim Twelve is **DENIED**.

### 4. Discovery

■ The Petitioner requests discovery of fourteen different categories of documents dealing with the prosecution's death eligibility determination. First Mot. for Discovery at 18–20. To obtain discovery in a selective prosecution claim, the petitioner must be able to produce " 'some evidence' making a 'credible showing' of both discriminatory effect and discriminatory intent." Olvis, 97 F.3d at 743 (quoting Armstrong, 517 U.S. at 469, 116 S.Ct. 1480). The reason for this heightened standard is that the costs associated with the government's response to a prima facie case of selective prosecution, such as diverting prosecutorial resources and intruding on the Executive's function, are also implicated and imposed by discovery. See Armstrong, 517 U.S. at 468, 116 S.Ct. 1480. Therefore, a petitioner must do more than simply provide raw nationwide statistics to be granted such discovery. See Bass, 536 U.S. at 863–64, 122 S.Ct. 2389.

As discussed above, Part IV.L.2, the Petitioner does not meet even the threshold requirements for a selective prosecution claim. While the discovery standard

---

authority, as the Petitioner provided no evidence of an impermissible basis for seeking the death penalty, such as race or religion. Id.

**57.** See supra note 56 and accompanying text.

is lower than actually proving selective prosecution, the Petitioner still does not meet the discovery standard. The studies the Petitioner cites do not make a credible showing of discriminatory intent and effect. The studies are limited in time, are based on nationwide data, and do not involve an analysis of similarly situated individuals who did not receive the death penalty. Further, based on the differences between the involvement of the Petitioner's co-defendants in the crime, and Cat Voss's decision to plead guilty, the Petitioner is unable to make a credible showing that similarly situated defendants were not authorized for the death penalty. His reference to the brief mention of race in the interrogation video hardly meets the requirement of showing some evidence of an invidious or bad faith prosecutorial intent. Accordingly, the court finds that the Petitioner fails to make even a good cause showing for discovery, let alone some evidence of a credible showing of discriminatory intent or effect. His request for discovery and corresponding interrogatories is **DENIED**.

## M. CLAIM THIRTEEN—THE PETITIONER ARGUES THAT HIS DEATH SENTENCE IS DISPROPORTIONATE AND IN VIOLATION OF THE FIFTH AND EIGHTH AMENDMENTS, AND COUNSEL WAS INEFFECTIVE FOR NOT RAISING THIS CHALLENGE DURING DIRECT PROCEEDINGS.

In this claim, the Petitioner argues that his sentence is disproportionate and in violation of the Fifth and Eighth Amendments. Mot. at 111. He asserts this is because his two co-defendants were not death authorized, and he claims that this implies an arbitrary and capricious application of the death penalty. Id. He also presents a separate argument that his trial and appellate counsel were ineffective for failing to raise this claim during earlier stages of the proceeding. Id.

### 1. Procedural Arguments

The government argues that this claim is barred by the Teague non-retroactivity doctrine. Resp. at 126. The court fails to understand the purpose of this argument, as there has been no change in the relevant procedural law since the Petitioner's conviction became final. As such, it finds the claim is not barred by the Teague non-retroactivity doctrine.[58]

The government's next procedural challenge is that the ineffective assistance claim is untimely because that claim appeared for the first time in the amended Motion, id. at 128, which was filed more than one year after the Petitioner's conviction became final. See 28 U.S.C. § 2255(f). However, the claim for ineffective assistance is grounded in the failure by trial and appellate counsel to raise the underlying claim of disproportionality in seeking the death penalty. The court finds that because the same conduct that gave rise to the underlying claim forms the basis of the ineffective assistance of counsel claim, the ineffective assistance claim is timely.[59]

The government also asserts that Claim Thirteen is procedurally defaulted. Resp. at 125. The Petitioner argues that the claim is based on information that the government failed to provide under Brady, which would provide cause to excuse default, Reply at 91, but it is unclear what materials the government supposedly withheld that would provide support for this claim. The Petitioner also argues that trial and appellate counsel were ineffective for not raising this claim earlier, and that such ineffectiveness should excuse the default.

---

58. See supra Part III.A.4.

59. See supra note 43.

Id. As such, the court will now examine the claim to determine if the Petitioner can prove ineffective assistance of counsel, both as its own independent constitutional claim and as a means to overcome procedural default.

## 2. Disproportionality of the Petitioner's Sentence

The Petitioner contends that the imposition of the death penalty was arbitrary and inconsistent, and it was disproportionate when compared with his co-defendants, who were not death-authorized. Mot. at 111. In support, he relies on Furman v. Georgia, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972). In that case, the court addressed the application of the death penalty and stated that it may not be applied in an arbitrary or capricious manner. Furman, 408 U.S. at 309–10, 92 S.Ct. 2726 (Stewart, J., concurring). Due to the severity and finality of such a punishment, the Eighth and Fourteenth Amendments could not allow the death penalty to be "so wantonly and so freakishly imposed." Id. at 310, 92 S.Ct. 2726. To avoid such an application of the death penalty, a meaningful objective system of review is required. See Proffitt v. Florida, 428 U.S. 242, 259–60, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976); see also Spaziano v. Florida, 468 U.S. 447, 460, 104 S.Ct. 3154, 82 L.Ed.2d 340 (1984), overruled on other grounds by Hurst v. Florida, —— U.S. ——, 136 S.Ct. 616, 193 L.Ed.2d 504 (2016) ("If a State has determined that death should be an available penalty for certain crimes, then it must administer that penalty in a way that can rationally distinguish between those individuals for whom death is an appropriate sanction and those for whom it is not.").

The Petitioner claims that such an objective system of review was not used in his case, because his co-defendants were not death-authorized, even though he argues that they were more involved with the planning of the crime than him. Mot. at

112–13. Draven and Cat Voss were also charged with three statutory aggravating factors, whereas the Petitioner was charged with only two. See Indictment at 13–14.

 In the event this claim is meant as a claim for proportionality review in general, the Petitioner fails to make such a case. Precedent provides that proportionality review, while a safeguard against arbitrary death sentences, is by no means constitutionally required. See Pulley v. Harris, 465 U.S. 37, 44–45, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984) ("Needless to say, that some schemes providing proportionality review are constitutional does not mean that such review is indispensable.... Examination of our [prior] cases makes clear that they do not establish proportionality review as a constitutional requirement."). Further, as the Petitioner even recognizes, see Reply at 90 n.37, the lack of proportionality review by the FDPA does not make the statute unconstitutional. See United States v. Higgs, 353 F.3d 281, 320–21 (4th Cir. 2003) (rejecting claim that the FDPA violates the Eighth Amendment "because it does not require proportionality review of a death sentence").

 As to the issue of the involvement by the Petitioner versus his co-defendants, just because the Petitioner's participation in the crime differed from that of his co-defendants, does not mean that it was arbitrary or capricious to seek the death penalty against only him. Deciding whether to authorize a defendant for the death penalty requires a look at the individual person and his involvement in the crime. As the court in Enmund v. Florida stated:

The question before us is not the disproportionality of death as a penalty for murder, but rather the validity of capital punishment for [the defendant's] own conduct. The focus must be on his culpability, not on that of those who committed the robbery and shot the victims, for

we insist on "individualized consideration as a constitutional requirement in imposing the death sentence." 458 U.S. 782, 798, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982) (quoting Lockett v. Ohio, 438 U.S. 586, 605, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978)).

The Petitioner argues that this case supports his contention that courts should look at the sentences of co-defendants and accomplices when determining a defendant's culpability. Mot. at 112. To the extent Enmund addressed the comparison of co-defendants' conduct, it was to note that the defendant was only a minor participant in the crime, and did not actually shoot or rob the victim. Enmund, 458 U.S. at 787–88, 102 S.Ct. 3368. The Supreme Court then looked at the defendant's individual culpability for just the acts he performed to determine if the death sentence was warranted. Id. at 801, 102 S.Ct. 3368 ("For purposes of imposing the death penalty, Enmund's criminal culpability must be limited to his participation in the robbery, and his punishment must be tailored to his personal responsibility and moral guilt.").

▇▇▇ Accordingly, this court needs to look at the Petitioner's own involvement in the crime when determining if the death penalty was imposed in an arbitrary and capricious manner. Here, as already discussed in addressing selective prosecution in Claim Twelve, Part IV.L.2, the facts show extensive involvement by the Petitioner, and the Fourth Circuit stated that

the prosecution exercised its discretion on the basis of a number of distinctions between Runyon and the other defendants-including that Runyon was the actual triggerman in the murder-for-hire scheme; that he accepted payment for killing someone who was essentially a complete stranger; and that he not only never cooperated with the investigation but sought to thwart it at virtually every turn.

Runyon, 707 F.3d at 520 n.6. Unlike the defendant in Enmund, who was a minor participant and did not shoot the victim, the evidence showed that the Petitioner was actively involved in the planning of the crime. He had numerous discussions with his co-defendant, Draven, to plot the murder. He assembled the necessary items in his "shopping list" to carry out the crime; he brought the .357 magnum the day of the crime; and he traveled from West Virginia to Hampton, Virginia, and waited for the victim at the Langley Federal Credit Union ATM. Finally, he was the one who pulled the trigger and killed Cory Voss. While his co-defendants were also engaged in the planning of the crime, that does not lower the Petitioner's culpability, especially as Cat Voss, the victim's spouse, pled guilty and was able to avoid the death penalty, and instead received four concurrent life sentences.

The Petitioner further argues that the other aggravating factors in his case are evidence of disproportionality. Mot. at 112–13. He contends that Draven had a much more violent background than him, and that this should have decreased the weight of the violence against women aggravator introduced against him. Id. This argument was fully discussed in Claim Two, Part IV.B, and the court again finds that Draven's background was not material to the Petitioner's case. Draven's past, albeit violent, does not affect the Petitioner's culpability, nor does it negate the prosecutor's decision to seek the death penalty for the Petitioner, given an individualized assessment of the Petitioner's background and involvement in the crime.

The Petitioner also argues that he never received payment for the murder, and that the most the prosecution could do was suggest he received a $275 money order from Draven's brother as payment for the crime. Id. at 113. The statutory aggrava-

ting factor is not that the Petitioner received pecuniary gain for the commission of the crime, but that he "committed the offense in consideration for the receipt of, or in expectation of the receipt, of anything of pecuniary value." Special Verdict Form—Eligibility Phase, at 5, ECF No. 255 (emphasis added). The evidence showed that he committed the murder in consideration for, and in expectation of, the receipt of payment, and that he did, in fact, receive some money. The fact that he never received full payment does not take away from his motive to kill a person he did not know for monetary gain. Regarding the Petitioner's argument that his mental health and brain damage make him less culpable than his two co-defendants, id. at 114, the court addresses, and denies, that argument in Claim Fourteen, Part IV.N.

Further, assuming the Petitioner intends this claim as an argument that the government unlawfully exercised its discretion in seeking the death penalty against him, and not Draven or Cat Voss, the claim fails, as "our constitutional system leaves it to the discretion of the Executive Branch to decide who will face prosecution." United States v. Passaro, 577 F.3d 207, 219 (4th Cir. 2009). A petitioner may not "prove a constitutional violation by demonstrating that other defendants who may be similarly situated did not receive the death penalty." McCleskey v. Kemp, 481 U.S. 279, 306–07, 107 S.Ct. 1756, 95 L.Ed.2d 262 (1987).

This is not to say that prosecutors have absolute unchecked discretion. Rather, "[b]ecause discretion is essential to the criminal justice process, we would demand exceptionally clear proof before we would infer that the discretion has been abused." Id. at 297, 107 S.Ct. 1756. The Petitioner fails to provide that exceptionally clear proof. As discussed in more detail in Claim Twelve, Part IV.L, the Petitioner is unable

to show that the government unlawfully sought death authorization for him based on race. In this claim, he is unable to prove any other arbitrary or capricious reason for seeking the death penalty against him, and not his co-defendants. Based on the Petitioner's involvement in the crime, the aggravating factors, and all individual circumstances, seeking the death penalty against the Petitioner, and not his co-defendants, was not disproportionate.

### 3. Ineffective Assistance of Counsel

The Petitioner also raises a challenge of ineffective assistance of trial and appellate counsel for their failure to argue disproportionality. Mot. at 111. He raises this ineffectiveness both as its own claim, and as cause to excuse procedural default. Id.; Reply at 91. He also claims that appellate counsel was ineffective for failing to show that the government exercised its discretion on some impermissible basis. Mot. at 113 n.48. To prove ineffective assistance of counsel, he must show that counsel did not act as an otherwise objectively reasonable attorney would have under the circumstances, and that such deficient conduct resulted in prejudice to the Petitioner. Strickland, 466 U.S. at 687, 104 S.Ct. 2052.

After having examined the merits of the underlying claim, the court finds that the death penalty was not applied in a disproportionate, arbitrary, or capricious manner. Accordingly, trial and appellate counsel were not ineffective for failing to raise this claim. As to trial counsel, the Petitioner's trial attorneys did raise a variant of this claim when arguing that equally culpable co-defendants did not receive the death penalty. Tr. at 2639–49. The jury found this factor in favor of the Petitioner. Special Verdict Form—Selection Phase, at 2, ECF No. 291. Counsel's failure to bring this challenge in the exact manner that the Petitioner does now is not deficient or prejudicial. Although some of the facts may have amounted to a mitigating factor,

they fail to show a constitutional violation, and counsel cannot be faulted for declining to raise a meritless argument. As to appellate counsel, this argument is not stronger than the claims brought on direct appeal, and since the argument has no merit, there is no reasonable probability of a different outcome had appellate counsel made this argument in their brief. For these reasons, the court finds that trial and appellate counsel were not ineffective for their decision not to raise this specific proportionality challenge, and the Petitioner cannot overcome the procedural default.

Appellate counsel also was not ineffective for failing to show that the government exercised its discretion on some impermissible basis. The court has determined that the government did not unlawfully decide to impose the death penalty, so the Petitioner would not have been able to make a successful claim at an earlier point in the proceedings. Accordingly, he is unable to prove that counsel's actions were ineffective.

The Petitioner fails to make a showing of ineffective assistance of trial and appellate counsel, and his disproportionality claim is procedurally defaulted as well as lacking in merit. Claim Thirteen is **DENIED**.

## N. CLAIM FOURTEEN—THE PETITIONER ARGUES THAT HIS DEATH SENTENCE VIOLATES THE EIGHTH AMENDMENT BECAUSE HE IS SEVERELY MENTALLY ILL, AND COUNSEL WAS INEFFECTIVE FOR NOT RAISING THIS CHALLENGE DURING TRIAL AND ON APPEAL.

The Petitioner's next argument is that he is severely mentally ill, and that sen-

tencing him to death violates the Eighth Amendment's ban on cruel and unusual punishment. Mot. at 115. As this claim was not raised on direct appeal, the government argues that it is procedurally defaulted. Resp. at 129.[60] The Petitioner contends that his attorneys were ineffective for not raising this claim, and that such ineffectiveness is its own constitutional claim, as well as cause to excuse procedural default. Reply at 94. Accordingly, to determine if counsel was ineffective for failing to raise this argument, the court will now examine the substance of Claim Fourteen.

### 1. Existing Exceptions to Application of the Death Penalty

When arguing that the court should prohibit the use of the death penalty against defendants with severe mental illness, the Petitioner relies on Atkins v. Virginia, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002), which held that it is an Eighth Amendment violation to give the death penalty to those defendants considered mentally retarded, and Roper v. Simmons, 543 U.S. 551, 125 S.Ct. 1183, 161 L.Ed.2d 1 (2005), which held that the execution of individuals who were under age eighteen at the time of the crime is unconstitutional.

In Atkins, the court held that it is unconstitutional to apply the death penalty to those who are mentally retarded. 536 U.S. at 321, 122 S.Ct. 2242. The court reasoned that those individuals "have diminished capacities to understand and process information, to communicate, to abstract from mistakes and learn from experience, to engage in logical reasoning, to control impulses, and to understand the reactions of others." Id. at 318, 122 S.Ct. 2242. There is also a concern that such defendants "may

---

**60.** The government also argues that this claim is barred by the Teague non-retroactivity doctrine. Resp. at 130. As there has been no change in the relevant procedural law on this issue since the Petitioner's conviction, the Teague doctrine does not apply.

be less able to give meaningful assistance to their counsel and are typically poor witnesses, and their demeanor may create an unwarranted impression of lack of remorse for their crimes." Id. at 320–21, 122 S.Ct. 2242. There is no evidence here that the Petitioner is mentally retarded.

In Roper, the court looked at the differences between juveniles and adults, and noted that juveniles lack maturity and have "an underdeveloped sense of responsibility," which results "in impetuous and ill-considered actions and decisions." Roper, 543 U.S. at 569, 125 S.Ct. 1183 (internal quotation marks omitted). Further, juveniles are "more vulnerable or susceptible to negative influences and outside pressures," and their character "is not as well formed as that of an adult." Id. at 569–70, 125 S.Ct. 1183. Accordingly, the court found it unlikely that either of the justifications for the death penalty—retribution and deterrence—would be advanced by imposing the death penalty against those who were juveniles at the time of the crime. Id. at 571–72, 125 S.Ct. 1183. The evidence here is that the Petitioner was thirty-six years old when he committed the murder of Cory Voss.

### 2. The Petitioner's Argument to Extend the Holdings in Atkins and Roper

■ As both parties recognize, the Supreme Court has never held that applying the death penalty against someone who is mentally ill, even severely mentally ill, violates the Eighth Amendment. The Petitioner, however, argues that this court should promulgate a new constitutional rule prohibiting just that. Mot. at 115–17. The Petitioner argues that the same concerns addressed in Atkins and Roper apply to those defendants who are severely mentally ill. Mot. at 115–17. As he claims to be severely mentally ill, such a prohibition would categorically exclude him from ap-

plication of the death penalty. Id. at 115 n. 50.

To support his claim of extending a ban on capital punishment to those with severe mental illness, the Petitioner argues that national public consensus generally opposes use of the death penalty against defendants suffering from serious mental illness. Mot. at 115–16. He also contends that norms of international law support a prohibition against capital punishment for mentally ill defendants. Id. at 115. He cites various studies and reports to support these assertions. Id. at 115–16. In his Reply, the Petitioner also cites Trop v. Dulles, 356 U.S. 86, 101, 78 S.Ct. 590, 2 L.Ed.2d 630 (1958), to argue that the "evolving standards of decency" in society require the court not to subject the mentally ill to the death penalty. Reply at 92.

In response to the Petitioner's claim, the government first argues that "[t]here is no national consensus in favor of a blanket exemption to capital punishment for the mentally ill," and the court should not create a new constitutional rule extending such protection. Resp. at 130. It also contends that the reasoning in Atkins and Roper does not extend to those defendants with severe mental illness. Id. at 134–36.

The court will first evaluate whether national consensus is in favor of banning the death penalty against mentally ill defendants. The Supreme Court has not instituted a prohibition on applying the death penalty to those with severe mental illness. See Mays v. Stephens, 757 F.3d 211, 219 (5th Cir. 2014) (discussing how neither Atkins nor Roper "created a rule of constitutional law making the execution of mentally ill persons unconstitutional"); Franklin v. Bradshaw, 695 F.3d 439, 455 (6th Cir. 2012) (noting that "no authorities have extended [Atkins or Roper] to prohibit the execution of those with mental illnesses"). Many state high courts have

also acknowledged the lack of a bar against imposing the death penalty on the severely mentally ill, and absent meeting the criteria for insanity, courts generally have permitted application of the death penalty against defendants with serious mental illness. See, e.g., Dotch v. State, 67 So.3d 936, 1006 (Ala. Crim. App. 2010); People v. Hajek, 58 Cal.4th 1144, 171 Cal. Rptr.3d 234, 324 P.3d 88, 173–74 (2014); Diaz v. State, 945 So.2d 1136, 1151–52 (Fla. 2006); State v. Dunlap, 155 Idaho 345, 313 P.3d 1, 36 (2013); State v. Hancock, 108 Ohio St.3d 57, 840 N.E.2d 1032, 1059–60 (2006); Malone v. State, 293 P.3d 198, 216 (Okla. Crim. App. 2013); Mays v. State, 318 S.W.3d 368, 379 (Tex. Crim. App. 2010).

Rather than focusing on federal and state cases, the Petitioner argues that the court turn to international norms and some public opinion data to evaluate whether evolving standards of decency require the court to create a new constitutional rule prohibiting capital punishment against the severely mentally ill. Although the citations to state and federal decisions provided by the government are not binding, the court finds them more instructive than the Petitioner's references to international cases and law. After evaluating the decisions by both federal and state courts that have chosen not to extend Roper and Atkins, this court finds it inappropriate to extend the holdings or the reasoning in Atkins and Roper to defendants with severe mental illness, absent Supreme Court authority.[61]

Finally, as applied to the Petitioner's particular case, the Petitioner fails to show how any alleged mental illness deprived him of the ability to control impulses, make logical decisions, or process information. The crime committed was not a spur-of-the-moment, heat of passion crime, that resulted from impulsivity or an inability to understand what was happening. As found by the jury, it was a calculated murder, which was carefully planned and required deliberate conduct. Thus, even were such a ban against the death penalty for severely mentally ill defendants to exist, the Petitioner does not show that it would categorically apply to him.

### 3. Ineffective Assistance of Counsel

The Petitioner argues that his trial and appellate counsel were ineffective for not raising this challenge during the direct proceedings. Reply at 94. This ineffectiveness claim is meant as both its own argument and as cause and prejudice to excuse the procedural default of his Eighth Amendment claim. Id.

The Petitioner fails to meet the Strickland requirements of deficient conduct by counsel and resulting prejudice. Strickland, 466 U.S. at 687, 104 S.Ct. 2052. As the court finds the claim to extend Roper and Atkins has no merit, the Petitioner has failed to show a reasonable probability of success had counsel presented this argument at trial or on appeal. Further, appellate counsel was not deficient, as this argument is not stronger than any brought on appeal, and trial counsel was not deficient for choosing to forego a claim that is not based on any existing constitutional grounds. Accordingly, the Petitioner is unable to show ineffective assistance of counsel, and this claim is both procedurally

---

**61.** While the court declines to extend Roper and Atkins, in the context of defendants with severe mental illness, it does note that many difficulties would arise from such an extension due to the varying degrees and types of mental illnesses. A person is either under age eighteen or not, as in Roper, or has a certain IQ or not, as in Atkins. By contrast, mental illness takes many forms, and it is also unclear what would qualify as a severe or serious mental illness.

defaulted and without merit. Claim Fourteen is **DENIED**.

### O. CLAIM FIFTEEN—THE PETITIONER ARGUES THAT SELECTION OF THE GRAND AND/OR PETIT JURY WAS TAINTED, AND COUNSEL UNREASONABLY FAILED TO REQUEST AND INSPECT THE JURY SELECTION RECORDS.

In Claim Fifteen, the Petitioner brings a four-part challenge to the jury selection process, consisting of three statutory claims and one ineffective assistance claim. Mot. at 117–24. The government argues that the three statutory parts are untimely and procedurally defaulted. Resp. at 137–38. The Petitioner acknowledges that the claim is not timely, but he argues that counsel was ineffective for not requesting certain jury selection records, and such ineffectiveness should create cause and prejudice to excuse the default. Reply at 94. Accordingly, to determine whether the Petitioner can overcome the default, the court will now address the merits of this claim. If the Petitioner can show that a statutory claim would have had merit, then he may be able to prove his ineffective assistance claim for counsel's failure to request certain jury lists and overcome the procedural default on the remaining arguments.

#### 1. Selection of the Grand and/or Petit Jury Venire

In this claim, the Petitioner argues that the jury selection process was tainted, and he provides a list of alleged errors in the jury selection process. Mot. at 117–18. This list includes such assertions as "[a]t one or more steps, there was a failure to fully and accurately comply with the procedures described in the Plan for the Random Selection of Grand and Petit Jurors in the United States District Court for the Eastern District of Virginia" and "[b]ecause of a computer error, inaccurate computer program, misconduct, or other reason, the names on the master jury wheels, the qualified jury wheels, the grand jury list, and/or the venire called for petit jury service in Runyon's case were not drawn at random from their immediate parent list." Id. He provides no additional supporting information for these claims. He complains that the court has failed to provide him with all the necessary information, but the court has already given him the extensive information available regarding jury selection for both the grand and petit juries, and the court does not know to what, if any, necessary information the Petitioner refers. He simply fails to show how the court denied him any specific information that would actually support any of the claims in his list of "errors."

This claim is simply too broad and overreaching. The Petitioner cannot claim that at some point in time there was some sort of error that caused some type of violation in the jury selection process, without providing any specifics as to that problem. As set forth before, the court finds that this claim has no merit.

#### 2. Compliance with the Jury Selection Plan and the Provisions of 28 U.S.C. § 1861 et seq.

■ In this portion of Claim Fifteen, the Petitioner argues that there was a substantial failure by the court to comply with the procedures in the Jury Selection and Service Act, 28 U.S.C. § 1861 et seq. (the "Act"), and in the Plan for the Random Selection of Grand and Petit Jurors in the United States District Court for the Eastern District of Virginia (the "Plan"). Mot. at 118–19. To be an actionable violation of the Act, the violation must be substantial, and a violation is substantial if it affects the twin objectives of the Act: (1) to provide for the random selection of jurors; and (2) to ensure that juror disquali-

fications, excusals, exemptions, and excuses are based on objective criteria. See United States v. Meredith, 824 F.2d 1418, 1424 (4th Cir. 1987); United States v. Carmichael, 685 F.2d 903, 911 (4th Cir. 1982); United States v. Paradies, 98 F.3d 1266, 1279 (11th Cir. 1996).

■ Technical violations generally do not warrant dismissal or a stay. See Meredith, 824 F.2d at 1424 ("The fact that the array members were passed over for service on previous juries does not amount to substantial noncompliance with the Act. Mere technical deviations do not constitute substantial noncompliance with the Act."); Carmichael, 685 F.2d at 911 ("The district court below recognized that there had been a technical violation of the Plan. The Act, however, requires a substantial violation of its provisions before an indictment may be dismissed.").

■ According to both the Plan and § 1866(d) of the Act, the clerk must note the reason for any person who is disqualified, excused, exempted, or excluded from jury service. The Petitioner argues that the clerk failed to do this, and he uses this as the basis for challenging the court's jury selection procedures. Mot. at 119–21.

In the instant case, four hundred twenty-five (425) jurors were drawn for the petit jury venire, two (2) of whom were deferred and not included on the race/age/gender documents provided to counsel. Out of the remaining four hundred twenty-three (423) potential jurors, two hundred forty-three (243) completed questionnaires. Of the one hundred eighty (180) individuals who did not fill out a questionnaire, the court records provided to counsel show the following facts. Ten (10) jurors were excused for being over the age of seventy; three (3) were deceased; seven (7) had moved out of the jurisdiction; two (2) were emergency personnel; two (2) had job-related or student conflict reasons; two (2) had to care for small children; five

(5) had recent previous service; and ninety-six (96) were excused by court order. To reiterate, a complete list of the foregoing excused jurors was provided and available to trial and current habeas counsel.

The Petitioner first argues that the court order category is not acceptable under the Plan or Act. This argument is frivolous. The court order category includes those jurors who asked to be excused and had those requests decided by the court. It is a specific category that accounts for ninety-six (96) jurors, and the Petitioner's mere speculation that the court would dismiss these jurors for non-objective reasons does not support a claim under the Plan or Act. All were properly excused on the basis of written requests about their personal and professional conflicts, careers, and problems. There were no subjective excusals by the court, and to speculate or suggest otherwise has no basis in fact.

After accounting for the jurors excused, exempted, or dismissed by the clerk and by court order, there remain fifty-three (53) potential jurors not included on the list of excusals, disqualifications, and exemptions provided to counsel. These remaining individuals are potential jurors who were nonresponsive because of circumstances such as ignoring the summons to fill out the questionnaire and having their mail returned as undeliverable. These fifty-three (53) jurors are simply not included, and would not be, on any list of excusals or list to counsel in any case. For example, when a person fails to respond, they are automatically classified in the computer system as nonresponsive, which is a separate area of the jury management system than the excusal codes. The same applies for the remaining jurors not included in the excusal list. As their status in the computer system is not manually edited, unlike that of the responsive jurors who

received formal excusals and disqualifications, they were not on the list given to counsel, nor would they be in any case. The court did not exclude them for non-objective reasons. The computer system ministerially accomplishes this task for these jurors by classifying them as nonresponsive.

In sum, the Petitioner's claim that the most obvious reason they were not included is because non-objective criteria were used is not grounded in any facts or the record, and is not persuasive. The Petitioner simply jumps to a negative conclusion without looking at the most likely solution first, that the individuals failed to respond or show up, and were thus input into the computer system in a different manner than those on the excusal list given to counsel.

The Petitioner also summarily presents that of the four hundred twenty-three (423) jurors drawn for the petit jury venire, two (2) self-identified as Native American and sixteen (16) self-identified as Asian. One of those who self-identified as Native American was non-responsive, and the other was excused. Nine (9) of those who self-identified as Asian were excluded for reasons such as failing to respond, failing to appear, or moving from the jurisdiction. If the Petitioner's four sentences describing these statistics are meant as proof that non-objective criteria were used to exclude jurors, it is not enough and is not supported by the record. He must do more than point to some raw figures to show impermissible reasons for excusal.

As the Petitioner can provide no evidence that the excusals and exclusions of potential jurors were done for non-objective reasons, he is unable to make out a substantial violation of the Act or Plan.

### 3. Participation of an Allegedly Unqualified Juror During the Jury Selection Process

The Petitioner withdraws this argument. Reply at 100. The court further notes for the record that no unqualified juror participated in the jury selection process.

### 4. Ineffective Assistance of Counsel

In the Petitioner's final challenge to this part of the jury selection process, he makes a blanket allegation of ineffective assistance of counsel for counsel's failure to request and examine jury selection records. Mot. at 123–24. It is not clear to what jury selection records the Petitioner refers.

To prove ineffective assistance of counsel, Strickland requires a showing that counsel was both deficient and that there was resulting prejudice to the petitioner. Strickland, 466 U.S. at 687, 104 S.Ct. 2052. It is clear that pursuant to 28 U.S.C. § 1867(f), trial counsel has essentially an unqualified right to inspect jury lists to determine whether the jury selection process complied with statutory and constitutional law. See Test v. United States, 420 U.S. 28, 29–30, 95 S.Ct. 749, 42 L.Ed.2d 786 (1975) (per curiam). The ability to inspect such lists does not require meeting any burden or standard of proof. Here, trial counsel did not make such a request.[62] The Petitioner claims that was due to ignorance or sloppiness, and had counsel acted differently, there is a "reasonable probability of a different, untainted jury and a different result." Mot. at 124.[63]

---

**62.** Counsel had all completed juror questionnaires, names, addresses, and so forth, of the petit jurors ultimately available for selection for trial. The court assumes that the Petitioner is referring to the group of jurors excused, dismissed, or exempted, and those who did not appear, for example as set forth in Part IV.0.2, and not to the two hundred forty-three (243) jurors who completed the questionnaire.

**63.** At a threshold level, and importantly, the Petitioner has not shown a tainted jury. See supra Part IV.0.1.

The Petitioner cites an American Bar Association Guideline that suggests "counsel should consider" challenging jury selection procedures, as proof that counsel was deficient. Mot. at 123. He also argues that counsel have been found ineffective for failing to investigate, and that is essentially the case where counsel did not request the jury information. Reply at 100–01. Counsel were actively involved with the jury selection process here and reviewed all two hundred forty-three (243) completed questionnaires of the eligible jurors. That counsel did not pursue information on jurors who did not fill out questionnaires because they did not appear, or who returned their responses late, and counsel did not pursue further those jurors who were excused by the court, does not make them ineffective. The facts show nothing unusual occurring during this procedure, and counsel would not have had reason to consider a possible jury selection challenge. As such, counsel was not deficient for declining to request the lists.[64]

The Petitioner also cannot show prejudice. After receiving the jury lists, the questionnaires, and the information about the race and gender composition of the petit jury venire and grand jury, all of which the Petitioner now claims his trial counsel should have done, but did not, the Petitioner is still unable to make a successful showing of a substantial violation of the Plan or Act. Had counsel requested and inspected the information earlier, they would not have been able to make a meritorious claim at such time. As such, the Petitioner fails to show that counsel was ineffective regarding this decision, and he is unable to overcome the procedural default for his other arguments in this claim. Claim Fifteen is **DENIED.**

64. See supra notes 62 and 63.

## P. CLAIM SIXTEEN—THE PETITIONER ALLEGES THAT THE GOVERNMENT USED ITS PEREMPTORY STRIKES TO DISCRIMINATE BASED ON RACE AND GENDER, AND COUNSEL UNREASONABLY FAILED TO OBJECT.

In Claim Sixteen, the Petitioner argues that the prosecutors discriminated on the basis of race and gender when using peremptory strikes, in violation of the Fifth Amendment and the holdings in Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), and J.E.B. v. Alabama ex rel. T.B., 511 U.S. 127, 114 S.Ct. 1419, 128 L.Ed.2d 89 (1994). Mot. at 124. He also argues that trial counsel unreasonably failed to object to these strikes. Id.

### 1. Procedural Default

The government argues that the Petitioner's Batson/J.E.B. claim is procedurally defaulted, as counsel did not contemporaneously object to the use of the government's peremptory strikes, nor did counsel raise this issue on appeal. Resp. at 144. In his Reply, the Petitioner argues against default for three reasons: (1) the strike lists were not entered on the record and made part of the docket until after the appeal, so appellate counsel could not have raised this claim based on the facts available at the time; (2) if the record was sufficient to raise the issue on appeal, appellate counsel was ineffective for failing to do so; and (3) trial counsel was ineffective for failing to contemporaneously challenge the government's use of peremptory strikes. Reply at 107–11.

The court is not convinced that the strike lists' entry on the docket after the appeal excuses the procedural default. This is not a case where the court or the gov-

ernment failed to provide information to defense counsel until after direct proceedings, and counsel had no way to know about that information until such time. The Petitioner's attorneys could have made a Batson/J.E.B. challenge during jury selection, or appellate counsel could have requested strike lists and questionnaires had they thought a Batson/J.E.B. claim would be meritorious.

However, the court must also consider the Petitioner's argument that trial and appellate counsel were ineffective for not raising a Batson/J.E.B. challenge during jury selection or on appeal, and such ineffectiveness should excuse the default. In order to determine (1) whether the failure to raise a Batson/J.E.B. challenge during trial or on appeal was ineffective, thus excusing default, and (2) whether the Petitioner can prove his separate ineffective assistance claim for trial counsel's failure to object to the peremptory strikes, the court will now examine the merits of Claim Sixteen.

## 2. Standard for a Batson/J.E.B. Claim

A defendant has "the right to be tried by a jury whose members are selected pursuant to nondiscriminatory criteria." Batson, 476 U.S. at 85–86, 106 S.Ct. 1712. In Batson, the Supreme Court held that "the Equal Protection Clause forbids the prosecutor to challenge potential jurors solely on account of their race." Id. at 89, 106 S.Ct. 1712. When a defendant makes a Batson challenge, the court must conduct a three-step inquiry. Rice v. Collins, 546 U.S. 333, 338, 126 S.Ct. 969, 163 L.Ed.2d 824 (2006). First, the court must determine whether the defendant has met his burden of making a prima facie case that the prosecutor's peremptory challenge was on the basis of race. Id. Second, the prosecutor has the burden to show a race-neutral reason for the strike. Id. (" 'The second step of this process does not demand an explanation that is persuasive, or even

plausible'; so long as the reason is not inherently discriminatory, it suffices." (quoting Purkett v. Elem, 514 U.S. 765, 767–68, 115 S.Ct. 1769, 131 L.Ed.2d 834 (1995) (per curiam))). Third, the court must decide if "the defendant has carried his burden of proving purposeful discrimination." Id. Although this involves evaluating the reasons put forth by the prosecutor, the ultimate burden of proving racial motivation remains with the defendant. Id.

To meet the first step of a Batson challenge, a defendant must make a prima facie case. This requires showing that

(1) the defendant is a member of a distinct racial group; (2) the prosecutor has used the challenges to remove from the venire members of the defendant's race; and (3) other facts and circumstances surrounding the proceeding raise an inference that the prosecutor discriminated in his or her selection of the jury pool.

Keel v. French, 162 F.3d 263, 271 (4th Cir. 1998); see also Batson, 476 U.S. at 96, 106 S.Ct. 1712. This standard has since been modified so that a defendant may raise a Batson claim, even if the defendant is of a different race than the excused juror. Powers v. Ohio, 499 U.S. 400, 415, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991).

The Court later extended the holding in Batson and found that gender-based peremptory strikes are unconstitutional. J.E.B., 511 U.S. at 128–29, 114 S.Ct. 1419. As with a Batson challenge, the defendant must first make a prima facie case of intentional discrimination. Id. at 144, 114 S.Ct. 1419. If the defendant presents a prima facie case, then the prosecution must provide a gender-neutral reason for the strike. Id. at 144–45, 114 S.Ct. 1419. This explanation may not be pretextual, but it does not need to be as strong as a for-cause challenge. Id. at 145, 114 S.Ct. 1419.

### 3. The Petitioner's <u>Batson</u> Claim

The court will first address the Petitioner's claim that the prosecutor exercised peremptory strikes based on jurors' race. Mot. at 127–28. Accordingly, the court must start by determining if the Petitioner has met his burden of making a prima facie case.

#### a. Prima Facie Case

The Petitioner alleges that the government unlawfully struck African American potential jurors. <u>Id.</u> The Petitioner identifies as Asian, as "his mother is Korean" and "his father is a white American." <u>See</u> <u>id.</u> at 2, 128. Although the Petitioner does not attempt to show unlawful peremptory strikes against potential jurors of Asian descent, he may still attempt to show discrimination in the use of peremptory strikes against jurors of other distinct races. <u>See</u> <u>Powers</u>, 499 U.S. at 415, 111 S.Ct. 1364. <u>But see</u> <u>Keel</u>, 162 F.3d at 271 ("While the defendant need not be a member of the same race as the excused jurors in order to raise a <u>Batson</u> challenge, that Keel and the jurors are of different races eliminates the argument that the jurors sympathize with the defendant because they share the same race." (internal citation omitted)).

In order to meet the third prong of a prima facie case, a showing of facts and circumstances raising an inference of discrimination is required, and raw data alone is often not enough. <u>See</u> <u>Allen v. Lee</u>, 366 F.3d 319, 330 (4th Cir. 2004) ("Though statistics are not utterly bereft of analytical value, they are, at best, manipulable and untrustworthy absent a holistic view of the circumstances to which they apply"); <u>Keel</u>, 162 F.3d at 271 (holding that there was no <u>Batson</u> claim even when the prosecution used nearly seventy percent (70%) of its peremptory strikes to remove potential African American jurors); <u>United States v. Tipton</u>, 90 F.3d 861, 881 n.11 (4th Cir. 1996) (rejecting a claim of gender discrimination in use of peremptory strikes when the defendant provided only "raw figures" that eight out of twenty women were peremptorily struck by the government while only two out of twenty-one men were struck). <u>But see</u> <u>Miller–El v. Cockrell</u>, 537 U.S. 322, 342, 123 S.Ct. 1029, 154 L.Ed.2d 931 (2003) ("[T]he statistical evidence alone raises some debate as to whether the prosecution acted with a race-based reason when striking prospective jurors.").

▮ Here, the Petitioner's argument for a prima facie case relies mainly on statistics regarding the use of peremptory strikes by the government. Mot. at 127. Sixty-two (62) individuals were called for voir dire on the first day, and ten (10) were excused for cause. Strike List, ECF No. 424. The make-up of the remaining potential jurors was ten (10) individuals who were African American, one (1) who was Asian, and forty-one (41) who were white. Of the twelve members of the petit jury, nine (9) were white and three (3) were African American. The government used only nineteen (19) of its twenty (20) peremptory strikes, and seven (7) of those strikes were against African Americans. <u>Id.</u>

The Petitioner argues that the government struck seventy percent (70%) of the African American potential jurors, and that based on the Fisher Exact test used by the Petitioner, this is statistically significant. Mot. at 127–28; Reply at 115, Attach. 5. While that is true, the statistics also show that the government used only thirty-five percent (35%) of its available peremptory strikes against African Americans, who made up nineteen percent (19%) of the venire on the first day. Although there is a difference between those percentages, it is not as alarming as the Petitioner makes it out to be. The end result was a jury that was seventy-five percent

(75%) white and twenty-five percent (25%) African American. The government also had one remaining peremptory strike, meaning it could have struck an additional African American juror, if that was its goal. These statistics do not show that the government engaged in discrimination in its use of peremptory strikes.

The only other piece of evidence the Petitioner cites in his Motion is the prosecution's introduction into evidence of an interrogation video that referenced Asian stereotypes. Mot. at 128. While the Fourth Circuit held that admitting the video was error, it recognized such error was harmless, and noted the video was less than an hour in a trial and sentencing that lasted longer than three weeks. Runyon, 707 F.3d at 492, 498–99. The fact that the prosecution introduced a short video clip that touched on race during a weeks-long trial is hardly enough to show a discriminatory intent during voir dire.

In his Reply, the Petitioner also cites the lists created at the court's request before voir dire. Reply at 116–17. Counsel for both parties used the juror questionnaires to make three lists: (1) jurors the parties agreed should be called for voir dire; (2) jurors the parties agreed should not be called for voir dire; and (3) jurors upon whom the parties could not agree. Id. The Petitioner now argues that the proportion of African American to white jurors on these lists shows discrimination. Id. at 117. However, these are just more statistics, and these statistics involve choices by both parties. The Petitioner's argument that a higher percentage of African Americans were on List Three—the list of jurors upon whom the parties could not agree—than the other lists does not support a claim of discrimination. As the Petitioner recognizes, it is not apparent which side wanted the jurors on List Three to come in for voir dire and which side did not. The court will not assume the

government objected to all the African American jurors on that list. Jurors could have been placed on List Three for many reasons, and the Petitioner's unsupported conclusion that it must have been due to race is not persuasive.

Accordingly, after looking at all the information put forth by the Petitioner, and the lack of any other history of discrimination or discriminatory statement by the government, the Petitioner is unable to make out a prima facie case of racial discrimination.

### b. The Government's Race–Neutral Reasons for the Strikes and the Petitioner's Response

 Even though the Petitioner has failed to carry his burden of making a prima facie case, the court recognizes that the government has provided race-neutral reasons for its strikes. The government asserts that the seven African American potential jurors who were struck answered on their questionnaires that they were either opposed to the death penalty or both generally opposed and generally in favor of it. Resp. at 148; see Keel, 162 F.3d at 271 (holding that peremptory strikes did not violate Batson when "[g]iven these jurors' opposition to, or hesitation toward, imposing the death penalty, it is clear that the prosecutor acted well within constitutional bounds in excusing them").

The Petitioner argues that two non–African American potential jurors who were not struck also indicated general opposition to the death penalty. Reply at 121–22. It is established that "[i]f a prosecutor's proffered reason for striking a black panelist applies just as well to an otherwise-similar nonblack who is permitted to serve, that is evidence tending to prove purposeful discrimination to be considered at Batson's third step." Miller–El v. Dretke, 545

U.S. 231, 241, 125 S.Ct. 2317, 162 L.Ed.2d 196 (2005).[65]

Although the court considers that these other jurors indicated opposition to the death penalty but were not struck by the government, the court does not find this to be enough to show that the government's reasons were pretextual. Other than the video clip, the Petitioner can point to no statement that is even arguably discriminatory, and the court has already concluded that the references to strike percentages and the lists does not prove discrimination. Accordingly, not only does the Petitioner fail to make a prima facie case, the government also exercised race-neutral reasons for its strikes, and the Petitioner fails to show that such reasons were pretextual. The Petitioner has failed to make a Batson claim.

### 4. The Petitioner's J.E.B. Claim

The Petitioner also brings a claim based on J.E.B., in which he argues that the government exercised its peremptory strikes in a discriminatory manner based on gender. Mot. at 129–30. The court will now examine the Petitioner's argument to determine if he has made a prima facie case.

### a. Prima Facie Case

■ After strikes for cause, fifty-two (52) potential jurors remained in the venire for the first day. Strike List, ECF No. 424. Twenty-nine (29) were women and twenty-three (23) were men. The government struck thirteen (13) women and six (6) men. Id. The petit jury was made up of eight (8) women and four (4) men. Thus, the end result was a jury that was sixty-seven percent (67%) female and thirty-three percent (33%) male.

The Petitioner argues that this use of peremptory strikes shows discrimination; however, the court disagrees. Fifty-six percent (56%) of the potential jurors remaining after for-cause strikes were women, and the government used only sixty-five percent (65%) of its available peremptory strikes against women. Although the government did strike more women than men, the percentage of its strikes used versus the percentage of women in the venire that day is not enough to show even an inference of discrimination. These statistics do not convince the court that the Petitioner has made a prima facie case that the government used its strikes in a discriminatory manner.

### b. The Government's Gender–Neutral Reasons for the Strikes and the Petitioner's Response

■ Although the Petitioner fails to make a prima facie case, the court recognizes that the government cites the jurors' answer to Question Sixty–One, regarding views on the death penalty, as a proper gender-neutral reason for its strikes. Resp. at 148. The Petitioner argues that the government did not strike two male jurors who gave the same answer to Question

---

**65.** In the Miller–El case, the Court considered the government's reasoning for its peremptory strikes, along with multiple other actions by the government, when deciding the defendant's Batson claim. The Court noted that the government had the order in which the prospective jurors were seated reshuffled several times in order for more of the African American jurors to be near the back of the panel, making them less likely to be chosen for the jury. Id. at 253–54, 125 S.Ct. 2317. More graphic questions were presented to a higher proportion of African American jurors than white jurors, and the questioning about minimum sentences varied by the potential jurors' race, in a way referred to by the Court as "trickery." Id. at 254–63, 125 S.Ct. 2317. Further, the District Attorney's Office had a history of excluding African Americans from the jury, and even had a formal written policy on the matter that was used until 1976. Id. at 264, 125 S.Ct. 2317. This is much different from showing a video clip that made several brief mentions of race and not striking two jurors who were generally against the death penalty.

Sixty–One as the female jurors who were struck. Reply at 125–26. As with the Batson claim, this is not enough to show that the government's reasons were pretextual. Further, unlike with race, where the Petitioner also cites the video and lists as proof of discrimination, the Petitioner offers no additional evidence to suggest even a possibility of discrimination based on gender. He merely speculates that the government may have wanted male jurors, as it would be easier to persuade male jurors "that Cat's moral culpability was not greater than Runyon's". Id. at 84. Interestingly, the reasoning the Petitioner provides for this speculation is his belief that the male and female jurors

> likely would give differing moral weights to evidence of the depraved and promiscuous lifestyle that Cat lived when Cory was at sea. Male jurors were more likely to view this aspect of Cat's conduct as titillating and give it diminished weight; female jurors were more likely to be less forgiving and to view it as contributing to greater moral culpability. In particular, Cat's practice of leaving her children with near-strangers or drugging them with cold medicine so that she could party at bars and with men would more likely be viewed by females, especially those with children, as contributing to greater moral culpability.

Id. at 84–85.

This reasoning, thought up by the Petitioner and which has no support in the record, just perpetuates negative stereotypes about both men and women, when the reasoning behind the ruling in J.E.B. was largely to eliminate such stereotypes from jury selection. See J.E.B., 511 U.S. at 130–31, 114 S.Ct. 1419 ("Intentional discrimination on the basis of gender by state actors violates the Equal Protection Clause, particularly where, as here, the discrimination serves to ratify and perpetuate invidious, archaic, and overbroad stereotypes about the relative abilities of men

and women."). Accordingly, based on the evidence presented, the Petitioner has failed to show that the government exercised its peremptory strikes in a discriminatory way based on gender.

### 5. Ineffective Assistance of Counsel

The Petitioner challenges the effectiveness of both his trial and appellate counsel. He argues that such ineffectiveness will excuse the procedurally defaulted Fifth Amendment claim, and that his trial counsel's ineffectiveness is also a distinct constitutional claim.

#### a. Ineffective Assistance of Trial Counsel

The Petitioner claims that his trial counsel was ineffective for failing to object to the use of the government's peremptory strikes. Mot. at 130. He raises this argument both as a distinct claim and as a means to excuse procedural default. To show ineffective assistance of counsel, he must prove that his counsel's representation was deficient and that there was resulting prejudice. Strickland, 466 U.S. at 687, 104 S.Ct. 2052. To establish that there was deficient representation, the Petitioner must show that counsel's representation "fell below an objective standard of reasonableness." Id. at 688, 104 S.Ct. 2052.

The basis for the Petitioner's ineffective assistance claim is that counsel should have known about the existence of Batson and J.E.B. and the necessity of raising "pertinent objections" to questionable strikes, and that by failing to object to the strikes, counsel acted deficiently. Mot. at 130–31. The court, however, finds nothing to suggest that experienced counsel did not know about the Batson or J.E.B. standards. The government was not striking an inordinate amount of African American or women venire members when compared to their representation after for-cause strikes, and there appear to be no other signs that should have alerted counsel to potential discrimination. Knowing that one

piece of evidence, the video, would briefly and once mention the Petitioner's Asian race is not enough for defense counsel to object to all peremptory strikes of African American jurors.

Further, defense counsel may have had its own reasons for wanting to exclude the challenged individuals from the jury, and thus did not object to the government's peremptory strikes. Perhaps that reason was related to those juror's military connections, as suggested by the government. Resp. at 148. Regardless of the reason, the court will give deference to what appears to be a reasonable decision on the part of counsel not to object to strikes that presented no appearance of discrimination. Accordingly, the Petitioner is unable to show that counsel's actions fell below an objective standard of reasonableness. He is also unable to show prejudice, as the above analysis has shown a <u>Batson</u> or <u>J.E.B.</u> challenge would have been meritless. The Petitioner has failed to prove ineffective assistance of trial counsel, and has yet to overcome the procedural default on his Fifth Amendment claim.

### b. Ineffective Assistance of Appellate Counsel

To overcome the procedural default, the Petitioner also argues that appellate counsel was ineffective for not requesting the strike sheets and raising a <u>Batson/J.E.B.</u> challenge on appeal. Reply at 109–10. One of the Petitioner's appellate attorneys, Teresa Norris, has stated that the failure to request the strike sheets and questionnaires was not a strategic decision. Mot. Attach. 36, ¶¶ 5–7. Regardless of whether counsel had a good reason for not requesting the documents, the court has already concluded that the Petitioner cannot even make out a prima facie case of discriminatory use of peremptory strikes by the gov-

ernment. The Petitioner is unable to prove that he suffered prejudice by counsel's failure to request the strike sheets, as even with the strike sheets, counsel would not have been able to present a meritorious argument on appeal. Accordingly, the Petitioner fails to make a claim of ineffective assistance of appellate counsel, and he cannot excuse the procedural default. Claim Sixteen is **DENIED.**

### 6. Discovery

In order to provide additional support for his claim, the Petitioner requests discovery of extensive jury selection records created by the government, not only for his case but also for other cases tried by the same prosecuting attorneys. First Mot. for Discovery at 7–12. Although the good cause standard for discovery is a lower standard than required for ineffective assistance and <u>Batson/J.E.B.</u> claims, it still requires making specific allegations that may be proven by the requested materials. See <u>United States v. Roane</u>, 378 F.3d 382, 402–03 (4th Cir. 2004) ("Specifically, discovery is warranted, 'where specific allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is ... entitled to relief.'" (quoting <u>Bracy v. Gramley</u>, 520 U.S. 899, 908–09, 117 S.Ct. 1793, 138 L.Ed.2d 97 (1997))); see also <u>United States v. Roane</u>, 378 F.3d 382, 402–03 (4th Cir. 2004) (clarifying that the good cause standard is met when a petitioner establishes a prima facie case for relief).

Here, the Petitioner appears to be going on a "fishing expedition," and nothing more. The statistics and video clip cited by the Petitioner are not enough to show the good cause necessary to warrant discovery of the prosecuting attorney's internal jury selection records.[66] The court will not allow

---

**66.** As an aside, these records likely constitute privileged attorney work product, and the Petitioner has made no showing to overcome

such privilege. See <u>Upjohn Co. v. United</u>

the Petitioner to receive the extraordinary volume of documents he requests simply to search through them for a possible claim, when he fails to make out even a prima facie case of discriminatory peremptory strikes based on race or gender.[67] The request for discovery is **DENIED.**

### Q. CLAIM SEVENTEEN—THE PETITIONER ALLEGES THAT THE VOIR DIRE VIOLATED HIS FIFTH AND SIXTH AMENDMENT RIGHTS, AND COUNSEL'S FAILURE TO OBJECT TO VOIR DIRE PROCEDURES WAS UNREASONABLE.

The Petitioner next alleges that the voir dire procedures violated his Fifth and Sixth Amendment rights to a fair trial and impartial jury. Mot. at 133. He asserts that there were several errors made during voir dire, including that the scope of the questioning was limited, that the court collectively asked the jury questions, and that the court did not ask questions required by Morgan v. Illinois, 504 U.S. 719, 112 S.Ct. 2222, 119 L.Ed.2d 492 (1992). Id. at 133–37.[68] He also claims that trial counsel was ineffective for not objecting to these procedures, id. at 138–39, and suggests that appellate counsel was ineffective for then not raising the issue on appeal. See Reply at 131.

### 1. Procedural Arguments

The government argues that the claim is barred by the Teague non-retroactivity

doctrine and that it is procedurally defaulted. Resp. at 149–50. The Teague argument is irrelevant. As the Petitioner notes, the right to adequate voir dire is not new, and there has been no change in the relevant law since the Petitioner's conviction became final. Reply at 131. As to procedural default, the Petitioner asserts that his argument that trial counsel was ineffective for not objecting to the relevant procedures should constitute cause to excuse default. Id. He further argues that appellate counsel's failure to raise this issue on appeal was ineffective, and should also excuse default. Id.

To determine whether the Petitioner can prove his claim of ineffective assistance of counsel, both in its own right and to excuse default, the court will now examine the various arguments in Claim Seventeen.

### 2. Collective Questioning of the Potential Jurors

■ The Petitioner argues that the manner of conducting voir dire, which involved asking collective questions to all sixty-two individuals present, was unconstitutional. Mot. at 134–35. After asking the collective questions, the court asked potential jurors to stand depending on their answers, and then further questioned those individuals who stood. Id. In this way, each potential juror was not individually asked each question. Id. The Petitioner argues that this permitted twenty-one of the sixty-two jurors to remain silent

---

States, 449 U.S. 383, 401, 101 S.Ct. 677, 66 L.Ed.2d 584 (1981).

**67.** The court acknowledges that the Petitioner does not know the reasoning for the placement of jurors on List Three, but that is not enough for discovery. This request is a "fishing expedition" for a "red herring," and it lacks even the hint of materiality. The Petitioner can point to nothing suggesting discrimination, and his unsupported assumption that the government must have wanted to exclude the African American jurors on List

Three is not enough to show good cause. Importantly, the jury was selected from the agreed upon list, List One, without the necessity to reach Lists Two or Three. See infra and accompanying text.

**68.** The Petitioner also incorporates by reference his argument in Claim S–2 that the questionnaire was flawed. Mot. at 133. The court now incorporates by reference its analysis and decision on that claim. See infra Part IV.R.

during voir dire. Id. at 135. He complains that those jurors who stayed silent may have harbored biases, but the court never engaged in individual questioning to root out those feelings. Id. This argument is far-fetched and frivolous.

"Voir dire plays an essential role in guaranteeing a criminal defendant's Sixth Amendment right to an impartial jury." United States v. Lancaster, 96 F.3d 734, 738 (4th Cir. 1996). This is because voir dire "serves the dual purposes of enabling the court to select an impartial jury and assisting counsel in exercising peremptory challenges." Mu'Min v. Virginia, 500 U.S. 415, 431, 111 S.Ct. 1899, 114 L.Ed.2d 493 (1991).

 The conduct of voir dire is committed to the sound discretion of the trial court, as the court has the opportunity and ability to observe the demeanor and actions of those participating in voir dire, and assess credibility and impartiality. Lancaster, 96 F.3d at 738–39. "[I]t is well established that a trial judge may question prospective jurors collectively rather than individually." United States v. Bakker, 925 F.2d 728, 734 (4th Cir. 1991). Additionally, the Constitution does "not dictate a catechism for voir dire, but only that the defendant be afforded an impartial jury." Morgan, 504 U.S. at 729, 112 S.Ct. 2222. Based on this established precedent, the court was well within its discretion to ask collective questions to those present and then ask specific follow-up inquiries to those jurors who responded in a certain way, even if this meant that some potential jurors were allowed to remain silent.

The Petitioner cites as support that one of the jurors did not stand in response to a question about employment with Langley Federal Credit Union, even though her employer was related to the credit union. Mot. at 135–36. This juror was not employed at the Langley Federal Credit Union in Newport News, Virginia, but at

another affiliated entity. Id. at 135. Importantly, the court had already ordered the potential jurors to fill out questionnaires, so much of the information that may normally be brought out during voir dire, such as detailed employment information, was already of record and known by counsel. Thus, this one example does not convince the court that the decision to exercise its discretion and ask collective questions, as the Supreme Court has established that it may do, violated the Petitioner's constitutional rights in his capital case.

3. **Use of Questions Designed to Determine Bias and Ability to Follow the Law and the Court's Instructions**

 The Petitioner also claims the voir dire was flawed because at several points the court asked whether the potential jurors understood the law, not whether they would or could comply with the law. Mot. at 136–37. This claim is not supported by the record, as it ignores the totality of the voir dire and focuses only on the following five questions by the court:

THE COURT: Now, do you understand that as a juror, however, your first duty is to determine whether a defendant is guilty or not guilty, without consideration of any possible penalty? Is there anyone who doesn't understand that? If so, please stand.

(No response.)

THE COURT: If your answer is "no" to the following questions, please stand.

Do you understand that the law never requires that a person be sentenced to death?

(No response.)

THE COURT: Again if your answer is "no" to any of the following questions, please stand.

Do you understand that the law never requires a person to be sentenced to

death, even if they have been convicted of being the triggerman in a murder-for-hire case?

(No response.)

THE COURT: Do you understand that the law never requires a person to be sentenced to death even if someone who murders a person by shooting him in the course of a carjacking is so convicted?

(No response.)

THE COURT: Do you understand that the law never requires that a person be sentenced to death even if the person is convicted of murdering a person by shooting him in the course of a bank robbery?

(No response.)

Tr. at 59, 123–24.

The Petitioner states that the above questions ask only whether a juror understands the law, not whether the person could or would follow the law, and that these were not proper reverse–Witherspoon questions. Mot. at 136–37; Reply at 135. He argues that because the court did not explicitly ask if the jurors could comply with the law, his conviction and sentence were obtained in violation of the Constitution. Id. at 137. In support for his argument against the final four questions, he also cites Morgan, 504 U.S. at 733, 112 S.Ct. 2222, which held that a defendant has a right to inquire into whether any juror would ignore the instructions of the court and automatically vote for death after a finding of guilt. He argues that these four questions did not allow for such an inquiry. Mot. at 137. At a threshold level, the Petitioner overlooks the entire voir dire conducted and isolates a few questions. The court specifically asked whether there was anyone who did not understand a juror's first duty would be to determine guilt, without consideration of any possible penalty. Tr. at 59, 171. The process made it clear that any determination of whether to impose the death penalty would only take place after an additional hearing. See id.

However, "[j]ust how an inquiry adequate for this specific purpose should be conducted is committed to the discretion of the district courts." Tipton, 90 F.3d at 878. The facts of the instant case are different from Morgan, where the judge asked variations on the following questions: (1) "Do you know of any reason why you cannot be fair and impartial?" (2) "Do you feel you can give both sides a fair trial?" and (3) "Would you follow my instructions on the law even though you may not agree?" 504 U.S. at 723–24, 112 S.Ct. 2222. Morgan held these "general fairness and 'follow the law'" type of questions are inadequate in determining jurors who would automatically vote for the death penalty. Id. at 734, 112 S.Ct. 2222.

Although the Petitioner argues that the questions in Morgan are similar to the instant case, the Morgan questions are vague and focus on general fairness and ability to apply the law. There is no mention of the death penalty. Here, the court specifically asked if the jurors understood the law in relation to the death penalty and the charged crimes. Tr. at 59, 123–24, 171, 174–75. The jury was not provided with vague generic questions, but with questions that focused on the specific issues that would be introduced at trial, and such questions did not violate the Petitioner's rights.

Importantly, at the start of voir dire, the court explained to the jurors that they would have to put aside any passions or prejudices, and decide the case based on the law given by the court and the evidence presented. Tr. at 52–53. The court then asked anyone who felt that he or she could not do that to stand in response. Id. at 53. Later, the court again asked about personal and moral biases regarding the death penalty, and whether such feelings

would affect the jurors' ability to weigh aggravating and mitigating factors and follow the court's instructions on the death penalty. Id. at 124–25. All of these questions were in addition to the detailed questions about the application of the death penalty in the questionnaire. ECF No. 211–1 at 11–13.

▬ There is no one way to conduct voir dire, so long as voir dire allows for the selection of an impartial jury. See Morgan, 504 U.S. at 729, 112 S.Ct. 2222; see also Darbin v. Nourse, 664 F.2d 1109, 1113 (9th Cir. 1981) ("[A] particular question [need not] be asked if the substance of the inquiry is covered in another question, differently phrased, or in the voir dire as a whole."). Just because the phrasing of the questions is slightly different from Morgan does not mean that the Petitioner's rights were violated. The jurors were clearly informed of their duty in relation to applying the law on the death penalty, and the court made sure that they understood this duty. Accordingly, the Petitioner is unable to show that the court's choice of questions violated his constitutional right to an impartial jury.

### 4. Scope and Structure of the Proceedings

▬▬ The Petitioner also argues that voir dire was minimal and limited. Mot. at 134. What matters, however, is not a quantitative comparison of the length of voir dire, but whether an impartial jury was selected. See United States v. LaRouche, 896 F.2d 815, 830 (4th Cir. 1990) ("Such quantitative comparisons are unhelpful— the only issue is whether [the court's] voir dire was sufficient to impanel an impartial jury."). In the instant case, prior to voir dire, the parties agreed to use a detailed, fifteen-page questionnaire to gather infor-

mation from the potential jurors. ECF No. 211. After reviewing the questionnaires, the parties submitted three lists: (1) those jurors the parties agreed should be called for voir dire, (2) those jurors the parties agreed should not be called for voir dire, and (3) those jurors upon whom the parties could not agree. ECF No. 236. The court then conducted voir dire of sixty-two (62) potential jurors on the first list.[69] The attorneys were told they could object or ask the court to give follow-up questions. Tr. at 44. The jurors were specifically told that they must ignore any prejudice or passion, and must follow the instructions of the court and consider the evidence presented when making a decision. Id. at 52–53, 174.

The court was able to effectively question the potential jurors during voir dire to expose any bias or prejudice not exposed in the questionnaires. Unlike other criminal cases, the jurors had already filled out lengthy questionnaires. This information aided in the voir dire process and allowed the court and parties to efficiently focus on specific issues. Between the questionnaire, collective questions, and follow-up inquiries, the court was able to search for any bias or prejudice held by the jurors and to provide the Petitioner with an impartial jury. Trial counsel was afforded a full opportunity at every juncture of the voir dire process to make and express objections. See Tr. at 10–130. Accordingly, not only is the Petitioner unable to show that a biased juror was seated, but more importantly, the Petitioner is unable to show that his voir dire was constitutionally infirm.

### 5. Ineffective Assistance of Counsel

The Petitioner also argues that his trial counsel was ineffective for not objecting to the above procedures. He makes this argument as its own claim and as a way to

---

**69.** As a panel was selected from the first list, it was unnecessary to reach the second and third lists.

excuse default. He also argues that his appellate lawyers were ineffective for not including this claim in their appellate brief, and such ineffectiveness should allow him to overcome the procedural default. The court will now address both arguments.

### a. Ineffective Assistance of Trial Counsel

■ The Petitioner argues that trial counsel rendered ineffective assistance regarding voir dire, first because counsel failed to review the juror questionnaires for evidence of bias and did not conduct outside research to determine such bias. This allegation is simply unsupported by the record and the Petitioner asserts no grounded basis for this accusation against trial counsel. Moreover, whether counsel did or did not do outside research beyond the juror questionnaires is irrelevant, as a proper jury was selected.[70] Next, the Petitioner asserts that counsel was ineffective for failing to object to the lack of guidance about the standards that would govern the jury's decision, both at and before voir dire. There was nothing here to which to object.[71] Next, the Petitioner asserts that counsel was ineffective for failing to object to the oral voir dire procedures, which permitted some potential jurors to stay silent during the proceedings. This allegation is meritless.[72] Finally, the Petitioner asserts that counsel was ineffective for failing to object to the questions discussed above that asked whether jurors understood the law, not whether they could comply with the law. However, the Petitioner has not referenced all of the voir dire, but has singled out specific questions the jury was asked. Again, there was nothing here to which to object.[73]

To prove ineffective assistance, the Petitioner must show (1) that his attorney's conduct was deficient because it fell below an objective standard of reasonableness, and (2) that he suffered prejudice as a result. Strickland, 466 U.S. at 687–88, 104 S.Ct. 2052. The Petitioner fails to meet either prong. First, counsel's performance was not deficient. As to the allegation that counsel failed to review the questionnaires for bias and perform Internet research to discover such bias, the Petitioner provides no support beyond the one-sentence claim. The court cannot say that counsel acted deficiently, as there is no evidence before it to suggest that counsel did not carefully review the questionnaires or investigate bias.

While the Petitioner alleges that there was insufficient information given, both at and before voir dire, on the proper standards for the jurors to apply, the Petitioner cites no law requiring that the court explain such detailed information prior to oral voir dire. See Mot. at 138. During voir dire, the court did cover the proper legal standards for jurors to be able to follow the evidence and to make their decision based solely on the law as instructed by the court and the evidence as presented at trial. Tr. at 10–130. The court inquired whether the jurors understood this direction and whether they could follow it. Id. at 52–53, 174. Counsel did not act unreasonably by choosing not to object to this level of instruction at this stage. Moreover, preliminary instructions were then given to the selected jurors, before opening statements and the presentation of evidence, id. at 199–213; and the final instructions on the statutes, burden and elements of proof, assessing the credibility of the witnesses, and so forth, were all given with great specificity at the conclusion of the case, after final arguments and before submission to the jury for decision.

---

70. See infra Part IV.R.3.

71. See supra Parts IV.Q.2, IV.Q.3, IV.Q.4.

72. See supra Part IV.Q.2.

73. See supra Part IV.Q.3.

Id. at 1666–1713. Jurors were thoroughly and properly instructed at all junctures and phases of trial.

It is incorrect that counsel failed to object to the collective questioning. Before trial, counsel filed a motion requesting that (1) prospective jurors complete questionnaires, which was granted and done; (2) counsel be permitted to directly question jurors; (3) individual questioning of jurors be permitted, particularly when evaluating the jurors' views about the death penalty and ability to follow the law; and (4) the Petitioner be given additional peremptory challenges. ECF No. 156. The court ruled on this Motion before the beginning of voir dire, and in relevant part, held that it would conduct collective questioning first, but would proceed with individual questioning as appropriate. Tr. at 5. This procedure was then followed at voir dire. Tr. at 10–130. Moreover, the defendants were given their twenty (20) peremptory challenges. Tr. at 7. Counsel cannot now be faulted for not further objecting to the court's decision to proceed as it did, under established precedent permitting collective questioning by the court, followed by individual questioning.

Finally, as to the claim that counsel failed to object to the questions that asked about understanding versus following the law, counsel did raise Morgan.[74] Tr. at 76–77, 116–17. It is clear that counsel knew of Morgan and raised the issue for the questions that they thought might be problematic. The Petitioner is unable to show that counsel did not reasonably consider the various questions when choosing what objections to make under Morgan, and that the court's rulings thereon were flawed.

For the above reasons, the Petitioner cannot show that counsel acted deficiently. Trial counsel did raise many of the above objections, and the ones not raised lack merit and/or foundation in the record. The Petitioner also fails to show that he suffered any prejudice from the actions of counsel or the rulings of the court during voir dire. Accordingly, he fails to make a claim of ineffective assistance of trial counsel, and is unable to excuse default.

**b. Ineffective Assistance of Appellate Counsel**

The Petitioner also suggests that his appellate counsel was ineffective for not raising this argument on direct appeal, and such ineffectiveness should excuse default. Reply at 131. After considering the instant claim and finding it to be without merit, the Petitioner is unable to show that this claim was stronger than any raised on appeal, or that had it been raised, there would have been a reasonable probability of a different outcome.

As the Petitioner fails to show ineffective assistance of either trial or appellate counsel, the Petitioner does not have cause to excuse default. Claim Seventeen is procedurally defaulted and without merit, and is **DENIED**.

**R. CLAIM S–2—THE PETITIONER ARGUES THAT THERE WERE PROBLEMS WITH THE JUROR QUESTIONNAIRE AND ITS USE BY THE COURT, AND COUNSEL UNREASONABLY FAILED TO OBJECT.**

Claim S–2 is filed under seal pursuant to the court's Order of October 5, 2015. ECF No. 476.[75] The discussion of this claim need

---

74. See supra Part IV.Q.3.

75. On October 2, 2015, the Petitioner filed a "Motion to File Under Seal Three Claims and One Exhibit to His Forthcoming Motion for

Collateral Relief Pursuant to 28 U.S.C. § 2255." ECF No. 471. On October 5, 2015, the court granted that Motion in part, permitting the Petitioner to file Claim S–2 and Ex-

not be under seal, as no personal identity information is divulged about any potential juror.

In his final claim, the Petitioner argues that the use of the juror questionnaire violated his Fifth and Sixth Amendment rights. Mot. at S2–1, ECF No. 508. Before beginning voir dire, the court ordered counsel for both parties to review the completed juror questionnaires and to submit three lists: (1) a list of those jurors that the parties agreed should be called for voir dire; (2) a list of those jurors the parties agreed should not be called; and (3) a list of those upon whom the parties could not agree. ECF No. 210. Counsel complied with this request. ECF No. 236.

The Petitioner now complains of several errors with this procedure. He argues that excluding the persons on List Two, who the parties agreed should not be called, without oral voir dire violated his Fifth Amendment rights to due process and equal protection and his Sixth Amendment right to an impartial jury. Mot. at S2–1. He further argues that there were flaws in the questionnaire, and he points to several individuals who he argues were improperly excluded based on their answers to the questionnaire and without voir dire. Id. at S2–8–16. He also alleges ineffective assistance of trial counsel for their failure to object and decision to participate in the process. Id. at S2–16–19.

### 1. Procedural Default

As with most of the Petitioner's claims, this argument was not raised on appeal. Since it is being raised for the first time on collateral review, the claim is procedurally defaulted. Resp. to Claim S–2 at 3, ECF No. 537.[76] The Petitioner argues that this default should be excused, as his attorneys

were ineffective for not challenging and bringing this claim earlier. Reply at S2–1, ECF No. 525. In order to determine if the Petitioner can prove his independent ineffective assistance claim, and ineffective assistance to excuse default, the court will now examine the arguments in this claim.

### 2. Exclusion Based Solely on Answers to Questionnaire Inquiries about the Death Penalty

The Petitioner argues that excluding jurors without oral voir dire based on their opinions about capital punishment violated his constitutional rights. Mot. at S2–1. The Supreme Court has held that a potential juror may be excluded for cause based on his or her views about the death penalty, if those views would " 'prevent or substantially impair the performance of is duties as a juror in accordance with his instructions and his oath.' " Wainwright v. Witt, 469 U.S. 412, 424, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985) (quoting Adams v. Texas, 448 U.S. 38, 45, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980)). This standard is broader than excluding only those who would never vote for, or against, the death penalty. Id.

To support his argument, the Petitioner relies on United States v. Chanthadara, 230 F.3d 1237 (10th Cir. 2000). Id. at S2–2. In Chanthadara, the trial court excused several potential jurors without conducting voir dire, and the appellate court reviewed the decisions de novo. 230 F.3d at 1269–70. Based on the specific facts of the case before it, the court found that the questionnaire answers of one of the potential jurors were not sufficient to show that she would be unable to follow the court's direction on the law regarding the death penalty. Id. at 1270–73. The court held that

---

hibit S–1 under seal. ECF No. 476. Claim S–1 is addressed herein as Claim Sixteen, Part IV.P, and Claim S–3 is addressed herein as Claim Seventeen, Part IV.Q.

**76.** The government again asserts that Teague bars review of this claim. Resp. at 3–4. As there has been no change in the relevant law since the Petitioner's conviction became final, the court finds that Teague does not apply.

exclusion of the juror based on the answers in her questionnaire was constitutional error. Id. at 1272–73. The Tenth Circuit, however, declined to create a per se rule against excusing a juror for cause before voir dire in a capital case, based on that person's view of the death penalty. Id. at 1269.

The Eighth Circuit declined to follow the Chanthadara decision to review de novo the dismissal of a juror based on her questionnaire answers about the death penalty. United States v. Purkey, 428 F.3d 738, 750 (8th Cir. 2005). Instead, it used an abuse of discretion standard, noting that reasons such as judges' expertise, respect for the judicial process, and conservation of judicial resources—not just the ability of a trial judge to assess the credibility of a potential juror during voir dire—command deference. Id. at 750. Based on the facts before it, the court held that the district court did not abuse its discretion in dismissing jurors for cause based on their views on the death penalty. Further, in United States v. Quinones, 511 F.3d 289, 301–04 (2d Cir. 2007), the Second Circuit permitted the use of for-cause exclusions in a capital case based only on pre-voir dire questionnaire answers. The court reasoned that "[h]owever strongly we recommend some oral voir dire in capital cases, we do not conclude that the procedure is constitutionally mandated." Id. at 301.

Accordingly, it is established that there is no one constitutionally mandated method of conducting voir dire. A district court has discretion in how to proceed, provided that the process is able to identify unqualified or biased jurors. Morgan, 504 U.S. at 729, 112 S.Ct. 2222. This may include oral voir dire, but it also may involve the use of an initial questionnaire. Moreover, it is clear that there is no per se rule against dismissing jurors without voir dire based on their death penalty views.[77] For these reasons, the use of the questionnaire by this court to exclude some jurors before voir dire was not unconstitutional, and nothing to the contrary shows that a biased jury was selected.

### 3. Exclusion of Five Specific Jurors Based on Questionnaire Answers

The Petitioner's next argument deals with the specific questionnaire and dismissed jurors in his case. After jurors returned the questionnaire, the parties created a list of those jurors they agreed should not be called for voir dire. It was only if both parties agreed that the individual was not called. The Petitioner now points to five specific individuals—Jurors 45, 96, 178, 195, and 232—who he argues were improperly dismissed based on their views about the death penalty, as contained in the questionnaire. Mot. at S–12–18. The Petitioner provides a list of reasons by defense counsel for objecting to specific jurors, and the list gives these five jurors' views on the death penalty as a reason trial counsel placed them on List Two. Mot. Attach. S–1. The Petitioner now argues that this list proves the jurors were dismissed for unconstitutional reasons. Mot. at S2–12.

First, the court has already found there was no error in using the questionnaire as a means to dismiss jurors without oral voir dire. Jury selection involves the experience of counsel and an evaluation of trial strategy. See, e.g., Romero v. Lynaugh, 884 F.2d 871, 878 (5th Cir. 1989) ("The selection of a jury is inevitably a call upon experience and intuition. The trial lawyer must draw upon his own insights and empathetic abilities."). Some of the answers by the five jurors indicated that the juror was strong-

---

**77.** Had one of these jurors been selected, the Petitioner would now be arguing error and a constitutional violation in that situation.

ly opposed to the death penalty, or that not only would the juror have a difficult time making a decision because of his or her views on the death penalty, but that he or she would have a difficult time, regardless of the facts and law in the case. Such views could be seen to substantially impair the juror's performance, and counsel reasonably could have wanted to remove jurors who appeared unable to follow the court's instructions.

■■■ Further, "[i]t has long been recognized that 'a court can not be asked by counsel to take a step in a case and later be convicted of error, because it has complied with such request.'" United States v. Herrera, 23 F.3d 74, 75 (4th Cir. 1994) (quoting Shields v. United States, 273 U.S. 583, 586, 47 S.Ct. 478, 71 L.Ed. 787 (1927)).[78] As the Petitioner points out, the court instructed the parties to compile a list of those jurors that it agreed should be dismissed based on the questionnaires, so the invited error doctrine in Herrera is not fully applicable. However, the court gave no instruction on how to create the lists. No party made any objection, and this system served to streamline the process by eliminating jurors that both parties agreed should not be called. If defense counsel did not agree with the government's decision to dismiss a juror, counsel could have put the individual on List Three, which was for those jurors upon whom the parties could not agree. The fact that counsel did agree to dismiss the jurors on List Two means that the defense counsel must have seen the benefit in eliminating them from the jury pool.

Finally, the court does not know if the only reason for the dismissal of the jurors was their death penalty views. It appears that the list was emailed between counsel, but nothing suggests it gives the only, or final, reasons for exclusion. For example, the list also provides that one of the jurors' husbands was a police officer, and another juror was a retired Naval officer—and Cory Voss was also a Naval officer. The court will not discount the exclusion of these five jurors, or any other juror to which the Petitioner now may object, based only on a list that is not proven to contain the exclusive reasons for dismissing the jurors. Accordingly, the Petitioner fails to show how those five jurors, who both parties agreed to put on List Two, were improperly dismissed.

**4. Alleged Flaws with the Questions in the Juror Questionnaire**

■■■ Not only does the Petitioner argue that jurors should not have been dismissed based on their questionnaire answers, he also challenges the questionnaire content itself. Mot. at S2–8–11. He presents the following arguments for why the questionnaire was flawed: (1) the questionnaire did not contain information about the law or procedures that would govern the jury's decision making at trial; (2) it did not contain a question about whether personal or moral opinions about the death penalty would substantially impair the juror's ability to weigh the aggravating and mitigating factors, and follow the judge's instructions; (3) the questionnaire was internally inconsistent; (4) the options to Question Sixty–One were skewed or based on a flawed legal premise; (5) Question Sixty–One presented jurors with several options about their views on the death penalty but did not allow them to express their opinion in their own words; and (6) the information in Question Fifty–Nine may have distorted jurors' views about the sentencing process. Id. The government essentially ignores this claim in its Response.

The court, however, finds that the questionnaire was not constitutionally infirm. It

---

78. See supra note 35.

was designed to gather basic information, which could then be expanded upon during voir dire as the parties deemed appropriate. For those jurors whose answers showed hardship, strong views about the death penalty, or some other reason that both parties agreed qualified a juror not to be seated, the questionnaire allowed for proper dismissal. But for the others, it was not necessary at this point to provide background information about the structure of the trial or relevant standards, or to provide opportunities for more in-depth explanations on views about the death penalty. Those topics would be, and were, covered in voir dire. Even assuming that some of the questions could benefit from being reworded, the questions served their purpose of gathering basic information, and that did not violate the Petitioner's rights. As discussed above, a questionnaire can be used in capital cases to assist with voir dire, and the Petitioner has failed to show how the questions and answer choices violated his right to an impartial jury and fair trial. Both the Petitioner and the United States contributed to and agreed upon the questionnaire used in this case. See ECF Nos. 156, 175, 190, 211, 212.

### 5. Ineffective Assistance of Counsel

The Petitioner next claims that trial counsel was ineffective for failing to object to (1) the questionnaire, (2) the court's direction to dismiss some potential jurors based only on answers to the questionnaire, and (3) the actual order of dismissal of the jurors on List Two. Id. at S2–16–18. The Petitioner further argues that counsel was ineffective for actively participating in these procedures. Id. at S2–18. He also argues counsel's ineffectiveness is cause to excuse the procedurally defaulted arguments in this claim. Reply at S2–1.

As discussed throughout this Order, to make a showing of ineffective assistance of counsel, a petitioner must show that (1) his

counsel's performance was deficient; and (2) such deficient performance prejudiced the petitioner by undermining the reliability of the judgment against him. Strickland, 466 U.S. at 687, 104 S.Ct. 2052. The Petitioner fails to meet these Strickland requirements.

The court has already concluded that the general use of a questionnaire to excuse jurors prior to voir dire, even in a capital case, is not unconstitutional. Thus, counsel was not deficient for declining to object when the court suggested the use of the questionnaire. The court also found no constitutional infirmities with the questionnaire itself, so counsel cannot be faulted for not objecting. Additionally, such objections would have been meritless, so the Petitioner is unable to show a reasonable probability of a different outcome had counsel objected.

Regarding the failure to object to the actual dismissal order based on List Two and counsel's participation in the process, the court has concluded such acts did not violate the Petitioner's rights and were not unconstitutional. These procedures were agreed to by both parties to streamline the process. This was not a situation where jurors were excused prior to voir dire due to a challenge by the government or a sua sponte dismissal by the court. Other than a list, the origin of which the Petitioner does not explain, the Petitioner presents no proof that counsel unreasonably excused jurors or felt forced to participate. The Petitioner's counsel was actively involved in the process, and the Petitioner has given the court no reason to question counsel's decisions regarding the questionnaire. Trial counsel had already filed multiple requests related to jury selection. ECF No. 156. If counsel did not want to participate, they certainly would have objected. That counsel declined to object to a procedure that has not been held unconstitutional is not deficient. It means that counsel

saw the benefit in the process, and the court will not second guess that choice. Based on the above analysis, the court concludes that trial counsel was not deficient for not objecting to, and for actively participating in, the voir dire procedures.

Regarding prejudice, the Petitioner states only that "[t]here is a reasonable probability that absent counsel's deficient performance, the composition of the jury would have been different, and that at least one juror would have voted for life." Mot. at S2–20. This blanket statement, with nothing more, is not enough to show the prejudice required for an ineffective assistance of counsel claim. The Petitioner is unable to point to any biased juror who was seated, or any juror improperly struck. Moreover, as discussed in this section, any objection would have been meritless, so the Petitioner fails to show a reasonable probability of a different outcome had counsel acted differently. For these reasons, the Petitioner is unable to prove his ineffective assistance of trial counsel claim, both as its own independent claim and as a means to excuse default.

The court also finds that this claim is not stronger than any claim presented on appeal, and that, as this claim has no merit, there is not a reasonable probability of a different outcome had the Petitioner appealed this issue. For these reasons, the Petitioner is unable to show ineffective assistance of appellate counsel.

As the Petitioner fails to prove ineffective assistance of counsel, he is unable to overcome the procedural default on his other arguments. Claim S–2 is both procedurally defaulted and lacking in merit, and it is **DENIED**.

## V. CONCLUSION

For the reasons stated herein, the Petitioner's First and Second Motions for Discovery are **DENIED**, and the Motion to Vacate brought pursuant to 28 U.S.C. § 2255 is **DENIED**. The court declines to issue a certificate of appealability for the reasons stated in this Opinion.

The Clerk is **DIRECTED** to send a copy of this Opinion to counsel for the Petitioner and to the United States Attorney at Newport News.

**IT IS SO ORDERED.**[79]

Attachment

Opinion are attached following the Index.

79. An Index of this Opinion is attached for reference purposes and made a part hereof. Exhibits A, B, C, and D referenced in the

# INDEX

I. FACTUAL BACKGROUND .......................................2

II. PROCEDURAL HISTORY .......................................9

III. STANDARDS OF REVIEW ....................................15

 A. MOTIONS BROUGHT PURSUANT TO 28 U.S.C. § 2255............15
 1. Ineffective Assistance of Counsel ....................16
 2. Procedural Default ...................................18
 3. Bar on Relitigating Claims Brought on Direct Appeal ...19
 4. Retroactive Application of New Rules to Cases on
 Collateral Review ....................................20
 5. Evaluation of New Claims Contained in Amended
 Pleadings ............................................21

 B. DISCOVERY FOR MOTIONS BROUGHT PURSUANT TO
 28 U.S.C. § 2255 .......................................22

IV. THE PETITIONER'S CLAIMS .................................24

 A. CLAIM ONE – DISHONEST LAW ENFORCEMENT OFFICERS INVOLVED IN
 CASE ...................................................24
 1. Robert Glenn Ford ...................................25
 2. Clifford Dean Posey .................................31
 3. Ineffective Assistance of Trial Counsel .............34
 4. Conclusion ..........................................35

 B. CLAIM TWO – PROSECUTION FAILED TO DISCLOSE EXCULPATORY
 EVIDENCE ABOUT CO-DEFENDANT MICHAEL DRAVEN .............35
 1. Procedural Default ..................................36
 2. Brady Claim .........................................38
 3. Ineffective Assistance of Trial Counsel .............44
 4. Discovery ...........................................45

 C. CLAIM THREE – COUNSEL RENDERED INEFFECTIVE ASSISTANCE AT
 GUILT PHASE OF TRIAL BY FAILING TO INVESTIGATE, PRESENT,
 HIGHLIGHT, AND/OR ARGUE EVIDENCE OF INNOCENCE...........46
 1. Chad Costa ..........................................47
 2. Cat Voss ............................................50
 3. Scott Linker ........................................52
 4. Rose Wiggins ........................................53

 5. Whereabouts of the Petitioner on the Day of the
 Murder ................................................... 55
 6. Cell Tower Testimony ..................................... 57
 7. The Petitioner's Shopping List ......................... 61
 8. Ballistics Tests ......................................... 62
 9. Conclusion .............................................. 66

D. CLAIM FOUR – COUNSEL ABDICATED RESPONSIBILITY TO ADVOCATE
 AT ELIGIBILITY PHASE OF TRIAL ........................... 66

E. CLAIM FIVE – TRIAL COUNSEL WAS INEFFECTIVE FOR FAILING TO
 INVESTIGATE, DISCOVER, AND PRESENT EVIDENCE OF INCOMPETENCY
 TO STAND TRIAL .......................................... 71
 1. Standard for Ineffective Assistance of Counsel for
 Failure to Request Competency Hearing ................. 71
 2. Whether Counsel was Ineffective for Failing to
 Investigate Competency and Request a Hearing on the
 Issue ................................................. 74
 3. Discovery .............................................. 76

F. CLAIM SIX – COUNSEL RENDERED INEFFECTIVE ASSISTANCE BY
 FAILING TO INVESTIGATE AND PRESENT MITIGATING EVIDENCE
 REGARDING PSYCHO-SOCIAL HISTORY, BRAIN DAMAGE, AND MENTAL
 HEALTH .................................................. 77
 1. Ineffective Assistance Standard ....................... 78
 2. Hudgins's Involvement with the Case ................... 81
 3. Counsel's Mental Health Investigation ................. 82
 4. Counsel's Decision Not to Introduce Mental Health
 as a Mitigating Factor ................................ 90
 5. Decision Not to Present a Complete Psycho-Social
 History ................................................ 95
 a. Various Records, Letters, and Medical Reports ....... 96
 b. Government Experts – Dr. Patterson and
 Dr. Montalbano...................................... 101
 c. Lay Witnesses...................................... 103
 d. Defense Experts – Dr. Mirsky, Dr. Merikangas,
 Dr. Cunningham, and Dr. Dudley..................... 108
 6. Evaluation of Counsel's Strategy Based on All of the
 Above Factors ........................................ 114
 7. Conclusion ........................................... 119

G. CLAIM SEVEN – CONFRONTATION CLAUSE VIOLATED, AND COUNSEL
 UNREASONABLY FAILED TO OBJECT AND ASK FOR A LIMITING
 INSTRUCTION ............................................ 120
 1. Procedural Default ................................... 121

 2. Confrontation Clause Claim .......................... 121
 3. Ineffective Assistance of Trial Counsel ............. 127

H. CLAIM EIGHT - THE PETITIONER ARGUES THAT HIS APPELLATE
 COUNSEL RENDERED INEFFECTIVE ASSISTANCE. ................ 130

I. CLAIM NINE - THE PETITIONER ARGUES THAT THE HOLDING IN
 *JOHNSON V. UNITED STATES*, 135 S. CT. 2551 (2015),
 INVALIDATES HIS CONVICTION. ............................ 133
 1. Holding and Retroactivity of
 *Johnson v. United States* ........................... 134
 2. Extension of *Johnson* to the Petitioner's Case ....... 137

J. CLAIM TEN - THE PETITIONER ARGUES THAT THE JURY
 INSTRUCTIONS LOWERED THE GOVERNMENT'S BURDEN OF PROOF. ...140
 1. Bar to Relitigating Claims Raised on Appeal ......... 142
 2. Extension of *Hurst v. Florida* to the Petitioner's
 Case ................................................. 144

K. CLAIM ELEVEN - THE PETITIONER ARGUES THAT HIS SENTENCE IS
 UNCONSTITUTIONAL BECAUSE IT IS BASED ON AGGRAVATING
 CIRCUMSTANCES THAT ARE ARBITRARY AND OVERBROAD. ......... 145
 1. Procedural Default and Bar on Relitigation .......... 146
 2. Standard for Evaluating Aggravating Factors ......... 148
 3. The Petitioner's Statutory Aggravating
 Factor Claim ........................................ 149
 4. The Petitioner's Non-Statutory Aggravating
 Factor Claim ........................................ 152
 a. Bar on Relitigation............................... 153
 b. The Prosecution's Use of Non-Statutory Aggravating
 Factors in the Petitioner's Case.................. 154
 c. Ineffective Assistance of Counsel................ 157
 5. Conclusion ......................................... 158

L. CLAIM TWELVE - THE PETITIONER ARGUES THAT THE GOVERNMENT
 ENGAGED IN SELECTIVE PROSECUTION BASED ON RACE, AND COUNSEL
 WAS INEFFECTIVE FOR FAILING TO RAISE THIS CLAIM DURING
 DIRECT PROCEEDINGS. .................................... 158
 1. Standard for Selective Prosecution Claims ........... 159
 2. The Petitioner's Argument for Selective
 Prosecution ......................................... 161
 3. Ineffective Assistance of Counsel ................... 165
 4. Discovery .......................................... 166

M. CLAIM THIRTEEN - THE PETITIONER ARGUES THAT HIS DEATH
 SENTENCE IS DISPROPORTIONATE AND IN VIOLATION OF THE FIFTH
 AND EIGHTH AMENDMENTS, AND COUNSEL WAS INEFFECTIVE FOR NOT
 RAISING THIS CHALLENGE DURING DIRECT PROCEEDINGS. .......168
 1. Procedural Arguments ................................168
 2. Disproportionality of the Petitioner's Sentence ......170
 3. Ineffective Assistance of Counsel ...................176

N. CLAIM FOURTEEN - THE PETITIONER ARGUES THAT HIS DEATH
 SENTENCE VIOLATES THE EIGHTH AMENDMENT BECAUSE HE IS
 SEVERELY MENTALLY ILL, AND COUNSEL WAS INEFFECTIVE FOR NOT
 RAISING THIS CHALLENGE DURING TRIAL AND ON APPEAL. ......179
 1. Existing Exceptions to Application of the Death
 Penalty ...........................................179
 2. The Petitioner's Argument to Extend the Holdings in
 Atkins and Roper ..................................181
 3. Ineffective Assistance of Counsel ...................185

O. CLAIM FIFTEEN - THE PETITIONER ARGUES THAT SELECTION OF THE
 GRAND AND/OR PETIT JURY WAS TAINTED, AND COUNSEL
 UNREASONABLY FAILED TO REQUEST AND INSPECT THE JURY
 SELECTION RECORDS. ...................................186
 1. Selection of the Grand and/or Petit Jury Venire ......186
 2. Compliance with the Jury Selection Plan and the
 Provisions of 28 U.S.C. § 1861 et seq. ..............188
 3. Participation of an Allegedly Unqualified Juror During
 the Jury Selection Process ..........................192
 4. Ineffective Assistance of Counsel ...................193

P. CLAIM SIXTEEN - THE PETITIONER ALLEGES THAT THE GOVERNMENT
 USED ITS PEREMPTORY STRIKES TO DISCRIMINATE BASED ON RACE
 AND GENDER, AND COUNSEL UNREASONABLY FAILED TO OBJECT. ..195
 1. Procedural Default ..................................196
 2. Standard for a Batson/J.E.B. Claim ..................197
 3. The Petitioner's Batson Claim .......................199
 a. Prima Facie Case.................................199
 b. The Government's Race-Neutral Reasons for the Strikes
 and the Petitioner's Response.....................204
 4. The Petitioner's J.E.B. Claim .......................206
 a. Prima Facie Case.................................206
 b. The Government's Gender-Neutral Reasons for the
 Strikes and the Petitioner's Response.............207

5. Ineffective Assistance of Counsel .................... 209
 a. Ineffective Assistance of Trial Counsel........... 209
 b. Ineffective Assistance of Appellate Counsel....... 211
6. Discovery ......................................... 211

Q. CLAIM SEVENTEEN - THE PETITIONER ALLEGES THAT THE VOIR DIRE
VIOLATED HIS FIFTH AND SIXTH AMENDMENT RIGHTS, AND
COUNSEL'S FAILURE TO OBJECT TO VOIR DIRE PROCEDURES WAS
UNREASONABLE. ........................................ 213
1. Procedural Arguments ................................ 214
2. Collective Questioning of the Potential Jurors ....... 215
3. Use of Questions Designed to Determine Bias and Ability
 to Follow the Law and the Court's Instructions ...... 217
4. Scope and Structure of the Proceedings .............. 221
5. Ineffective Assistance of Counsel ................... 223
 a. Ineffective Assistance of Trial Counsel........... 223
 b. Ineffective Assistance of Appellate Counsel....... 227

R. CLAIM S-2 - THE PETITIONER ARGUES THAT THERE WERE PROBLEMS
WITH THE JUROR QUESTIONNAIRE AND ITS USE BY THE COURT, AND
COUNSEL UNREASONABLY FAILED TO OBJECT. .................. 228
1. Procedural Default ................................. 229
2. Exclusion Based Solely on Answers to Questionnaire
 Inquiries about the Death Penalty .................. 230
3. Exclusion of Five Specific Jurors Based on Questionnaire
 Answers ........................................... 233
4. Alleged Flaws with the Questions in the Juror
 Questionnaire ..................................... 236
5. Ineffective Assistance of Counsel ................... 237

V. CONCLUSION ........................................... 241

676

Verdict

**EXHIBIT A**

*United States District Court*
*Eastern District of Virginia*
*Newport News Division*

FILED
IN OPEN COURT
Page 1
JUL 17 2009
CLERK, U.S. DISTRICT COURT
NORFOLK, VA

| UNITED STATES OF AMERICA | VERDICT |
| --- | --- |
| v. | CASE NUMBER: 4:08cr16 |
| DAVID ANTHONY RUNYON | |

Pursuant to the E-Government Act,
the original of this page has been filed
under seal in the Clerk's Office.

### VERDICT FORM

WE, THE JURY, FIND THE DEFENDANT DAVID ANTHONY RUNYON:

AS TO COUNT 1 ................................ Guilty
 Guilty/Not Guilty

AS TO COUNT 2 ................................ Guilty
 Guilty/Not Guilty

AS TO COUNT 4 ................................ Not Guilty
 Guilty/Not Guilty

AS TO COUNT 5 ................................ Guilty
 Guilty/Not Guilty

REDACTED COPY

FOREPERSON'S SIGNATURE 7/17/09 DATE

EXHIBIT B

EXHIBIT B | IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Newport News Division

FILED
IN OPEN COURT

JUL 2 2 2009

CLERK U.S. DISTRICT COURT
NORFOLK, VA

UNITED STATES OF AMERICA )
)
v. ) Criminal No. 4:08cr16
)
DAVID ANTHONY RUNYON, )
)
 Defendant )

## SPECIAL VERDICT FORM - ELIGIBILITY PHASE

I. **AGE:** DAVID ANTHONY RUNYON was more than 18 years of age at the time of the offense.

Count One (Conspiracy to Commit Murder for Hire):

YES X
NO _____

Count Two (Carjacking Resulting in Death):

YES X
NO _____

Count Five (Murder with a Firearm in Relation to a Crime of Violence):

YES X
NO _____

If your finding is "yes," as to Counts One, Two and/or Five, move on to the Threshold Intent/"Gateway" Factors in Section II for that count. If your finding is "no" as to all counts, stop your deliberations and complete Section IV.

## II. THRESHOLD INTENT / GATEWAY FACTORS

A. Count One (Conspiracy to Commit Murder for Hire)

Instructions: If you unanimously find that one of these four factors has been proved beyond a reasonable doubt, place an "X" next to "YES" as to that one factor and move on to Count Two. You may find only one factor present for the count. If you do not find any of these four factors present for Count One, move on to Count Two.

1. DAVID ANTHONY RUNYON intentionally killed Cory Allen Voss.

 YES _X_____

2. DAVID ANTHONY RUNYON intentionally inflicted serious bodily injury that resulted in the death of Cory Allen Voss.

 YES _____

3. DAVID ANTHONY RUNYON intentionally participated in an act, contemplating that the life of a person would be taken or intending that lethal force would be used in connection with a person, other than one of the participants of the offense, and Cory Allen Voss died as a direct result of the act.

 YES _____

4. DAVID ANTHONY RUNYON intentionally and specifically engaged in an act of violence, knowing that the act created a grave risk of death to a person, other than one of the participants in the offense, such that participation in the act constituted a reckless disregard for human life and Cory Allen Voss died as a direct result of the act.

 YES _____

B. Count Two (Carjacking Resulting in Death):

Instructions: If you unanimously find that one of these four factors has been proved beyond a reasonable doubt, place an "X" next to "YES" as to that one factor and move on to Count Five. You may find only one factor present for the count. If you do not find any of these four factors present for Count Two, move on to Count Five.

1. DAVID ANTHONY RUNYON intentionally killed Cory Allen Voss.

 YES _☒_____

2. DAVID ANTHONY RUNYON intentionally inflicted serious bodily injury that resulted in the death of Cory Allen Voss.

 YES _____

3. DAVID ANTHONY RUNYON intentionally participated in an act, contemplating that the life of a person would be taken or intending that lethal force would be used in connection with a person, other than one of the participants of the offense, and Cory Allen Voss died as a direct result of the act.

 YES _____

4. DAVID ANTHONY RUNYON intentionally and specifically engaged in an act of violence, knowing that the act created a grave risk of death to a person, other than one of the participants in the offense, such that participation in the act constituted a reckless disregard for human life and Cory Allen Voss died as a direct result of the act.

 YES _____

C. Count Five (Murder with a Firearm in Relation to a Crime of Violence):

Instructions: If you unanimously find that one of these four factors has been proved beyond a reasonable doubt, place an "X" next to "YES" as to that one factor and move to the next set of instructions below. You may find only one factor present for the count. If you do not find any of these four factors present for Count Five, move to the next set of instructions below.

1. DAVID ANTHONY RUNYON intentionally killed Cory Allen Voss.

 YES __X__

2. DAVID ANTHONY RUNYON intentionally inflicted serious bodily injury that resulted in the death of Cory Allen Voss.

 YES _____

3. DAVID ANTHONY RUNYON intentionally participated in an act, contemplating that the life of a person would be taken or intending that lethal force would be used in connection with a person, other than one of the participants of the offense, and Cory Allen Voss died as a direct result of the act.

 YES _____

4. DAVID ANTHONY RUNYON intentionally and specifically engaged in an act of violence, knowing that the act created a grave risk of death to a person, other than one of the participants in the offense, such that participation in the act constituted a reckless disregard for human life and Cory Allen Voss died as a direct result of the act.

 YES _____

Instructions: If you did not find any Threshold Intent Factors in Section II above as to Counts One, Two and Five, then that ends your consideration of whether the defendant is eligible to be considered for the death penalty. You must stop your deliberations, complete Section IV, and advise the Court that you have reached a decision.

If you answered "YES" with respect to one of the Threshold Intent Factors in Section II above as to Counts One, Two and/or Five, then continue your deliberations and proceed to the Section III.

## III. STATUTORY AGGRAVATING FACTORS

Instructions: Answer "YES" or "NO" as to whether you unanimously find that the government has established, beyond a reasonable doubt, the existence of the statutory aggravating factors enumerated below as to Counts One, Two and Five. You should consider each factor separately, and answer "YES" or "NO" as to each count for both factors. In this category, you may answer "yes" to more than one factor for each count.

Factor 1. The defendant, DAVID ANTHONY RUNYON, committed the offense in consideration for the receipt of, or in expectation of the receipt, of anything of pecuniary value.

Count One (Conspiracy to Commit Murder for Hire):

YES X
NO

Count Two (Carjacking Resulting in Death):

YES X
NO

Count Five (Murder with a Firearm in Relation to a Crime of Violence):

YES X
NO

Factor 2. The defendant, DAVID ANTHONY RUNYON, committed the offense after substantial planning and premeditation to cause the death of a person.

Count One (Conspiracy to Commit Murder for Hire):

YES X
NO

Count Two (Carjacking Resulting in Death):

YES X
NO

Count Five (Murder with a Firearm in Relation to a Crime of Violence):

YES X
NO

Instructions: Once you have completed the deliberations associated with Section III, please complete Section IV and advise the Court that you have reached a decision.

682

## IV. CERTIFICATION

By signing below, each juror certifies that consideration of the race, color, religious beliefs, national origin, or sex of the defendant or the victim was not involved in reaching his or her individual decision, and that the individual juror would have made the same decisions with regard to the age of defendant DAVID ANTHONY RUNYON, the threshold intent factors and the statutory aggravating factors no matter what the race, color, religious beliefs, national origin, or sex of the defendant, or the victim, would have been.

All jurors and foreperson sign below:

REDACTED COPY

‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾
FOREPERSON

Pursuant to the E-Government Act, the original of this page has been filed under seal in the Clerk's Office.

Date: July 12, 2009.

EXHIBIT C

EXHIBIT C

IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Newport News Division

FILED
IN OPEN COURT

AUG 27 2009

CLERK, U.S. DISTRICT COURT
NORFOLK, VA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal No. 4:08cr16 |
| | ) | |
| DAVID ANTHONY RUNYON, | ) | |
| | ) | |
| Defendant | ) | |

## SPECIAL VERDICT FORM - SELECTION PHASE

### I. NON-STATUTORY AGGRAVATING FACTORS

**Instructions:** For each of the following factors, answer "YES" or "NO" as to whether you, the jury, unanimously find that the United States has established the existence of that non-statutory aggravating factor beyond a reasonable doubt.

Factor 1. The defendant, DAVID ANTHONY RUNYON, caused injury, harm, and loss to the victim, Cory Allen Voss, and the victim's family and friends, as shown by the victim's personal characteristics and by the impact of his death upon the victim's family, friends, and co-workers.

YES X
NO _____

Factor 2. The defendant, DAVID ANTHONY RUNYON, utilized education, training, and experience that he received in college courses focused on criminal justice, and as a law enforcement and correctional officer, as an officer of the Kansas National Guard, and as a member of the United States Army, to kill Cory Allen Voss.

YES X
NO _____

Factor 3. The defendant, DAVID ANTHONY RUNYON, engaged in acts of physical abuse toward women, including, but not limited to, his estranged spouse and former girlfriend.

YES X

NO

Factor 4. The defendant, DAVID ANTHONY RUNYON, has demonstrated a lack of remorse for murdering Cory Allen Voss as demonstrated by the evidence in the case.

YES X

NO

Instructions: Regardless of whether you answered "YES" or "NO" with respect to any of the Non-Statutory Aggravating Factors in Section I above, continue your deliberations in accordance with the Court's instructions and proceed to Section II.

## II. MITIGATING FACTORS

Instructions: For each of the listed mitigating factors, you have the option to indicate in the space provided, the number of jurors who have found the existence of that mitigating factor to be proven by a preponderance of the evidence. If you choose not to make these written findings, cross out that factor with a large "X" and then continue your deliberations in accordance with the instructions of the Court.

Regardless of whether or not you choose to make written findings with respect to any or all of the mitigating factors, a finding with respect to a mitigating factor may be made by one or more of the members of the jury, and any member of the jury who finds the existence of a mitigating factor may consider such a factor established in considering whether or not a sentence of death shall be imposed, regardless of the number of other jurors who concur that the factor has been established.

A. Statutory Mitigating Factors

1. DAVID ANTHONY RUNYON does not have a serious criminal record.

Number of jurors who so find __12__.

2. Other persons equally culpable in the crime will not be punished by death.

Number of jurors who so find __12__.

B. Additional Non-Statutory Mitigating Factors

1. DAVID ANTHONY RUNYON will serve a sentence of life in prison without the possibility of release if not sentenced to death.

Number of jurors who so find _____.

2. DAVID ANTHONY RUNYON has worked and has been legally employed for all of his life.

Number of jurors who so find _____.

3. DAVID ANTHONY RUNYON committed acts of kindness and generosity for his neighbors and his community.

Number of jurors who so find _____.

4. DAVID ANTHONY RUNYON grew up, witnessed, and experienced, domestic violence and parental conflict until his mother and biological father separated.

Number of jurors who so find _____.

5. DAVID ANTHONY RUNYON has demonstrated his ability to make a positive adjustment to incarceration.

Number of jurors who so find _____.

6. DAVID ANTHONY RUNYON has the respect and support of correctional officers.

Number of jurors who so find _____.

7. DAVID ANTHONY RUNYON has had no disciplinary write-ups while incarcerated and has helped other inmates conduct themselves in non-violent or non-aggressive ways.

Number of jurors who so find _____.

8. DAVID ANTHONY RUNYON does not present a risk of future violence or danger to the public while in prison for the rest of his life.

Number of jurors who so find _____.

9. David Anthony Runyon, Jr., the son of DAVID ANTHONY RUNYON, will suffer emotional harm if his father is executed.

Number of jurors who so find __12__.

10. Suk Cha Runyon, the mother of DAVID ANTHONY RUNYON, will suffer emotional harm if her son is executed.

Number of jurors who so find __12__.

11. DAVID ANTHONY RUNYON served his country as a member of the United States Army and was honorably discharged.

Number of jurors who so find __12__.

12. DAVID ANTHONY RUNYON graduated from high school and earned an associate of arts degree from Wentworth Military Academy and took further college courses to expand his education.

Number of jurors who so find __12__.

C. The following extra spaces are provided to write in additional mitigating factors, if any, found by any one or more jurors. If none, write "NONE." If more space is needed, write "CONTINUED" and use the reverse side of this page.

_David A. Runyon continued to witness and experience domestic violence and parental conflict/abuse from mother and adoptive father._

Number of jurors who so find __12__.

_Mark Runyon, brother of David A. Runyon will suffer emotional harm if his brother is executed._

Number of jurors who so find __12__.

_David A. Runyon was given the impression that Cory Voss was molesting his daughter._

Number of jurors who so find __11__.

## III. RECOMMENDATION

Based upon consideration of whether the aggravating factors (statutory and non-statutory) found to exist sufficiently outweigh any mitigating factor or factors found to exist, or in the absence of any mitigating factors, whether the aggravating factors are themselves sufficient to justify a sentence of death, we recommend, by unanimous vote, that the following sentence should be imposed upon the defendant, DAVID ANTHONY RUNYON:

### COUNT ONE - (Conspiracy to Commit Murder for Hire)

A. Death ___✗___

or

B. Life Imprisonment Without Possibility of Release _____

### COUNT TWO - (Carjacking Resulting in Death)

A. Death _____

or

B. Life Imprisonment Without Possibility of Release ___✗_____

or

C. Some Other Lesser Sentence _____

### COUNT FIVE - (Murder with a Firearm in Relation to a Crime of Violence)

A. Death ___✗___

or

B. Life Imprisonment Without Possibility of Release _____

or

C. Some Other Lesser Sentence _____

## IV. CERTIFICATION

By signing below, each juror certifies that consideration of the race, color, religious beliefs, national origin, or sex of the defendant or the victim was not involved in reaching his or her individual decision, and that the individual juror would have made the same decisions without regard to these considerations.

All jurors and foreperson sign below:

Pursuant to the E-Government Act, the original of this page has been filed under seal in the Clerk's Office.

REDACTED COPY

FOREPERSON

Date: August 21, 2009.

EXHIBIT D

**EXHIBIT D**

FILED
IN OPEN COURT

JUL 1 8 200

CLERK, U.S. DISTRICT COURT
NEWPORT NEWS, VA

IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Newport News Division

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| v. | ) CRIMINAL NO. 4:08cr16 |
| | ) |
| CATHERINA ROSE VOSS, | ) |
| a/k/a "Cat Voss" | ) |
| a/k/a "Cathleen Wiggins" | ) |
| | ) |
| Defendant. | ) |

## STATEMENT OF FACTS

If this matter were to proceed to trial, the United States of America would prove beyond a reasonable doubt, by competent and admissible evidence, the following facts:

1. From on or about March 11, 1999, to on or about April 29, 2007, defendant CATHERINA ROSE VOSS (hereinafter "VOSS") was married to Cory Allen Voss. The couple resided in Newport News, Virginia, within the Eastern District of Virginia. In 2006, after graduating from Old Dominion University, Cory was commissioned as an officer in the United States Navy. He was stationed at the Norfolk Naval Base aboard the USS Elrod as the Communications Officer. During the course of their marriage, they had two children: Casey, age 8, and Cory Jr., age 7.

2. As a member of the United States Navy, Cory Allen Voss had a life insurance policy in the amount of $400,000 through the Office of Servicemember's Group Life Insurance (hereinafter "SGLI"). The primary beneficiary on this policy was VOSS.

3. In or about the late Summer to Fall of 2006, within the Eastern District of Virginia, defendant VOSS began an extramarital affair with co-defendant MICHAEL ANTHONY ERIC DRAVEN (hereinafter "DRAVEN"), a resident of Newport News, Virginia. The affair began while

VOSS's husband, Cory Allen Voss, was on a six-month deployment aboard the USS Elrod. VOSS and DRAVEN continued the affair after Cory Allen Voss returned from deployment in November 2006. During the affair, VOSS and DRAVEN took overnight trips together, communicated frequently by telephone and electronic mail (hereinafter "e-mail"), discussed marriage with each other and referred to each other as husband and wife.

4. In or about the Fall of 2006 through April 30, 2007, VOSS and Cory Allen Voss were experiencing financial difficulties, resulting from outstanding and overdue mortgage, student loans, and credit card payments and VOSS' prolific spending habits. During this time period, VOSS had no regular source of income.

5. In or before January 2007, VOSS and DRAVEN began contemplating the murder of Cory Allen Voss. In early 2007, DRAVEN called a cooperating witness to discuss killing Cory Allen Voss. On January 2, 2007, DRAVEN sent an e-mail to an individual inquiring as to whether this individual had done a "swipe or hit on someone before."

6. In or about February 2007, DRAVEN met co-defendant DAVID ANTHONY RUNYON (hereinafter "RUNYON"), a resident of West Virginia, while the two were employed as subjects for a medical research study in Baltimore, Maryland. RUNYON, a former enlisted member of the United States Army and former police officer, was experienced with firearms.

7. In or about February or March 2007, RUNYON and DRAVEN discussed the contract killing of Cory Allen Voss. RUNYON and DRAVEN were released from the Baltimore research study on or about March 14, 2007, and made arrangements to further discuss the killing later in the month.

8. On or about March 24, 2007, VOSS and RUNYON discussed a plan for

2

RUNYON to murder Cory Allen Voss, the amount of money to be paid to RUNYON and the timing of both the payment and the planned murder of Cory Allen Voss. Their conversation lasted approximately an hour and a half, as confirmed by telephone records. On or about March 26, 2007, VOSS relayed the details of her March 24, 2007 conversation with RUNYON to DRAVEN.

9. Between in or about March 2007 and April 29, 2007, VOSS, RUNYON and DRAVEN crafted a plan to murder Cory Allen Voss at the Langley Federal Credit Union, Oyster Point Branch, (hereinafter "LFCU"), located at 11742 Jefferson Avenue, in Newport News, Virginia, in order to obtain life insurance proceeds and other benefits that VOSS would receive upon her husband's death. LFCU is a credit union, the deposits of which are insured by the National Credit Union Administration Board. The activities of LFCU operate in and affect interstate commerce.

10. VOSS and/or DRAVEN communicated with RUNYON by telephone or text message approximately 13 times between on or about March 24, 2007, and April 29, 2007 — the date of the murder — and approximately three (3) times on May 8, 2007. DRAVEN communicated with RUNYON by telephone or text message approximately 30 times between on or about March 22, 2007, and April 29, 2007, and approximately 83 times between on or about May 8, 2007, and September 26, 2007.

11. On April 20, 2007, VOSS opened a bank account with $5.00 at LFCU. No other deposits were made to this account. VOSS and Cory Allen Voss had a total of four (4) other bank accounts at Navy Federal Credit Union.

12. On or about April 24, 2007, VOSS prepared on her home computer a Power of Attorney document, which attempted to grant VOSS power over financial matters in the event of the death of Cory Allen Voss. Earlier she had Cory Allen Voss obtain a similar Power of Attorney through the United States Navy; however, this document did not grant VOSS power over financial

3

 

692

matters at LFCU in the event of Cory Allen Voss' death. On Saturday April 28, 2007, the day before the murder of Cory Allen Voss, VOSS hand delivered to the LFCU Oyster Point branch these two (2) Powers of Attorney documents.

13. On April 29, 2007, RUNYON purchased a .357 caliber revolver in or around Morgantown, West Virginia, and traveled in his vehicle from Morgantown, West Virginia, to Newport News, Virginia, to kill Cory Allen Voss.

14. Around 11:00 p.m., on April 29, 2007, VOSS sent Cory Allen Voss to the the LFCU Oyster Point branch to withdraw $40.00 or $60.00 dollars from the account that VOSS had opened on April 20, 2007, with $5.00. VOSS made two (2) telephone calls from her home to Cory Allen Voss on his cellular phone while he was en route and after he had arrived at LFCU. Cory Allen Voss drove to the LFCU in his 1997 Ford Ranger pick-up truck. The Ford Ranger pick-up truck with Virginia license plate number, JDS-7544, had been transported and shipped in interstate commerce.

15. On or about April 29, 2007, VOSS, DRAVEN and RUNYON communicated with one another by telephone or text message approximately 23 times leading up to the time of Cory Allen Voss's trip to the LFCU. Specifically, DRAVEN placed or received four (4) telephone calls between 10:12 p.m. to 10:16 p.m. to/from RUNYON, as RUNYON stopped at pay telephones off of Interstate 64 in the City of Newport News. During one of these calls or in person, DRAVEN passed on to RUNYON specific details regarding Cory Allen Voss's pick-up truck, including its make and model, and the location of the LFCU where Voss would be that night. The identification details given to RUNYON were found written down on a map of the Hampton Roads area that was subsequently found in RUNYON's vehicle in December 2007.

4

16. On or about April 29, 2007, Cory Allen Voss appeared at the drive-up ATM of the LFCU Oyster Point branch in his Ford Ranger at 11:31 p.m. He first attempted a transaction with a bank card belonging to VOSS, but entered a wrong Personal Identification Number (PIN). Video still shots and phone records reveal Cory Allen Voss talking on his cellular phone to VOSS at this time. At approximately 11:33 p.m., RUNYON, while armed with a firearm, entered Cory Allen Voss's truck while Voss was at the ATM machine at the LFCU and caused Cory Allen Voss at gunpoint to drive around the LFCU building and reenter the ATM drive-up. RUNYON directed Cory Allen Voss to make three attempted withdrawals of United States currency from an automated teller machine at the LFCU. These withdrawals were unsuccessful because sufficient funds did not exist in the account opened by VOSS.

17. Between approximately 11:45 p.m. and midnight on April 29th, RUNYON shot Cory Allen Voss five (5) times in his vehicle in the vicinity of LFCU, within the Eastern District of Virginia. His lifeless body was discovered, riddled with bullets, at approximately 6:45 a.m. on April 30th. A subsequent autopsy report performed by the Virginia Medical Examiner's Office found that the cause of death was three separate gunshot wounds to the chest and abdomen (although the victim was shot five times). Forensics analysis on the bullets found at the crime scene indicated that the rounds were Caliber .38 Class and the markings on the bullets were consistent with that of a .357 magnum revolver, the same type of firearm purchased by RUNYON in West Virginia sometime in the late morning or early afternoon on the day of the murder.

18. During the early morning hours of April 30, VOSS attempted to create an alibi for herself as a concerned wife by calling area hospitals, police, and other numbers trying to find Cory Allen Voss before ultimately calling the police at approximately 6:15 a.m. to report Cory Allen Voss

5

missing. Furthermore, in the early morning hours of April 30, VOSS enlisted her mother to ride around Newport News to search for Cory Allen Voss.

19. On or about May 1, 2007, in the Eastern District of Virginia, VOSS received a $100,000 death gratuity from the United States Navy due to the death of Cory Allen Voss and of that amount deposited $96,100.00 into a Navy Federal Credit Union account. Shortly thereafter, VOSS signed and submitted a claim for the $400,000 SGLI life insurance policy.

20. After receiving this death gratuity payment, VOSS made a number of purchases for and payments to DRAVEN. On May 17, 2007, VOSS purchased a $1,300 cashier's check made payable to DRAVEN. Between on or about May 20, 2007, through on or about May 21, 2007, VOSS purchased over $10,000 in jewelry for DRAVEN and herself during a trip to the Outer Banks of North Carolina financed by VOSS. On May 23, 2007, VOSS paid $5,638 to an apartment complex for six months advance rent for DRAVEN.

21. On June 1, 2007, a Western Union money gram for $275.00 was sent to RUNYON in Morgantown, West Virginia, and was purportedly signed by DRAVEN's brother.

22. On June 11, 2007, VOSS submitted the SGLI Claim for Death Benefits form in connection with Cory Allen Voss' $400,000 life insurance policy. VOSS made repeated inquiries to SGLI as to why these funds were not being disbursed to her. From May 1, 2007 through July 2007, VOSS spent the $100,000 death gratuity benefit.

23. During the investigation by law enforcement authorities into the murder of Cory Allen Voss, VOSS, DRAVEN and RUNYON communicated with one another by e-mail and telephone in order to coordinate false alibis, cover the nature of their relationships and provide false information to law enforcement.

6

 

24. In the early morning hours of December 14, 2007, Newport News Police Department officers arrested VOSS for the murder of Cory Allen Voss. After being advised of her *Miranda* rights, VOSS agreed to speak with law enforcement. VOSS admitted that she and DRAVEN had had an affair and conspired with RUNYON to murder Cory Allen Voss. VOSS stated that she agreed to pay RUNYON $20,000 to murder her husband, but that she refused to pay him after the murder. As a result, RUNYON kept increasing the amount he was owed. VOSS stated that she had not yet paid RUNYON the $20,000 as originally agreed.

25. The acts taken by the defendant, CATHERINA ROSE VOSS, in furtherance of the offenses charged in this case, including the acts described above, were done willfully and knowingly with the specific intent to murder Cory Allen Voss and violate the law.

Respectfully Submitted,

CHUCK ROSENBERG
UNITED STATES ATTORNEY

By: _____
Lisa R. McKeel
Assistant United States Attorney

By: _____
Blair C. Perez
Assistant United States Attorney

By: _____
Brian J. Samuels
Assistant United States Attorney

7

After consulting with my attorneys and pursuant to the plea agreement entered into this date between the defendant CATHERINA ROSE VOSS, and the United States, I hereby stipulate that the above Statement of Facts is a partial summary of the evidence which is true and accurate, and that had the matter proceeded to trial, the United States would have proved the same beyond a reasonable doubt. The defendant further acknowledges that she is obligated under her plea agreement to provide additional information about this case beyond that which is described in this Statement of Facts

_____
CATHERINA ROSE VOSS
Defendant

We are counsel for CATHERINA ROSE VOSS. We have carefully reviewed the above Statement of Facts with her. To our knowledge, her decision to stipulate to these facts is an informed and voluntary one.

_____
Paul G. Gill
Counsel for the Defendant

_____
Gerald Zepkin
Counsel for the Defendant

_____
Larry M. Dash
Counsel for the Defendant

_____
Jeffrey A. Swartz
Counsel for the Defendant

8